Lee Radford, ISB #5719
John E. Cutler, ISB #9907
Daniel Biddulph, ISB #11561
PARSONS BEHLE & LATIMER
350 Memorial Drive, Suite 300
Idaho Falls, Idaho 83402
Telephone:  208.522.6700
Facsimile:  208.522.5111
LRadford@parsonsbehle.com
JCutler@parsonsbehle.com
DBiddulph@parsonsbehle.com
*Attorneys for Plaintiff SRM-Kodiak America, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>                    Plaintiff,<br><br>vs.<br><br>BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., and Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, and Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, and individual; LURENE DILLE, an individual; | Case No. 4:24-cv-00112<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 1
4856-5242-8200.v3

DOE DEFENDANTS I-XX; and ROE
ENTITY DEFENDANTS I-XX

Defendants.

Plaintiff SRM-Kodiak America, LLC, by and through its counsel of record, Parsons Behle & Latimer, hereby complains against Defendants Kodiak America, LLC; Kodiak Northwest, Inc.; BAUB, LLC; Brek Pilling; PFT Enviro Investments, LLC; Brek Pilling, on information and belief, as trustee of the Pilling Family Trust; Budget Truck Center, LLC; Scott Pilling; Sawtooth Industrial, LLC; IIOVIII Precision, LLC; Intermountain Living, LLC; Arthur Sadampi Yamada; Gary Wickersham; Carolyn Shoemaker; Lurene Dille; Doe Defendants I–XX, and Roe Entity Defendants and alleges as follows:

## PARTIES

1.      Plaintiff SRM-KODIAK America, LLC ("**SRM**" or "**Plaintiff**") is an Idaho limited liability company with its principal place of business in Minidoka County, Idaho.

2.      Defendant Brek Pilling ("**Brek**") is an individual who at all relevant times to this Complaint has been domiciled in Idaho.

3.      Defendant Scott Pilling ("**Scott**") is an individual who at all relevant times to this Complaint has been domiciled in Idaho.

4.      Defendant Kodiak America, LLC ("**Sold Kodiak**") is a Delaware limited liability company with its principal place of business in Minidoka County, Idaho.

5.      Defendant Kodiak Northwest, Inc. ("**Kodiak Northwest**") is an Idaho corporation.

6.      Defendant BAUB LLC ("**BAUB**") is an Idaho limited liability company with its principal place of business in Minidoka County, Idaho.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 2
4856-5242-8200.v3

7.     Defendant PFT Enviro Investments, LLC ("**PFT**") is an Idaho limited liability company with its principal place of business in Minidoka County, Idaho.

8.     Defendant Budget Truck Center, LLC ("**Budget Truck**") is an Idaho limited liability company with its principal place of business in Minidoka County, Idaho.

9.     Defendant Sawtooth Industrial, LLC ("**Sawtooth**") is an Idaho limited liability company with its principal place of business in Blaine County, Idaho.

10.    Defendant IIOVIII Precision, LLC ("**IIOVIII**") is an Idaho limited liability company with its principal place of business in Blaine County, Idaho.

11.    Defendant Intermountain Living, LLC ("**Intermountain Living**") is an Idaho limited liability company with its principal place of business in Minidoka County, Idaho.

12.    Defendant Brek Pilling is also, on information and belief, trustee for the Pilling Family Trust ("**Brek as Trustee**"), which on information and belief is an Idaho trust. The Pilling Family Trust is listed as the purported manager of PFT. Thus, Brek Pilling is also a defendant in his capacity as trustee of the purported manager of PFT.

13.    Defendant Arthur Sadampi Yamada ("**Yamada**") is an individual. On information and belief, Yamada is domiciled in Canada. But in filings with the state of Idaho Yamada identifies himself as a member of Sawtooth and its registered agent with an address located at 930 Snowflake Dr., Hailey, Idaho 83333-8474.

14.    Defendant Gary Wickersham ("**Wickersham**") is an individual who at all relevant times to this Complaint has been domiciled in Idaho.

15.    Defendant Carolyn Shoemaker ("**Shoemaker**") is an individual who at all relevant times to this Complaint has been domiciled in Idaho.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 3
4856-5242-8200.v3

16.     Defendant Lurene Dille ("**Dille**") is an individual who at all relevant times to this Complaint has been domiciled in Idaho.

17.     Additional individuals and entities yet to be fully identified have aided and conspired with the named defendants in violation of SRM's rights.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over the claims arising under 18 U.S.C. § 1836(c), 18 U.S.C. § 1964(c), and 28 U.S.C. § 1331.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims are so related to Plaintiff's federal law claims that they form part of the same case or controversy.

20.     Venue is proper in the District of Idaho pursuant to 28 U.S.C. § 1391(b)(1) and (2) because most of the defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

### SRM'S Contract with Sold Kodiak, BAUB, and Brek.

21.     Sold Kodiak was a custom manufacturer of commercial snow removal equipment, whose product line included, among other items, snow blowers, runway sweepers, push plows, and railway blowers. Sold Kodiak manufactured equipment for overseas customers as well as customers across the United States—primarily servicing government clients.

22.     On September 22, 2021, SRM Holdings, LLC formed SRM-KODIAK America, LLC (defined *supra* as "SRM") to facilitate the purchase of certain Sold Kodiak assets.

23.    On September 29, 2021, SRM entered an agreement with Sold Kodiak, BAUB, and Brek ("**Asset Purchase Agreement**"). The Asset Purchase Agreement closed the same day, September 29, 2021.

24.    The terms of the Asset Purchase Agreement are confidential and are therefore not disclosed or attached to this complaint. But they are incorporated herein as the basis for the allegations of this complaint.

25.    Brek, Sold Kodiak, and BAUB intentionally (both affirmatively and by omission) misrepresented information in connection with the Asset Purchase Agreement, transactions contemplated in the Asset Purchase Agreement, and ancillary agreements entered in connection with the Asset Purchase Agreement.

26.    The willful and intentional misrepresentations include but are not limited to the following: (a) understatement of liabilities that SRM was to assume under the Asset Purchase Agreement; (b) concealment (and unlawful retention) of revenue that SRM was entitled to receive under the Asset Purchase Agreement; and (c) maintenance (and production of) accounting information that was incomplete, misleading, and out of compliance with generally accepted accounting practices.

27.    The willful and intentional misrepresentations have caused damage to SRM in ways that are still developing and playing out in real time, but they include (without limitation) damages arising from at least the following contracts.

    a.    Sold Kodiak, Brek, and BAUB have caused more than one million dollars in damages to SRM through their unlawful retention of money due to SRM under the terms of the Asset Purchase Agreement and a contract with the Nevada Department of Transportation. The contract is colloquially known by SRM, Sold Kodiak, Brek, and BAUB as "Nevada 7."

Documents in the parties' possession show that the Nevada Department of Transportation paid invoice # 005038 by check in October 2021 and the full amount of the payment, more than one million dollars, was deposited into a commercial Wells Fargo bank account owned by Sold Kodiak. These funds should have been immediately conveyed to SRM under the terms of the Asset Purchase Agreement. However, Sold Kodiak, Brek, and BAUB wrongfully retained this money.

b.      SRM was similarly damaged by Sold Kodiak, Brek, and BAUB, with respect to another contract known colloquially as "City of Lubbock." The damages to SRM accrued from at least two distinct sources (i) the use of improper accounting methods by Sold Kodiak, Brek, and BAUB, with respect to the City of Lubbock contract, and (ii) the unlawful retention of over $500,000 improperly paid to Sold Kodiak in 2022 that should have been delivered to SRM after SRM finished and delivered the equipment under the City of Lubbock contract.

c.      SRM was damaged by Sold Kodiak, Brek, and BAUB with respect to a contract colloquially known by the parties as "City of Chicago." Sold Kodiak, Brek, and BAUB, caused roughly a million dollars in damages by intentionally misrepresenting the books and records of Sold Kodiak with respect to the City of Chicago contract. Specifically, the books and records of Sold Kodiak should have but did not acknowledge an advance payment on the City of Chicago contract for almost one million dollars as unearned revenue. In failing to recognize that this revenue was unearned, SRM inherited the obligation to perform the City of Chicago contract but wrongfully did not receive the one-million-dollar advance payment made by the City of Chicago towards the ultimate purchase price of the machines under the contract.

28.     Sold Kodiak, Brek, and BAUB's intentional misrepresentations (both affirmative and by omission) with respect to the books and records of Sold Kodiak have caused substantial additional damages including (but not limited to) damages arising from misrepresented valuation and tracking of inventory.

29.     Sold Kodiak's QuickBooks accounting records show that there were substantial alterations to the accounting made after closing, and on information and belief, these changes reflect efforts by Sold Kodiak, Brek, and BAUB to conceal the unlawful receipt and retention of money that should have been paid directly to SRM.

30.     As a component of the Asset Purchase Agreement, Sold Kodiak, Brek, and BAUB assigned to SRM all benefits of an international joint venture with a Chinese company. Just as Sold Kodiak, Brek, and BAUB, wrongfully retained money due for domestic contracts under the asset purchase agreement, they also wrongfully received and retained money due to SRM under international contracts related to the joint venture, including contracts with foreign governments. On information and belief, the funds wrongfully retained by these defendants exceed one-million-dollars.

31.     Under the terms of that agreement, SRM acquired from Sold Kodiak, among other assets, the Kodiak America name, all intellectual property, books, records, data, ledgers, files, documents, correspondence, customer lists, customer accounts, referral sources, drawings, specifications, and creative materials.

32.     Sold Kodiak was required to change the name of its LLC so that it no longer used the "Kodiak" or "Kodiak America" name, but it failed to do so.

33.     Under the Asset Purchase Agreement, Sold Kodiak, Brek, and BAUB, agreed to an expansive non-competition provision, and they have not honored that agreement. Sold

Kodiak, Brek, and BAUB have been integrally involved with Scott Pilling—Brek's son—in Scott's theft of SRM intellectual property, impersonation of SRM to its clients, operation of a competing snow removal manufacturing and service business, and (on information and belief) the unlawful export of SRM intellectual property from the United States to the foreign company Elecon Engineering in India.

34.    The Asset Purchase Agreement provided that SRM would enter a subscription agreement to purchase equity in PFT, an Idaho limited liability company. SRM entered into the subscription agreement as provided in the Asset Purchase Agreement.

35.    SRM also timely paid the full purchase price of Sold Kodiak set forth in the Asset Purchase Agreement.

36.    Under the Asset Purchase Agreement, SRM was given an expansive right of setoff that permits SRM in good faith to set off damages it has incurred through the defendants' breach of the Asset Purchase Agreement against its obligations under the related subscription with PFT.

37.    SRM timely and in good faith gave notice (on multiple occasions) to Sold Kodiak, Brek, and BAUB of the breaches of the Asset Purchase Agreement and SRM's corresponding intent to stop payment on its obligations under the subscription agreement. Under the terms of the Asset Purchase Agreement, SRM's lawful exercise of its setoff right means it is not in breach of the subscription agreement.

38.    Before it exercised its right of setoff, SRM had contributed millions of dollars to PFT under the subscription agreement.

39.    The stated purpose of PFT is to conduct lawful business in any jurisdiction in which it does business.

40.    SRM and Brek Pilling are the members of PFT.

41.    Brek Pilling was the original manager of PFT but as of May 2023, Brek Pilling filed a report with the Idaho Secretary of State indicating that the Pilling Family Trust is now the manager of PFT.

42.    On information and belief, no meeting and no vote was held to change the manager from Brek Pilling to someone else—including the Pilling Family Trust—as would have been required by the Operating Agreement.

43.    Under the operating agreement, self-interested transactions must be fair to PFT or the disinterested member.

44.    SRM is the only member that has made positive capital contributions to PFT. Brek Pilling has made no capital contributions to PFT.

45.    Yet, since SRM's original contributions, Brek Pilling has used the assets of PFT for no lawful business, and he has instead siphoned funds to his personal accounts for his personal use.

46.    In addition to his personal use of funds contributed for the lawful business of PFT, Brek has loaned money to other companies that he has interest in (and SRM does not) on terms that are not commercially reasonable and appear instead designed to further siphon money from PFT for Brek's personal gain.

47.    Brek, and on information and belief the Pilling Family Trust, have managed PFT in a manner designed to oppress SRM—the only party who has made any financial contribution to the entity.

**Scott's Employment with SRM**

48.     Among the terms of the Asset Purchase Agreement, Sold Kodiak was to terminate all of its employees immediately prior to closing and to use commercially reasonable efforts to cause each of its employees that SRM desired to hire to accept SRM's offer of employment.

49.     Scott was among the Sold Kodiak employees that SRM desired to continue working with.

50.     Scott agreed to continue working with SRM in or around September 2021 and thereafter worked with SRM through June 29, 2023.

51.     On August 1, 2022, Scott signed an "Independent Contractor Agreement."

52.     During Scott's tenure, he was the President of SRM.

53.     Under the Independent Contractor Agreement, Scott agreed to an expansive confidentiality provision prohibiting any disclosure of SRM's "internal operations and procedures, finances, strategies, pricing, compensation and other personnel information, client lists and contact information, sales lists, technology, source codes, programs, costs, plans, systems, inventions, developments, and trade secrets of every kind and character, whether or not they constitute a trade secret under applicable law, including such of the foregoing developed by Contractor while performing Services pursuant to this Agreement."

54.     In his role as President, Scott also agreed to ensure enforcement of the Snake River Manufacturing Employee Handbook ("Employee Handbook").

55.     In his position as the President of SRM, Scott had unfettered access to SRM's proprietary and confidential information, including, without limitation, its trade secrets and financial information and documents—a fact he acknowledged in his Independent Contractor Agreement.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 10
4856-5242-8200.v3

56. Scott's position also afforded him significant public exposure, including, without limitation, to SRM's customers, prospective customers, suppliers, and distributors.

57. Additionally, Scott's position afforded him significant contact with and leadership over SRM's other employees.

58. Scott voluntarily terminated his employment with SRM on June 29, 2023.

**Wickersham's Employment with SRM**

59. Wickersham was also among the Kodiak America, LLC employees that SRM desired to hire after purchasing the company's assets in September 2021.

60. Wickersham accepted SRM's offer of employment in or around September 2021 and was thereafter employed by SRM through August 11, 2023.

61. Wickersham voluntarily terminated his employment with SRM on August 11, 2023.

62. At the time of Wickersham's voluntary termination of employment with SRM, Wickersham was SRM's service manager.

63. In his position as SRM's service manager, Wickersham had access to company computers and email as well as other proprietary information related to his employment.

**Shoemaker's Employment with SRM**

64. Shoemaker was also among the Kodiak America, LLC employees that SRM desired to hire after purchasing the company's assets in September 2021.

65. Shoemaker accepted SRM's offer of employment in or around September 2021 and was thereafter employed by SRM through January 31, 2023.

66. Shoemaker voluntarily terminated her employment with SRM on January 31, 2023.

67.     At the time of Shoemaker's voluntary termination, she was an accountant with SRM.

68.     In her position as an accountant, Shoemaker had access to SRM's confidential and proprietary business information, including its accounting and other financial records.

69.     On information and belief, prior to the termination of her employment with SRM, Shoemaker violated SRM's company policies and her duty of loyalty to SRM as its employee through her unauthorized use of external USB storage device(s) to make and take a complete copy of the files on her SRM computer when she left—essentially stealing a host of SRM files.

**Dille's Employment with SRM**

70.     Dille was also among the Kodiak America, LLC employees that SRM desired to hire after purchasing the company's assets in September 2021.

71.     Dille accepted SRM's offer of employment in or around September 2021 and was thereafter employed by SRM through January 31, 2023.

72.     Dille voluntarily terminated her employment with SRM on January 31, 2023.

73.     At the time of Dille's voluntary termination, she was an accounting clerk with SRM.

74.     In her position as an accounting clerk, Dille had access to SRM's confidential and proprietary business information, including its accounting information.

75.     While employed and working for SRM, Dille continued to also work for Brek and Sold Kodiak. On information and belief, Sold Kodiak accounting records show that Dille made changes to the Sold Kodiak books and records after the closing that appear designed to conceal (a) Brek's unlawful retention of money that was due to SRM under the Asset Purchase Agreement, and (b) Brek's improper and incomplete accounting practices.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 12
4856-5242-8200.v3

**Intermountain Living**

76.     Brek is identified as a member of Intermountain Living, LLC, on its January 6, 2022, filings with the Idaho Secretary of State. And Scott is identified as the manager of Intermountain Living.

77.     On information and belief, Scott is also a member of Intermountain Living, LLC, as this is the entity through which he insisted on receiving his compensation under his Independent Contractor Agreement with SRM.

**Formation of Sawtooth**

78.     Sawtooth's Certificate of Organization was filed with the State of Idaho, Office of the Secretary of State on April 10, 2023.

79.     Sawtooth's Certificate of Organization names Yamada as a Governor and the Organizer and Registered Agent.

80.     On information and belief, Yamada's full legal name is Arthur Sadampi Yamada.

81.     Sawtooth's April 10, 2023, Certificate of Organization lists the "Principal Office Address," "Mailing Address," and the address for the "Registered Agent" both "Physical" and "Mailing" as:

SADAMPI
930 SNOWFLAKE DR
HAILEY, ID 83333-8474

82.     On April 17, 2023, Sawtooth filed an Amendment to its Certificate of Organization, changing its "Principal Office Address" and its "Mailing Address" to:

ARTHUR SADAMPI YAMADA
930 SNOWFLAKE DR.
HAILEY, ID 83333-8474

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 13
4856-5242-8200.v3

83. The April 17, 2023, Amendment to Sawtooth's Certificate of Organization also lists Yamada as a Member of the company and Authorized Person.

84. Both the April 10, 2023, Certificate of Organization and the April 17, 2023, Amendment to the Certificate of Organization list Yamada's personal address as:

> 930 SNOWFLAKE DR.
> HAILEY, ID 83333-8474

**Formation of IIOVIII**

85. IIOVIII's Certificate of Organization was filed with the State of Idaho, Office of the Secretary of State on April 22, 2023.

86. IIOVIII's Certificate of Organization names Yamada as the Organizer and Registered Agent as well as a Governor.

87. IIOVIII's Certificate of Organization lists the "Mailing Address" and the address for the "Registered Agent" both "Physical" and "Mailing" as:

> 930 SNOWFLAKE DR
> HAILEY, ID 83333

88. IIOVIII's Certificate of Organization lists the "Principal Office Address" as:

> 50 E ELLIS ST
> PAUL, ID 83347

89. The Minidoka County property records show that 50 E. Ellis St., Paul, Idaho 83347 is owned by Kodiak Northwest, Inc. and lists the mailing address as

> C/O BAUB, LLC
> 251 Nevada St.
> Heyburn, Idaho 83336

90. On information and belief, Sawtooth also operates out of the 50 E. Ellis St. Property, which is owned by Kodiak Northwest, Inc.—of which Brek Pilling is a principal owner.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 14
4856-5242-8200.v3

91.    And, on information and belief, the 50 E. Ellis St. Property is insured under Kodiak America, LLC and BAUB, LLC.

**First Predicate Act Example: Fraud through the Mails and Wires with Respect to SRM's Contract Number 140P8423P0020 with the National Park Service.**

92.    Scott knew that he was planning on terminating his employment well in advance of June 29, 2023, and acted in a manner that intentionally deprived SRM of valuable revenue.

93.    On Tuesday, April 18, 2023, at approximately 10:04 a.m., the National Park Service, a bureau of the Department of the Interior for the United States Government ("**NPS**"), emailed Scott at his then SRM email address awarding SRM with Purchase Order No. 140P8423P0020.

94.    Purchase Order 140P8423P0020 is a $53,109.32 contract awarded to SRM for it to perform upgrades to a Kodiak America blower gear box on a machine previously purchased by NPS and used at Lassen Volcanic National Park.

95.    Lassen Volcanic National Park is located in Northern California.

96.    That same day, on April 18, 2023, at approximately 11:11 a.m., Scott responded to NPS from his SRM company email address stating,

> We are working through restructuring and preparation for this project to make sure we can accommodate this work. Please cancel and I will be in touch for a re-issuing of an award when we are ready to receive.
>
> Thank you
>
> Scott Pilling
> President
> SRM-Kodiak

97.    Scott's statement to NPS that SRM was "working through restructuring" was knowingly false and was intended to deceive NPS.

98.    There was no restructuring going on at SRM that would have affected this purchase order.

99.    Also on April 18, 2023, at approximately 11:13 a.m., just minutes after instructing NPS to cancel the award, Scott emailed NPS again from an unknown outlook.com email address.

100.    On information and belief, the unknown outlook.com email address is one of Scott's personal email addresses.

101.    The April 18, 2023 email included the subject: "Sawtooth Industrial" and, in the body, stated the following:

> Thank you for the call. Please email me what you need. Our Sam.gov credentials should be issued soon.
>
> As mentioned, we are splitting departments. The service department will remain under my oversight. The same techs will be performing the work. The company credentials will be the different item.
>
> Thank you
>
> Scott Pilling
> President
> SRM-Kodiak

102.    Scott's statements that SRM was "splitting departments," that the "service department [would] remain under [his] oversight," that "[t]he same techs [would] be performing the work," and only the "company credentials [would] be the different item," were intended to deceive NPS into believing that the new business entity was part of SRM.

103.    The following day, on April 19, 2023, at approximately 11:23 a.m., NPS relied upon Scott's false statements and emailed Scott requesting that he "please sign the modification for the termination of the contract. Please sign box 15a, 15b, and 15c and return as soon as possible."

104.    Also on April 19, 2023, at approximately 11:15 p.m., Scott responded to NPS, filling out and signing the requested boxes as follows:

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | |
| --- | --- |
| Scott Pilling, President | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED |
| *(Signature of person authorized to sign)* | 4-19-23 |

105.    Nearly two-and-half months later, on Tuesday, June 27, 2023, two days before he voluntarily terminated his employment with SRM, Scott emailed NPS from his new Sawtooth email address, scott@sawtoothindustrial.com. Scott's email included the subject: "Blower repair po," and the body of the email stated, "Please use this email going forward. Please send modified PO here."

106.    Later that same day, on June 27, 2023, NPS responded to Scott's Sawtooth email address and asked for Scott to "please provide company name and UEI for me to start working on this modification."

107.    Two days later, on June 29, 2023, the day Scott voluntarily terminated his employment with SRM, Scott responded to NPS stating the following:

> Company Name: Sawtooth Industrial LLC
> UEI XC48A5RKTLE7

108.    On July 22, 2023, Scott contacted NPS again from his Sawtooth email address asking whether there was "any update on the PO?" In the same email, Scott further stated, "The blower is ready for pickup. I could come out next week to get it if we could get a PO issued."

109.    On July 13, 2023, Scott emailed again following up on the status of the modified PO from SRM to Sawtooth stating,

I'm just checking in again on the issuing of this PO. I could come
out on the 25th to pick it up if we could that PO.
If you could please give me an update that would be great.

110.    That same day, on July 13, 2023, relying on Scott's previous false statements,
NPS responded telling Scott that he could pick up and begin working on the machine but that he
could not submit any invoices until the modification to change company name and UEI was
executed and NPS gave Scott the green light.

111.    That same day, July 13, 2023, Scott responded asking, "Do you have a timeline
for when you could give me the green light?"

112.    Later that same day, on July 13, 2023, NPS responded to Scott stating, "I am not
sure as this will need to go thru [sic] legal review but I will keep you updated as I get
information."

113.    On July 18, 2023, approximately three weeks after Scott's voluntary termination
with SRM, NPS inadvertently emailed a Novation Agreement Letter to Scott's previous SRM
company email address spilling@srm-mfg.com, stating, in relevant part:

> Dear Mr. Pilling,
>
> We are in receipt of your written request to recognize Sawtooth
> Industrial LLC, as a successor in interest to Contract No.
> 140P8423P0020 … we request that your firm, SRM-KODIAK
> AMERICA, LLC, submit the information necessary to evaluate the
> proposed agreement for recognizing a successor in interest….

114.    On or around July 26, 2023, Scott travelled from Idaho to 38050 Highway 36
East, Mineral, California 96063, took possession of NPS's machine, and transported it to Idaho
to begin the work required under Contract No. 140P8423P0020.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 18
4856-5242-8200.v3

115.    Scott took the NPS's machine to 50 E. Ellis St., Paul, Idaho 83347, where Sawtooth was conducting its operations—this address being the same building owned by Brek's company Kodiak Northwest, Inc. and insured by both Kodiak Northwest, Inc. and BAUB, LLC.

116.    After receiving no response from Scott's previous SRM company email address, on July 29, 2023, NPS emailed Scott's Sawtooth email address, scott@sawtoothindustrial.com, asking Scott whether he had received the novation agreement to modify the awarded contract from SRM to Sawtooth.

117.    That same day, on July 29, 2023, Scott responded to NPS stating, "No, I have not received it."

118.    On July 31, 2023, Scott responded to NPS again asking "can you please resend?"

119.    On July 31, 2023, NPS sent the Novation Agreement to Scott at his Sawtooth email address stating, "Here you go Scott."

120.    Eight days later, on August 8, 2023, Scott responded to the Novation Agreement Letter stating,

> Sawtooth Industrial is not a successor to SRM Kodiak. Snake River Manufacturing (SRM) acquired certain assets from Kodiak America (Including the name) in 2021. The name was officially changed to SRM-Kodiak. Since that time, Snake River Manufacturing has lost ever manufacturing employee in their snow blower sector, does not have a service department, or a parts department. They have changed direction as a company and are no longer able to provide service work, such as this gearbox upgrade to the Park's snow blower.
>
> Sawtooth Industrial is not affiliated with SRM-Kodiak. We are the original group of Kodiak Employees that have continued to service and provide parts for Kodiak equipment. I won't be able to fill out this paper because we are not a successor. Please let me know how you'd like to move forward. There is nobody @ SRM-Kodiak that can perform the work on this snow blower, everybody who worked

at Kodiak works for Sawtooth Industrial. I know this may seem complicated, please call me for further clarification.

121.    Scott's response admits that this original statements to NPS were false and misleading when he acknowledged that Sawtooth Industrial was "not a successor to SRM Kodiak."

122.    But, as with the previous representations to NPS in his August 8, 2023, email, Scott knowingly made yet more materially false statements with the express intent of completing his plan to steal SRM's contract with NPS.

123.    SRM had not and has not "lost every manufacturing employee in [its] snow blower sector."

124.    SRM had and continues to have a service department and a parts department.

125.    SRM never "changed direction as a company" such that it was "no longer able to provide service work, such as [the] gearbox upgrade to [NPS's] snow blower."

126.    Scott knew that his statement that "[t]here is nobody @ SRM-Kodiak that can perform the work on this snow blower, everybody who worked at Kodiak works for Sawtooth Industrial" was materially false.

127.    Contrary to Scott's assertions, SRM's service and parts departments continue, and they provide the parts and service previously offered, including the gearbox upgrade pertaining to NPS Contract No. 140P8423P0020.

128.    Based on Scott's false statements, on August 9, 2023, at approximately 1:02 p.m., NPS responded to Scott's email explaining that its plan was to cancel the award to SRM and reissue the award to Sawtooth. NPS then asked Scott if he "still ha[d] access to SRM Kodiak so [NPS] c[ould] canccel [sic] the award" and, if not, whether Scott knew "who [NPS] c[ould] reach out to for this?"

129.    Scott, acting in concert with Wickersham, responded to NPS that same day on August 9, 2023, at approximately 4:09 p.m. First Scott tried to convince NPS not to contact SRM at all, but then stated that if it "had to," it should contact then current SRM employee, Wickersham, who was leaving SRM two days later to work for Scott at Sawtooth. Scott stated,

> I still worked at SRM-Kodiak when the award was made, but because of this whole transfer issue, it was never put into their system. To-Date, SRM-Kodiak does not have anything in their system about this job, so I don't think you'd have to reach out. If you had to, reach out to gwickersham@srm-mfg.com. I think Gary's last day is Friday and they don't have a replacement. I'm not sure who else to reach at the company, nobody really works in their snow blower division anymore. If you were able to send to gary [sic] tomorrow am, he would get it.

130.    On information and belief, before Scott directed NPS to contact Wickersham, Scott and Wickersham conspired with the intent to deprive SRM of revenue it was legally entitled and to redirect such revenue to Sawtooth for their own personal gain.

131.    Just a few minutes later, on August 9, 2023, at 4:26 p.m., NPS emailed Gary Wickersham on his SRM company email address, attaching a termination of NPS Contract No. 140P8423P0020 and asking for him to fill and sign boxes 15A, 15B, and 15C on behalf of SRM.

132.    Again, just minutes later, on August 9, 2023, at approximately 5:05 p.m., Gary Wickersham responded to NPS's email with no questions, only attaching the executed termination of NPS Contract No. 140P8423P0020, and filling boxes 15C, 15B, and 15C as follows:



VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 21
4856-5242-8200.v3

133. SRM was unaware of Wickersham's receipt of the NPS email, and it did not authorize Wickersham to sign the termination on its behalf.

134. On information and belief, Wickersham signed the contract at Scott's direction with the specific intent of denying SRM the benefits of its contract with NPS and directing those benefits instead to Sawtooth.

135. The following day, August 10, 2023, NPS contacted Scott again to confirm Sawtooth's company information for purposes of awarding Contract No. 140P8423P0020 to Sawtooth.

136. NPS asked whether the below information was correct:

**SAWTOOTH INDUSTRIAL LLC**

ⓘ This entity record is only available FOR OFFICIAL USE ONLY.

| | | |
|---|---|---|
| Unique Entity ID<br>**XC48A5RKTLE7** | Registration Status<br>● Active Registration | Expiration Date<br>May 12, 2024 |
| CAGE/NCAGE<br>**9KK63** | Purpose of Registration<br>**All Awards** | |
| Physical Address<br>**930 Snowflake DR<br>Hailey, Idaho<br>83333-8474, United States** | Mailing Address<br>**930 Snowflake DR<br>Hailey, Idaho<br>83333-8474, United States** | |

137. Minutes later, Scott responded, "Yes."

138. On August 10, 2023, having become aware of the Novation Agreement Letter sent by NPS to Scott's previous SRM company email address, SRM sent a letter to NPS with subject line, "Wrongful Request for Novation — Contract No. 140P8423P0020, Kodiak Blower Gear Box Upgrade Repair Services for Lasen Volcanic Nation Park."

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 22
4856-5242-8200.v3

DocuSign Envelope ID: 56BDF8C4-49D9-42E3-8460-7FFC643DC605

139.   In the letter, SRM informs NPS that Scott no longer worked for SRM and that it was not affiliated in any way with Sawtooth. SRM stated its belief that Scott "Pilling ha[d] made material misrepresentations to [NPS] in effort to fraudulently procure Contract No. 140P8423P0020."

140.   SRM further informed NPS that contrary to any claims propagated by Scott, SRM is fully committed and prepared to fulfill NPS's purchase order.

141.   On August 10, 2023, at approximately 5:15 p.m., NPS told Scott to "stop all work on the snow blower at this time."

142.   Minutes later Scott responded stating, "We are pretty far into this build … [c]ould you please provide any Insight [sic] for the pause."

143.   Having received no response, four days later, on August 14, 2023, Scott wrote to NPS again "looking for an update" and further stating, "We have quite a bit of work into this but quite a lot left. We are trying to get this back to the park asap. Please provide any update that you can."

144.   On August 16, 2023, NPS sent a letter to Scott and Sawtooth stating that Scott and Sawtooth had taken possession of its machine under false pretenses.

145.   In its August 16, 2023 letter to Scott and Sawtooth, NPS explained that it had come to their attention that Sawtooth is not affiliated with SRM in any way "and thus should not be performing repairs on the blower. The contract for these repairs was awarded to SRM-Kodiak America, LLC and they are the only company authorized to repair the equipment."

146.   The August 16, 2023 letter from NPS to Scott and Sawtooth further provides,

> When the equipment was picked up by Sawtooth Industrial LLC it was with the understanding that the two companies were closely affiliated and a novation agreement would be prepared by the

contractor to transfer the contract to the new company. However, at this time it appears the equipment was obtained by Sawtooth Industrial LLC under false pretenses.

147.    NPS further demanded for the equipment to be "immediately returned to the park" and for shipping information to be provided showing the equipment was enroute.

148.    That same day, on August 16, 2023, Scott responded to NPS's letter via email falsely stating that "it was never communicated to anybody at the park that sawtooth was a part of Kodiak," and further stating, "We have parts built, the machine torn apart … and further work without compensation from the park would be problematic."

149.    Scott and Wickersham's fraudulent use of the mails and/or wires caused serious delay in the performance of the work needed on the NPS machine, damaging both NPS and SRM in its ability to perform the work contracted for with NPS.

150.    In a tacit admission of its unlawful receipt and retention of the NPS machine, Sawtooth and Scott eventually delivered the NPS machine to SRM, but it was missing essential components—causing SRM to incur substantial damages in conducting the repairs and modifications required under the NPS contract.

151.    On information and belief, Scott and others acting in concert with him, have used stolen SRM customer data and contacts to make the same representations made to NPS to other SRM customers—claiming that SRM no longer has the ability to service Kodiak snow blowers or similar equipment and that Sawtooth, Scott, or others acting in concert with them are now the only ones capable of performing necessary work for SRM's customers.

DocuSign Envelope ID: 56BDE8C4-49D9-42E3-8460-7FEC643DC605

**Second Predicate Act Example: Misappropriation of SRM's Trade Secrets, and Corresponding Fraud through the Mail and the Wires Employing SRM's Trade Secrets for the Benefit of Their Criminal Enterprise.**

152. Scott, Shoemaker, and Dille stole SRM's Intellectual Property ("IP") and other proprietary and confidential business records before voluntarily terminating their respective employments with SRM.

153. Since voluntarily terminating their respective SRM employments, Scott along with IIOVIII and Sawtooth, have repeatedly and knowingly used SRM's stolen IP and other proprietary and confidential business records to further their own economic interests.

154. For example, Scott through IIOVIII, by means of electronic communications over the wires, has requested quotes and sent purchase orders to Christensen Machine, Inc. ("CMI") for CMI to perform custom manufacturing of SRM's parts.

155. On August 31, 2023, an agent of IIOVIII sent a purchase order to CMI for CMI to custom manufacture a part owned by SRM.

156. On September 14, 2023, an agent of IIOVIII, with Scott's approval and knowledge, sent four parts schematics to Christensen Machine, Inc. ("CMI"), asking for manufacturing quotes of the same.

157. The four parts schematics are SRM's IP.

158. As part of the fraudulent scheme carried out through the mail and wires Scott, IIOVIII, or someone acting in concert with them knowingly removed references to "Kodiak" and other identifying marks in the schematics before sending them over the wires in an effort to conceal the fact that the drawings had been stolen from SRM.

159. Nonetheless, these defendants missed at least one reference to Kodiak, as one of the schematics still inconspicuously stated the following, "NOTE: DRILL HOLES AT KODIAK PLANT LOCATION."

160. Scott and IIOVIII possessed these schematics through the theft of SRM's IP and other proprietary and confidential information carried out by Scott and others acting in concert with him.

161. SRM had not licensed or otherwise authorized anyone at IIOVIII to possess or use SRM's IP.

162. On information and belief, all or a substantial portion of the business conducted by IIOVIII and Sawtooth is premised on the use of SRM's stolen IP and other proprietary and confidential information to service and upgrade Kodiak machines. And the business is carried forward through fraud using the mail and wires to deceive SRM's customers into believing that Scott, IIOVIII, Sawtooth, and others acting in concert with them are the only ones able to service, upgrade, and maintain Kodiak machines and that SRM is not in that business any longer.

**Third Predicate Act Example: Use of SRM IP and False Statements with Elecon**

163. While working as SRM's president, in November 2022, Scott began corresponding with individuals at a company in India known as the Elecon Group of Companies ("Elecon") about a collaboration under which Elecon would provide manufacturing services in India for 50 Snow Cutters required by the Indian Armed Forces.

164. The correspondence between Scott and Elecon representatives took place using Scott's SRM email: spilling@srm-mfg.com.

165. Elecon advised that the Indian government has a preference for purchase of machines that have at least 50% of the work performed within India.

166.    Elecon provided Scott, as president of SRM, the technical specifications for the snow cutters and blowers, and it advised that under the specifications at least 60% of the manufacturing would need to be done in India.

167.    Scott spoke with representatives of Elecon in a virtual meeting held in late November 2022.

168.    In follow up to the virtual meeting, Elecon representatives advised of the "following needs to take the proposal forward:"

> a. Selection of the suitable product (and variants) that will offer full compliance to the technical specifications of the requirement.
> b. Formulation of the process (sourcing, localization of the components/assemblies, integration etc) to achieve 60% indigenization of the product value[.]
> Cost optimization with a view to be lowest bidder in the tenders floated by various agencies[.]

169.    Elecon requested "another round of discussion after the idea has got traction with your management."

170.    Scott did not advise SRM's management of his communications with Elecon. Instead, on information and belief, he knowingly withheld this opportunity from SRM management and instead conspired with others including but not limited to Brek and Yamada to personally benefit from this opportunity to the exclusion of SRM—by setting up new companies including Sawtooth and IIOVIII to use stolen SRM IP and other confidential, proprietary business information in a partnership with Elecon.

171.    Evidence of this fraudulent scheme is included in the same email chain that Scott had been having with Elecon through his SRM email.

172.    After the late November meeting, Elecon had asked for a follow up call on December 8, 2022, "after the idea has got traction with your management."

173.    But Scott did not respond to this email.

174.    So Elecon followed up on December 9, 2022, proposing a December 12th meeting instead.

175.    Again, Scott did not respond to the email.

176.    Once more, Elecon followed up on January 5, 2023, requesting a meeting on January 9, 2023.

177.    In direct violation of duties to SRM, as its president, Scott did not respond.

178.    On January 24, 2023, Elecon tried again to follow up: "Dear Scott, Can we connect for discussion anytime soon …..???"

179.    Scott finally responded on January 26, 2023, but rather than advance SRM's interests, he furthered his own interests in deceiving Elecon and stealing this opportunity for himself and others with whom he was conspiring. Specifically, Scott wrote the following:

> Gagan, I wrote you an email from my personal email. Please respond there. We are going through some company email changes for a little bit and I've [sic] having problems with my email.
>
> Look forward to talking with you. Thank you

180.    Scott knew that SRM had not authorized him to use his personal email rather than his company email to conduct SRM business. Scott's statements to Elecon's representative were knowingly false and intended to deceive Elecon into working with him—and those with whom he was conspiring—rather than with SRM.

181.    Scott continued to correspond with Elecon representatives using both his SRM email and his personal email.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 28
4856-5242-8200.v3

182.    In a January 31, 2023, email sent from Scott's personal email that (inadvertently) included Brek's former SRM email, Scott thanked Elecon representatives for meeting with him and promised to "stay in touch on our trip to India."

183.    Scott directed Elecon representatives to "continue communication on this specific email chain moving forward." Scott made this statement because he wanted to ensure that SRM was not aware of his efforts to use SRM IP (and other confidential, proprietary business information) for his personal gain and the gain of those with whom he was conspiring—including (on information and belief) Brek, Yamada, Sawtooth, and IIOVIII.

184.    Scott, Brek, Yamada, Sawtooth, and IIOVIII conducted a substantial portion of their fraudulent activities within the United States in a manner that impacts interstate commerce.

185.    SRM management became aware of Scott's fraudulent activities near the time he left SRM. And by email on June 14, 2023, SRM advised Col. Gagan Deep Sing Rupaal (Retd) Head – Land Systems at Elecon that SRM had become aware of Brek and Scott's contact with Elecon "about manufacturing Kodiak America snow blowers in India." And SRM advised "that neither Brek nor Scott have any ownership in Kodiak America or it's [sic] technology and whatever information they possess it by illegal means."

186.    Elecon's representative Col Gagan Deep Singh Rupaal (Retd) Head – Land Systems at Elecon responded by reference to the November 2022 communications with Scott— advising that Elecon "had approached Kodiak with a proposal to have indigenous manufacture of the Snow Cutter and Blower equipment, and was replied to by Scott."

187.    In this same period, SRM advised Brek, through his attorney David Gadd, of Brek's involvement in the fraudulent scheme to sell or otherwise unlawfully use SRM's IP in collaboration with Elecon.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 29
4856-5242-8200.v3

188.    In response, Brek, through counsel, denied his involvement, but somehow possessed an email on which Brek was not cc'd—the one quoted above between Elecon and Brian Tibbets at SRM.

189.    Brek's response, through counsel, made misrepresented that "Scott presented" the opportunity with Elecon "to SRM's Board, which elected not to pursue a relationship with Elecon."

190.    Specifically, the response from Brek (through counsel) implies that Scott had presented the opportunity to SRM management at the outset, when the reality is that Scott was confronted by SRM management about his activities in India after he did not directly return from a business trip to Israel. At that time Scott falsely asserted that his activities had been on behalf of SRM, and he falsely withheld the fact that he had been in communication with Elecon since late 2022 and was already well underway in his efforts to launder SRM IP to Elecon for his personal gain.

191.    Brek, through counsel, falsely asserted that discussions with Scott related to "a potential business relationship between Scott's current employer and Elecon" and that "[a]ny intellectual property that may be provided to Elecon pursuant to any resulting agreement or relationship will be designed by Scott's current employer or its contractors."

192.    On information and belief, Scott (with Brek's knowledge and participation) worked with Elecon while he was President of SRM. And Scott used his access to SRM's IP to directly or indirectly advance his efforts to pursue an opportunity with Elecon in direct breach of his Independent Contractor Agreement with SRM.

193.    On information and belief, Scott has traveled to India multiple times to meet with Elecon in furtherance of his fraudulent scheme to use SRM IP and confidential, proprietary information in a partnership with Elecon.

194.    On information and belief Scott, Brek, and representatives of Elecon met in Burley in August 2023 to advance their plans to have Elecon manufacture snow cutters and blowers using SRM IP.

195.    Representatives of Elecon were directly advised on multiple occasions that Brek and Scott had no rights in the SRM IP that would be used by Elecon in the manufacture of snow cutters and blowers. Nonetheless, on information and belief, Elecon knowingly proceeded ahead with plans to bid on government contracts in India using stolen engineering plans from SRM.

196.    Scott's social media posts show that he was in India in the past month, and they appear to show that he was meeting again with Elecon to advance the fraudulent scheme set forth above.

197.    On information and belief, Scott, Brek, others acting in concert with them, and Elecon intend to imminently submit bids to the Indian Government on snow cutters and blowers as contemplated in the November 2022 outreach by Elecon to Scott.

198.    Without immediate injunctive relief against Scott, Brek, and others acting in concert with them, including (on information and belief) Sawtooth and IIOVIII, SRM will be irreparably injured. This injury flows from not only the unlawful theft of SRM IP and in stealing this opportunity with Elecon, but also because SRM intends to bid on the same government contracts for snow cutters through its existing manufacturing partners in India.

DocuSign Envelope ID: 56BDE8C4-49D9-42E3-8460-7EBC643DC605

**Fourth Predicate Act Example: Competing Quotes from Sawtooth and Intermountain Living; Ongoing Deception and Misrepresentations to SRM Clients**

199.    In the spring of 2023, while serving as SRM's president, Scott used his access to SRM's client information, employees, intellectual property, and other confidential, proprietary business information to poach employees from SRM to work at Sawtooth and IIOVIII and to solicit SRM clients to do business instead with Sawtooth and/or IIOVIII.

200.    For example, on or around April 11, 2023, Scott created an excel file on his SRM issued computer that he titled "Business Ideas.xlsx." Although he deleted the file on April 13, 2023, SRM was able to recover the file.

201.    Within the file, Scott identifies a plan for "Sawtooth Industrial" and included a column titled "Employee Poach." Underneath this column, Scott listed SRM employees he intended to poach from SRM, their hourly wage, and their position/skillset.

202.    Scott successfully poached at least some of these employees, violating his obligations under his contract with SRM in doing so to the detriment of SRM.

203.    The recovered search history from Scott's laptop also demonstrates his misdeeds. In March and April 2023, Scott conducted searches on his SRM laptop that included the following:

a. "why can't i download information from my Lenovo to an external hardrive? Windows ssd is full?";

b. "Managing Inventory in Quickbooks Desktop";

c. "what is the legal penalty for credit card fraud for American express"; and

d. "create new company idaho."

DocuSign Envelope ID: 56BDE8C4-49D9-42E3-8460-7EFC643DC60E

204.    Also in April 2023, Scott accessed what appears to be his personal "iCloudDrive" from his SRM laptop. And the data on his computer shows that his "iCloudDrive" had a folder entitled "Sawtooth Industrial" which included a subfolder titled "Kodiak."

205.    Within the "Kodiak" subfolder Scott had a file or folder named "SRMK Quotes."

206.    Another folder directory with Scott's "iCloudDrive" was titled "C\Users\spilling\iCloudDrive\Sawtooth Industrial\Kodiak\Engineering."

207.    Another folder directory with Scott's "iCloudDrive" was titled "C:\Users\spilling\iCloudDrive\Sawtooth Industrial\Kodiak\Manage Docs."

208.    Another example of a file that Scott had within his personal "iCloudDrive" was one titled "Copy of Purchase Requisition Form Kodiak Employees.xlsx."

209.    These are only a tiny fraction of the files within Scott's "iCloudDrive" that reflect, on information and belief, his theft of Kodiak IP as well as his knowing breach of his Independent Contractor Agreement.

210.    In addition to this forensic imaging evidence, there are also records in SRM's possession showing that while serving as SRM's president Scott was sending competing quotes from his other companies (including Sawtooth and Intermountain Living) for the purchase and upgrade of snowblowers in the spring of 2023.

211.    Using the same purchase quote template, Scott would send one price quote from SRM and another competing quote from Sawtooth or Intermountain Living.

212.    Scott sent competing quotes to representatives of the Wolf Creek Ski Area, the Jackson Hole Airport, Conam Co., and the FAA in Vancouver.

213.    Throughout the spring of 2023, and on information and belief, to the present day, Scott, Brek, and others acting in concert with them, have continued to make false and misleading

DocuSign Envelope ID: 56BDF8C4-49D9-42E3-8460-7EEC643DC605

statements to the public that SRM is no longer in the business of servicing or selling snow blowers and similar equipment. And they have represented that Scott and his new companies are the true Kodiak, the original Kodiak, and the only company able to service SRM's customers.

214.    As examples of this, Brek has not removed the Kodiak America name from his company, in direct violation of the Asset Purchase Agreement.

215.    Moreover, Brek has personally directed individuals looking for the contact information for "Kodiak's" (SRM's) service department to Scott Pilling's personal cell phone.

216.    Similarly, former SRM employees who are now working with Scott—when asked for contact information for "Kodiak's" (SRM's) service department—have directed individuals to Scott Pilling.

217.    On information and belief, Scott, Brek, and those acting in concert with them—including the legal entities Sawtooth, IIOVIII, Kodiak Northwest, and Sold Kodiak—continue to make false and misleading statements to SRM customers through the mail and wires with the express intent of defrauding these individuals into diverting their business away from SRM and to the competing entities using SRM's stolen IP.

## FIRST CAUSE OF ACTION: DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836(b) (Against Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Doe Individual Defendants, and Roe Entity Defendants)

218.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

219.    SRM is the "owner" of "trade secret[s]" as those terms is defined in 18 U.S.C. § 1839(3)–(4).

220.    SRM is the entity in whom or in which rightful legal or equitable title to the trade secrets at issue are reposed.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 34
4856-5242-8200.v3

221.    SRM maintains secret its financial, business, scientific, technical, economic, or engineering information (including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing).

222.    SRM does this by taking reasonable measures to keep the information secret that include but are not limited to (1) physical access restraints on trade secret materials including locked cabinets; and (2) digital access restraints on trade secret materials that include (a) limiting the number of people with digital access to those with a need to know the information for their jobs, (b) establishing employee policies that require maintenance of the confidentiality of company information, and (c) employing information technology specialists to ensure the protection of company trade secrets from internal and external threats.

223.    SRM's trade secrets have independent economic value (actual or potential) from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

224.    The value of SRM's trade secrets is evidenced by (among other things) (1) SRM's willingness to purchase the trade secrets in September 2021 under the Asset Purchase Agreement for millions of dollars, (2) the existence of the international joint venture contract with a manufacturer in China that SRM is now the beneficiary, (3) Elecon's interest in partnering with SRM to develop snow blowers and snow cutters for the government of India, and (4) the numerous contracts that SRM has to manufacture and service industrial snow removal equipment for government (and private) clients across the country.

225.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Doe Individual Defendants, and Roe Entity Defendants misappropriated SRM's trade secrets within the meaning of the term "misappropriation" in 18 U.S.C. § 1839(5), in that they have acquired the trade secrets by a person who knows or has reason to know that the trade secret was acquired by improper means.

226.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Doe Individual Defendants, and Roe Entity Defendants misappropriated SRM's trade secrets within the meaning of the term "misappropriation" in 18 U.S.C. § 1839(5), also in that they disclosed the trade secrets of SRM without its express or implied consent (1) using improper means to acquire knowledge of the trade secret; or (2) knew or had reason to know that the knowledge of the trade secret was (a) derived from or through a person who had used improper means to acquire the trade secret, (b) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (3) before a material change of the position of the person, knew or had reason to know that (a) the trade secret was a trade secret, and (b) knowledge of the trade secret had been acquired by accident or mistake.

227.    The improper means employed by Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Doe Individual Defendants, and Roe Entity Defendants to acquire SRM trade secrets included but were not limited to theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means; and they excluded reverse engineering, independent derivation, or any other lawful means of acquisition.

228. SRM has already suffered and will continue to suffer immediate and irreparable injury if seizure of trade secrets is not ordered. This injury has included and will continue to include dissemination of trade secret information—particularly engineering drawings—to direct competitors of SRM including the defendants but also of critical importance, Elecon.

229. It has been reported to agents of SRM as recently as the week of February 20, 2024, that Elecon intends to manufacture and sell throughout the world competing products to those sold and manufactured by SRM. And on information and belief, Elecon's technological ability to do this and to imminently bid on government contracts that SRM also intends to bid on has occurred through Elecon's unlawful acquisition of SRM trade secrets (including, but not limited to, engineering drawings) improperly provided by some or all of Scott, Brek, Sawtooth, IIOVIII, Yamada, and Intermountain Living.

230. SRM has employed a private investigator to assist it in developing the record for this lawsuit, and that investigator has lawfully obtained information showing that Scott, Sawtooth, IIOVIII (and thus its principal Yamada) are in actual possession of SRM engineering drawings.

231. The private investigator has also come into possession of information demonstrating that Scott, Sawtooth, IIOVIII (and thus its principal Yamada) have delivered SRM's engineering drawings to a manufacturing company seeking production of parts for their work—demonstrating these defendants actual unlawful use of SRM's trade secrets.

232. SRM acquired the assets of Kodiak America, LLC (previously defined as "Sold Kodiak"), including all engineering drawings and other intellectual property, on September 29, 2021. Sold Kodiak had been a major player in the market for industrial snow removal equipment for decades. For this very reason Elecon reached out to SRM, the owner of Sold Kodiak's

intellectual property and trade secrets, in an effort to work together to produce snow blowers and cutters for the Indian government. Elecon's contact demonstrates it was not capable of servicing this industry on its own. Emails sent by Scott—while serving as the president of SRM—demonstrate that he directed Elecon's representatives to communicate with him through his personal email—not his SRM company email.

233.    Scott's Facebook posts, personal statements, and pictures place him in contact with Elecon representatives both before and after he terminated his position at SRM.

234.    Scott's Independent Contractor Agreement with SRM included an expansive confidentiality provision expressly designed to protect SRM's trade secrets—prohibiting Scott's personal use of those trade secrets to advance his own personal gain.

235.    Scott knowingly and intentionally diverted the Elecon representatives away from SRM's management at the end of 2022 and into 2023 with the intent of securing personal gain and advantage from his access to SRM trade secrets to the severe detriment of SRM.

236.    On information and belief, Scott worked with Sawtooth, IIOVIII, Intermountain Living, Yamada, and Brek to use SRM's trade secrets for their own advantage. On information and belief, every one of these defendants knew they were in possession of SRM's trade secrets and using that information unlawfully.

237.    Scott and Brek were publicly seen dining in Burley Idaho at Morey's Steakhouse with individuals who, on information and belief, are representatives of or affiliated with Elecon in or around August 2023.

238.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Doe Individual Defendants, and Roe Entity Defendants have also employed SRM's trade secrets in their

competition with SRM within the United States to perform upgrades and service on SRM's "Kodiak" industrial machines.

239.    All of this has caused serious damages to SRM, including loss of personnel to the competing companies Sawtooth and IIOVIII—competitors whose primary (and potentially exclusive) business operations rest on the unlawful use of SRM's trade secrets. Other damages arise from the dissemination of SRM's trade secrets to other companies both locally in Idaho and internationally to Elecon.

240.    Immediate injunctive relief is critical to avoid irreparable injury because SRM has no patents or other durable protections on its intellectual property. If these materials are not located, isolated, and returned (or destroyed) their widespread dissemination will permanently destroy most or all the value in SRM's trade secrets.

241.    Accordingly, SRM is entitled to the appointment of a special master to carry out the Court's order in locating and securing the unlawfully misappropriated trade secrets of SRM. This relief is expressly contemplated by 18 U.S.C. § 1836(b)(2)(D)(iv) in connection with entry of an order for the seizure of trade secret materials.[1]

242.    SRM is also entitled to a temporary restraining order and preliminary injunction against the Defendants requiring the following:

a.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall preserve (and prevent the loss of) all physical files and

---

[1] Although the facts likely warrant one, SRM is not requesting an *ex parte* seizure order under 18 U.S.C. § 1836(2)(A)(i). SRM's decision not to seek such an order stems from the uncertainty with respect to the location of the information making it impractical to carry out a seizure order in the absence of a temporary restraining order/preliminary injunction. SRM will need the court ordered cooperation of Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and agents acting in concert with them in order to carry out the seizure of the trade secrets that have been misappropriated. Accordingly, SRM seeks instead a temporary restraining order and permanent injunction on an expedited basis to be heard and decided as soon as possible upon service of the complaint.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 39
4856-5242-8200.v3

electronic data in their possession and shall not destroy any physical or electronic data until further order of this Court directing otherwise.

b.      Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall identify to the special master all physical and electronic storage devices in their possession or control—including physical storage cabinets, digital cloud servers to which they have access, laptops, desktop computers, cell phones, CDs/DVDS, USB storage devices, hard drives, and other similar media.

c.      Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall cooperate in the forensic imaging of all physical and electronic storage requested by the special master. In carrying out this order, the special master shall seize property for the narrowest time necessary to accomplish the imaging and shall take commercially reasonable steps to avoid the need for physical seizure of property—e.g. by conducting imaging remotely if technically feasible. The special master shall conduct the imaging in a manner that minimizes interruption of business to unrelated third parties and, to the extent possible, does not interrupt the legitimate business operations of the persons accused of misappropriating SRM's trade secrets.

d.      Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall identify for the special master all physical or electronic storage devices (including but not limited to such devices as described above) on which they have ever conducted any business related to the sales, service, manufacture, or other business involving commercial snow removal equipment—whether Kodiak brand equipment or otherwise.

e.      The Special Master shall conduct forensic imaging of all physical and electronic devices determined by the Special Master to have a reasonable potential of (at some

DocuSign Envelope ID: 56BDE8C4-49D9-42E3-8460-7EBC643DC605

point in time) having stored data related to the sales, service, manufacture, or other business involving commercial snow removal equipment—whether Kodiak brand equipment or otherwise.

f.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them are enjoined from using or disseminating SRM's engineering drawings, customer contact information, parts lists and information, and supplier lists and information.

g.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them must take reasonable efforts to secure the immediate return of all SRM engineering drawings, customer contact information, parts lists and information, and supplier lists and information that they have allowed to be disseminated to their agents or to third parties.

h.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall advise the special master, SRM, and the Court in a sealed filing of any and all agents or third parties who have not affirmatively agreed to comply with this Court's order for return of SRM's engineering drawings, customer contact information, parts lists and information, and supplier lists and information.

i.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them are enjoined from using or disseminating any of their own materials that have been developed in whole or in part using SRM's engineering drawings, customer contact information, parts lists and information, and supplier lists and information.

j.    Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them must take reasonable efforts to secure the immediate return of their

own materials that have been developed in whole or in part using SRM engineering drawings, customer contact information, parts lists and information, and supplier lists and information that they have allowed to be disseminated to their agents or to third parties.

        k.     Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, and others acting in concert with them shall advise the special master, SRM, and the Court in a sealed filing of any and all agents or third parties who have not affirmatively agreed to comply with this Court's order for return of materials that have been developed in whole or in part using SRM's engineering drawings, customer contact information, parts lists and information, and supplier lists and information.

        l.     All materials returned pursuant to this Court's order shall be maintained in the possession of the Special Master pending further order of this Court.

243.    In addition to the above-described injunctive relief, SRM is also entitled to damages, exemplary damages, and reasonable attorney fees in amounts to be determined at trial.

### SECOND CAUSE OF ACTION: UNFAIR COMPETITION 15 U.S.C. § 1125(a) (Against Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants)

244.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

245.    Since September 29, 2021, SRM has been the owner of the unregistered trademark or trade name "Kodiak" which has been used for decades in commerce throughout the United States and the world associated with its brand of industrial snow removal equipment including snow blowers, cutters, and sweepers. The use has been particularly prevalent within the market for government snow removal equipment across the United States—including the National Park Service, regional airports, and other governmental entities.

246.    The Kodiak name is distinctive because it is associated with the brand of industrial snow removal equipment and the connection between the name and the product is arbitrary, fanciful, or suggestive and therefore inherently distinctive. To the extent there is any descriptiveness to the "Kodiak" name it has acquired distinctiveness through its long use in commerce and association with the SRM's industrial snow removal equipment.

247.    After SRM's acquisition of the Sold Kodiak intellectual property—including the Kodiak name—Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants have used the "Kodiak" name in a manner that is likely to cause confusion among consumers.

248.    Specifically, these defendants have in the past and are at the present representing to SRM's customers and others in the marketplace for industrial snow removal equipment that they are "Kodiak" or the "original Kodiak" and the only ones able to service, upgrade, and maintain Kodiak machines. These representations have occurred by phone, email, text message, and in-person interactions with customers and potential customers looking for industrial snow removal equipment.

249.    These efforts have caused serious, irreparable, and ongoing harm to SRM. The harm is particularly acute because the misrepresentations are being made by Scott, Brek, and entities they control or are interested in. And Scott and Brek have a lengthy history with Kodiak and deep connections with SRM's clients—making their representations (directly and indirectly through their entities) more impactful on SRM's ability to derive the legitimate benefits of the "Kodiak" brand that it purchased in the Asset Purchase Agreement.

250.    Kodiak Northwest, Inc. is a company controlled by Brek and should not continue to use "Kodiak" in its corporate name following the Asset Purchase Agreement.

251.    Kodiak America, LLC, is a company controlled by Brek that was required to change its name following the Asset Purchase Agreement but has not done so.

252.    SRM is entitled to an injunction prohibiting Scott, Brek, Sawtooth, IIOVIII, Yamada, Intermountain Living, Kodiak Northwest, Sold Kodiak, and BAUB from using the "Kodiak" name in any commercial setting within the market for industrial snow removal equipment.

253.    SRM is entitled to damages to be proven at trial arising from these defendants' misrepresentations with respect to the "Kodiak" brand.

### THIRD CAUSE OF ACTION: CIVIL RICO 18 U.S.C. § 1964(c)
### (Against Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants)

254.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

255.    As set forth in the factual allegations preceding this cause of action, Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, are engaged in an ongoing pattern of continuing criminal activity that will continue to extend indefinitely into the future without judicial relief.

256.    Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, are each culpable persons within the meaning of the Civil RICO statute, and collectively the association of these entities forms the criminal enterprise, as illustrated in the allegations preceding this cause of action.

257.    Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, all possessed actual knowledge that their conduct was unlawful and the specific intent to commit their unlawful acts.

258.    Specifically, Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, have knowingly and willfully used the mail and the wires to perpetuate fraud on consumers of industrial snow removal equipment—leading consumers to believe that the companies associated with Scott and Brek are the only ones able to service, maintain, and upgrade industrial Kodiak snow removal activities.

259.    The criminal enterprise conducted by Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, has directly impacted interstate commerce as the consumers of Kodiak industrial snow removal equipment span the United States and the globe. And these defendants' criminal enterprise has swept just as broadly.

260.    Scott, Brek, Sawtooth, IIOVIII, Intermountain Living, Kodiak Northwest, Sold Kodiak, BAUB, Doe Individual Defendants, and Roe Entity Defendants, directly operate and manage the affairs of the criminal enterprise—as evidenced from the allegations above, with many of the entities expressly formed with the purpose of operating the criminal enterprise at issue.

261.    As a result of this ongoing criminal enterprise, SRM has been seriously injured in the loss of business, consumer confusion, theft of intellectual property, and unfair competition perpetuated through the unlawful means employed by these defendants in the conduct of their business.

DocuSign Envelope ID: 56BDF8C4-49D9-42E3-8460-7FFC643DC605

262.    Accordingly, SRM is entitled to an award of treble damages, costs, and reasonable attorney fees.

## FOURTH CAUSE OF ACTION: BREACH OF THE ASSET PURCHASE AGREEMENT
### (Against Brek, Sold Kodiak, Kodiak Northwest, and BAUB)

263.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

264.    As set forth in the allegations preceding this cause of action, SRM entered into an Asset Purchase Agreement with Brek, Sold Kodiak, and BAUB.

265.    Brek, Sold Kodiak, and BAUB are jointly and severally liable for breaches of that agreement under its terms.

266.    These defendants breached their agreement with SRM in myriad ways outlined in both specific examples and general allegations set forth above.

267.    The breach by these defendants caused millions in damages to SRM.

268.    SRM is entitled to specific performance of the agreement's requirements that Sold Kodiak change its name and that Brek cease use of the Kodiak brand, including its use in the name of his other company Kodiak Northwest.

269.    The Asset Purchase Agreement required Brek to deliver to SRM money he received from SRM customers within 10 business days. He has violated that obligation and retained substantial sums due and owing to SRM under the Asset Purchase Agreement. SRM is entitled to an injunction for specific performance and to have the funds now overdue and still owing delivered to it immediately.

270.    Brek, Sold Kodiak, and BAUB, knowingly engaged in numerous representations under the Asset Purchase Agreement, including the representation that its books and records

were complete, accurate, and in compliance with Generally Accepted Accounting Practices (GAAP). These breaches caused serious damage to SRM.

271.    Additionally, Brek, Sold Kodiak, and BAUB, did not disclose a complete copy of the contract with the Western Reserve Port Authority and the failure to provide a complete copy of that contract has injured SRM.

272.    Brek, Sold Kodiak, and BAUB willfully misrepresented by omission their non-performance of the contract with Western Reserve Port Authority, and their pre-acquisition actions have caused and contributed to Western Reserve Port Authority's allegations of breach of this contract against SRM. Thus, Brek, Sold Kodiak, and BAUB have retained the liability for their actions in breach of the contract with Western Reserve Port Authority—which Western Reserve Port Authority alleges is $600,000.

273.    The total damages from Brek, Sold Kodiak, and BAUB's breaches of the Asset Purchase Agreement will be proven and established at trial.

## FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT
### (Against Brek, Sold Kodiak, BAUB, and PFT)

274.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

275.    Under the Asset Purchase Agreement, SRM is afforded an expansive right of set off that is additional, and not a substitute, for its other remedies. The set off provision provides that if SRM gives notice of the alleged breaches that form the basis for its set off, SRM cannot be deemed in default or breach of its obligations arising under the Asset Purchase Agreement and any related agreements including its subscription agreement and note payable to PFT.

276.    The set off provision also provides that so long as SRM exercises the right of setoff in good faith it cannot be deemed in default on any of the agreements on grounds of failure

to make timely payment even if a court later determines that SRM was incorrect in its ground for asserting a set off.

277.    There is an actual dispute between the parties, accordingly SRM asks for a declaratory judgment under 28 U.S.C. § 2201 that SRM is not in breach of any of its obligations to Brek, Sold Kodiak, or PFT because it has exercised its right of set off in good faith when it determined that it would not continue paying on the note to PFT on account of the many breaches of the Asset Purchase Agreement committed by Brek, Sold Kodiak, and BAUB as evidenced in the preceding allegations.

## SIXTH CAUSE OF ACTION: JUDICIAL DISSOLUTION OF PFT
### (Against Brek, PFT, and Brek as Trustee of the Pilling Family Trust)

278.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

279.    Both orally and in the written agreements, Brek, Sold Kodiak, and BAUB represented to SRM that PFT was a legitimate company that would conduct lawful business with the intent of returning a profit for its owners.

280.    Reality has proven just the opposite. Brek individually as manager and later as manager in his capacity (on information and belief) as the trustee of the Pilling Family Trust, has not conducted any legitimate business whatsoever with PFT.

281.    Instead, Brek has used PFT as a personal slush fund to be used to advance his personal interests and those of his other businesses through both direct transfer of assets to his own personal bank account as well as non-market instruments that purport to be loans to companies he owns but that in fact are merely transfers of PFT assets out of the company to other companies that Brek has an interest in but SRM does not.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 48
4856-5242-8200.v3

282. As manager of PFT, Brek (and Brek as Trustee) owe SRM fiduciary duties of loyalty and good faith and fair dealing. He has violated those duties from the beginning, and he is continuing to do so each and every day he remains in control of the company.

283. All or substantially all PFT's business is unlawful and oppressive to the interests of SRM, and as such this Court has power under Idaho Code § 30-25-701(4)(A) and (C)(i)–(ii) to enter an order judicially dissolving PFT.

284. SRM expressly asks this Court to exercise its equitable powers to appoint a receiver to trace the dissipation of PFT assets, conduct an accounting, and to wind up the affairs of the company returning to each party their capital account. Based on the records in SRM's possession, Brek has made no capital contribution to PFT, and instead SRM is the only party that has contributed money to PFT, and it is therefore the only party with a capital account balance to be returned.

285. Because the outstanding note payable to PFT that SRM owes would only increase SRM's capital account further, as a part of the judicial dissolution and winding up this note should be deemed satisfied as part of the return of SRM's capital account.

### SEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT
#### (Against Budget Truck Center)

286. SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

287. Budget Truck Center (previously defined as "Budget Truck") is an entity, on information and belief, owned and controlled by Brek.

288. As part of Brek's scheme with PFT, he transferred a substantial sum of money to Budget Truck on terms that were not commercially reasonable to PFT.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 49
4856-5242-8200.v3

289.    Budget Truck knew (because Brek its owner knew) that it was unlawfully receiving SRM's money from PFT.

290.    As such, SRM conveyed a benefit on Budget Truck when Brek delivered SRM's capital contributions to PFT to Budget Truck unlawfully.

291.    Under the circumstances, allowing Budget Truck to keep the money would be no different then allowing Brek (a manager with fiduciary duties to SRM and PFT) to take capital contributions for himself.

292.    Accordingly, it would be unjust for Budget Truck to keep the money it has received from PFT and that money should be returned and ultimately paid to SRM as part of the reimbursement of SRM's capital account during the winding up of PFT.

**EIGHTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**
**(Against Brek and Brek as Trustee of the Pilling Family Trust)**

293.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

294.    As manager of PFT, Brek (and Brek as Trustee) owe SRM fiduciary duties of loyalty and good faith and fair dealing. He has violated those duties from the beginning, and he is continuing to do so each and every day he remains in control of the company.

295.    SRM has been damaged by these breaches of fiduciary duty owed to it and seeks damages against Brek and Brek as Trustee in amounts to be proven at trial.

**NINTH CAUSE OF ACTION: BREACH OF CONTRACT**
**(Against Scott)**

296.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 50
4856-5242-8200.v3

DocuSign Envelope ID: 56BDE8C4-49D9-42E3-8460-7FEC643DC605

297.    As set forth in the preceding allegations Scott was SRM's president and entered into an Independent Contractor Agreement with SRM.

298.    Scott breached the Independent Contractor Agreement by among other things stealing SRM's trade secrets, using his access to SRM's information and position within the company to advance his personal interests including, without limitation, by sending competing quotes to SRM customers for his other businesses.

299.    Each of these breaches and others to be proven through further discovery caused damage to SRM in amounts to be proven at trial.

## TENTH CAUSE OF ACTION: BREACH OF DUTY OF LOYALTY
### (Against Dille)

300.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

301.    Dille was employed by SRM as an accounting clerk and in such capacity she had access to SRM's confidential and proprietary business records—including accounting records and other information through her SRM computer.

302.    Based on forensic computer analysis of Dille's computer, she breached her duties of loyalty to SRM and the company's policies by using external storage devices to take personal possession of SRM company data.

303.    On information and belief, Dille also made changes to the Sold Kodiak books and records after closing to conceal Brek, Sold Kodiak, and BAUB's unlawful accounting practices and retention of money that was due to SRM under the Asset Purchase Agreement.

304.    SRM is entitled to injunctive relief to discover the scope of company information that Dille possesses and for return of that information to SRM.

305.    SRM is entitled to actual damages arising from any unlawful dissemination of information stolen from SRM's files.

## ELEVENTH CAUSE OF ACTION: BREACH OF DUTY OF LOYALTY
### (Against Shoemaker)

306.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

307.    Shoemaker was employed by SRM as an accountant and in such capacity she had access to SRM's confidential and proprietary business records—including accounting records and other information through her SRM computer.

308.    Based on forensic computer analysis of Shoemaker's computer, she breached her duties of loyalty to SRM and the company's policies by using external storage devices to take personal possession of SRM company data. Records appear to show that she may have made an entire copy of her full computer and taken that with her upon her.

309.    SRM is entitled to injunctive relief to discover the scope of company information that Shoemaker possesses and for return of that information to SRM.

310.    SRM is entitled to actual damages arising from any unlawful dissemination of information stolen from SRM's files.

## TWELFTH CAUSE OF ACTION: BREACH OF DUTY OF LOYALTY
### (Against Wickersham)

311.    SRM incorporates all allegations preceding and following this allegation as if fully set forth in this paragraph.

312.    Wickersham was employed by SRM as its Service Manager and in such capacity he had an SRM email address and computer.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 52
4856-5242-8200.v3

313.     As evidenced above, Wickersham willfully used his access to SRM's computer system and email to receive correspondence from NPS related to an SRM contract to service an NPS Kodiak machine.

314.     In violation of his duties to SRM, Wickersham falsely represented to NPS that SRM agreed to have the contract it was lawfully awareded canceled and re-issued to Scott's company Sawtooth—where Wickersham was going to be working imminently.

315.     Because of Wickersham's disloyal and unlawful conduct, SRM suffered serious damages in relation to the contract with NPS at issue.

316.     SRM is entitled to actual damages for Wickersham's unlawful conduct in amounts to be proven at trial.

## JURY DEMAND

317.     SRM acknowledges that several of the agreements at issue include a jury trial waiver. And SRM intends to honor those agreements, absent agreement by all parties to relinquish the advance waiver of a jury trial. But on all claims where a jury trial is not foreclosed and SRM is entitled to a trial by jury, SRM demands a jury.

## ATTORNEYS FEES

318.     SRM asserts that it is entitled to attorney fees under all applicable law including agreements of the parties and governing statutes.

## PRAYER FOR RELIEF

For the reasons set forth above, SRM prays for the following relief:

1.  Judgment in its favor all claims set forth above.

2.  Damages proven on each of its claims set forth above.

3.  Specific performance as indicated in each of the individual causes of action set forth above.

4.  Injunctive relief as described in the individual causes of action set forth above.

5.  Exemplary damages on its claims under the Defend Trade Secrets Act.

6.  Treble damages on its Civil RICO claim.

7.  Declaratory relief as set forth in the cause of action above.

8.  All other relief to which it is entitled under principles of law and equity as determined by the Court in this action.


      DATED February 26, 2024.

                    PARSONS BEHLE & LATIMER


                    By _____
                    Daniel Biddulph
                    Attorneys for Plaintiff SRM-Kodiak America, LLC


## VERIFICATION

      I declare under penalty of perjury under the laws of the state of Idaho that I have reviewed the foregoing factual allegations of the Verified Complaint and Demand for Jury Trial, and that said foregoing factual allegations are true and correct to the best of my knowledge and belief.


      Dated this 26th day of February 2024.


                    SRM-Kodiak America, LLC
                    By: Wayne Powell