Lee Radford, ISB #5719
John E. Cutler, ISB #9907
Daniel Biddulph, ISB #11561
PARSONS BEHLE & LATIMER
350 Memorial Drive, Suite 300
Idaho Falls, Idaho 83402
Telephone:  208.522.6700
Facsimile:  208.522.5111
LRadford@parsonsbehle.com
JCutler@parsonsbehle.com
DBiddulph@parsonsbehle.com

*Attorneys for Plaintiff SRM-Kodiak America, LLC*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>       Plaintiff,<br><br>vs.<br><br>BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., an Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, an Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, an | Case No. 4:24-cv-00112-DCN<br><br>**SRM-KODIAK AMERICA'S MOTION FOR PRELIMINARY INJUNCTION** |

individual; LURENE DILLE, an individual;
DOE DEFENDANTS I-XX; and ROE
ENTITY DEFENDANTS I-XX

        Defendants.

---

KODIAK AMERICA, LLC; KODIAK
NORTHWEST, INC.; BAUB LLC; BREK
PILLING; and PFT ENVIRO
INVESTMENTS, LLC,

        Counterclaimants,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho
limited liability company,

        Counterdefendant,

---

SCOTT PILLING; SAWTOOTH
INDUSTRIAL, LLC; IIOVIII PRECISION,
LLC; and INTERMOUNTAIN LIVING, LLC,

        Counterclaimants,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho
limited liability company,

        Counterdefendant,

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    I.    SRM's trade secrets ................................................................................................2

        A.    The assets SRM purchased from Sold Kodiak. .......................................2

        B.    Brek's & Scott's Covenants Not to Improperly Use SRM's Trade Secrets. ..................................................................................................4

    II.    MISAPPROPRIATION OF SRM'S TRADE SECRETS ......................................4

        A.    The Trade Secret Defendants work in concert to misappropriate SRM's trade secrets. ............................................................................4

            1.    The relationship among Trade Secret Defendants Scott, Brek, Yamada and Sawtooth, IIOVIII, and Intermountain Living. ......................................................................................4

            2.    Carolyn Shoemaker copies SRM's emails and trade secrets and leaves SRM to work for Scott. ...................................5

            3.    LuRene Dille copies SRM's emails and trade secrets while working for SRM and Brek. ............................................6

        B.    Scott uses SRM's trade secrets to steal SRM's customers and employees and compete against SRM in the marketplace. .........................7

            1.    Scott uses SRM's trade secrets to bid against SRM while employed by SRM. ......................................................7

            2.    Scott copies SRM's trade secrets before returning his SRM-issued computer. ..................................................8

            3.    Scott and Brek conspire to divert business from SRM for the manufacture of Kodiak machines in India. .....................9

            4.    Scott poaches numerous SRM employees having SRM's proprietary information. ..............................................10

            5.    A Sawtooth employee posts photos showing SRM components being manufactured at Sawtooth/IIOVIII. .................11

            6.    Scott diverts SRM's contracts and deceives SRM's customers into thinking Sawtooth is affiliated with SRM. ............11

            7.    Scott gives SRM's trade secrets to Christensen Machine, Inc. to manufacture snow blower components for IIOVIII/Sawtooth. ......................................................16

            8.    Scott and Sawtooth Use SRM's trade secrets to win bid for new snowblower at Yosemite National Park. ...............17

LEGAL STANDARD..............................................................................................................18

ARGUMENT ..........................................................................................................................19

        A.    SRM is likely to succeed on the merits...................................................19

            1.    SRM owns trade secrets..............................................................19

            2.    The Trade Secret Defendants have misappropriated SRM's trade secrets..............................................................21

            3.    The Trade Secret Defendants' misappropriation has harmed SRM. ...........................................................................24

B.     A preliminary injunction is necessary to avoid and redress irreparable injury to SRM in the unlawful use and distribution of its trade secrets...................................................................................25

C.     The balance of equities and the public interest both favor entry of a preliminary injunction....................................................................26

D.     Appropriate injunctive relief encompasses both determining the scope and scale of the misappropriation and alleviating the ongoing harm arising from the Trade Secret Defendants' unlawful conduct. .........27

     1.     The Court's injunction should facilitate an expedited assessment of the scope of the Trade Secret Defendants' misappropriation by requiring them to identify all physical and electronic storage devices in their possession and to forensically images these repositories. ..........................................27

     2.     The Court's injunction should facilitate an expedited assessment of the scope of the Trade Secret Defendants' misappropriation by allowing SRM to review Sawtooth's schematics to verify whether they are copies of or are derived from SRM's proprietary schematics. ...............................29

     3.     The Court should prohibit the Trade Secret Defendants, their agents, and anyone acting in concert with them from using SRM's trade secrets, and the Court should require the Trade Secret Defendants' cooperation in identifying third parties with whom SRM's trade secrets have been shared and in recovering SRM's data from them...............................................30

     4.     No bond should be required with respect to the injunctions' impact on Brek, as he affirmatively waived any right to a bond in the Asset Purchase Agreement. Further, no bond should be required to protect any Trade Secret Defendants due to the likelihood that SRM will succeed on the merits in this case.......................................................................................32

CONCLUSION.................................................................................................34

## Federal Cases

*Barahona–Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999) ............................................................... 32

*Comet Techs. USA Inc. v. XP Power LLC*,
    2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) ...................................... 25, 26, 27

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ............................................................... 19, 26

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996) .................................................................... 32

*Eastman Kodak Co. v. Collins Ink Corp.*,
    821 F. Supp. 2d 582 (W.D.N.Y. 2011) .............................................. 33, 34

*iBASEt v. Exacore, LLC*,
    2014 WL 12576816 (C.D. Cal. March 24, 2014) ....................................... 26

*IME Watchdog, Inc. v. Gelardi*,
    No. 22-CV-1032, 2024 WL 4314714 (E.D.N.Y. Mar. 13, 2024) ................ 32, 33, 34

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ............................................................... 32, 34

*Just Tacos, Inc. v. Zezulak*,
    No. CV 11-00663 DAE-KSC, 2011 WL 6140866 (D. Haw. Dec. 9, 2011) ........... 33

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ............................................................... 27, 30

*Logistics Guys Inc. v. Cuevas*,
    No. 2:23-CV-01592-DAD-CSK, 2024 WL 3011216 (E.D. Cal. June 13, 2024) ............ 34

*Maximus, Inc. v. Holdren*,
    No. 24-CV-395, 2024 WL 1756342 (E.D. Va. Mar. 15, 2024) ................... 27, 33, 34

*Monster Energy Co. v. Vital Pharms., Inc.*,
    No. EDCV181882JGBSHKX, 2023 WL 8168854 (C.D. Cal. Oct. 6, 2023) ............. 25, 26, 27

*Morris CM Enterprises, LLC v. Wingstop Franchising, LLC*,
    No. 219CV02306KJMCKD, 2020 WL 42241 (E.D. Cal. Jan. 3, 2020) ............. 33, 34

*Samick Music Corp. v. Gordon*,
 No. SACV 20-395-GW-JDEX, 2020 WL 3210613 (C.D. Cal. Mar. 26, 2020) ................ 32, 34

*Van De Kamp v. Tahoe Reg'l Planning Agency*,
 766 F.2d 1319 (9th Cir. 1985) ................................................................................ 32

*Vinyl Interactive, LLC v. Guarino*, No. C,
 09–0987 CW, 2009 WL 1228695 (N.D. Cal. May 1, 2009) .................................... 26

*WeRide Corp. v. Kun Huang*,
 379 F. Supp. 3d 834 (N.D. Cal. 2019) ............................................................... 19, 26

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ................................................................................................ 19

## Federal Statutes

18 U.S.C. § 1836(b)(1) ............................................................................................ 18

18 U.S.C. § 1839(3)(A)-(B) .................................................................................... 20

18 U.S.C. § 1839(5) .......................................................................................... 21, 22

## Federal Rules

Federal Rule of Civil Procedure 65(c) .................................................................. 32

Plaintiff SRM-Kodiak America, LLC ("SRM"), by and through its undersigned counsel of record, hereby submits this *Memorandum in Support of Motion for Preliminary Injunction*, arguing as follows.

## INTRODUCTION

The Kodiak brand of commercial and industrial snow blowers has been around for decades, and the machines sold under it are well-known on an international scale for their quality, durability, and craftsmanship. The machines are also highly valuable; indeed, a single Kodiak snow blower sells for hundreds of thousands of dollars.

In September 2021, SRM purchased from defendants Kodiak America, LLC ("Sold Kodiak"), BAUB LLC ("BAUB"), and Brek Pilling, the Kodiak brand and, *inter alia*, the technology and intellectual property used to construct and service Kodiak snow blower machines. The parties' agreement is reflected in an Asset Purchase Agreement dated September 29, 2021 (the "Agreement"). Through an expansive "Confidentiality" provision in the Agreement, Sold Kodiak, BAUB, and Brek also agreed to maintain the confidentiality of the highly valuable proprietary information SRM purchased from them.

SRM also maintained an Independent Contractor Agreement ("Contractor Agreement") with Brek Pilling's son, Scott Pilling. Under the Contractor Agreement, Scott agreed to act as President of SRM and accepted a broad "Confidentiality and Works Made for Hire" provision in that agreement. Scott acknowledged that he would receive confidential and/or proprietary information as President of SRM, and he agreed to only use such information to benefit SRM.

Despite their agreements with SRM, Brek and Scott, in concert with several other defendants, have disclosed and used SRM's trade secrets for their own commercial gain. Indeed, evidence establishes that numerous defendants, including Sawtooth Industrial, LLC ("Sawtooth"), IIOVIII Precision, LLC ("IIOVIII"), Intermountain Living, LLC ("Intermountain Living"), Scott

1

Pilling, Brek Pilling, Arthur Sadampi Yamada, Carolyn Shoemaker, Lurene Dille, Doe Defendants I–XX and Roe Entity Defendants I–XX (collectively, the "Trade Secret Defendants") have acted together to aid Scott, Sawtooth, IIOVIII, and Intermountain Living in competing against SRM in the snow blower market using SRM's own proprietary information.

SRM depends on its trade secrets to effectively do business in the niche and competitive market for heavy duty snow blower equipment. As a result, SRM now moves for a preliminary injunction to assess the scope of the Trade Secret Defendants' misappropriation of its intellectual property and to stop the Trade Secret Defendants from further exploiting its trade secrets until the imposition of a permanent injunction is obtained after a full trial. Continued misappropriation would cause immense injury to SRM by depriving SRM of its right to exclude competitors from using its proprietary technology and information for their own gain—without any compensation to SRM.

Absent injunctive relief, there is no reasonable belief that the Trade Secret Defendants will cease using SRM's trade secrets to compete with SRM, or that the irreparable harm to SRM will diminish. Moreover, halting the Trade Secret Defendants' use of SRM's trade secrets would not present a bar to their ability to continue any lawful business that is being conducted without the use of stolen intellectual property. The courts have long recognized the need for injunctive relief in such circumstances and, accordingly, SRM's motion should be granted.

**STATEMENT OF FACTS**

## I.     SRM's trade secrets

### A.     The assets SRM purchased from Sold Kodiak.

Pursuant to an Asset Purchase Agreement executed on September 29, 2021 (the "Agreement"), SRM paid Brek Pilling and BAUB LLC $6,000,000 to purchase the assets of Sold Kodiak, which was "a custom manufacturer of snow removal equipment." *See Declaration of Tyler*

2

*Groves in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Groves Decl.")

¶ 3, Exhibit 1, *Asset Purchase Agreement*, Recitals. In the Agreement, Sold Kodiak's assets were defined to include, among other things, "customer lists, customer accounts, referral sources, drawings, specifications, creative materials . . . studies, . . . [and] Intellectual Property." *Id.* at Section 1.1 (defining "Assets"). The Agreement further defined "Intellectual Property" as

> domestic and foreign patents, patent applications, registered and unregistered trademarks, service marks, trade names and logos, registered and unregistered copyrights, designs, inventions, computer programs, software, data bases, choses in action, internet domain names, websites, licenses, trade secrets, confidential information, proprietary information and all goodwill associated therewith.

*Id.* (defining "Intellectual Property"). In addition, the Agreement defined "Confidential Information" to include (among other things):

> any information concerning the Assets or the Business, and . . . information or data, whether or not reduced to writing, . . .including, without limitation, trade secrets, proprietary data, inventions, concepts, designs, processes, research, test results, plant layout, feasibility studies, procedures or standards, know-how, manuals, patent information, the identity of or information concerning current or prospective clients, customers, accounts, suppliers, service providers, licensors, licensees, contractors, subcontractors or other agents or representatives, financial or sales information, current or planned commercial activities, business strategies, records or marketing plans, or any other information that Purchaser advises in writing should be treated as confidential.

*Id.* (defining "Confidential Information").

In the Agreement, Sold Kodiak, Brek, and BAUB represented to SRM that they had and were "transferring to [SRM] hereunder, the rights to use all data and information (including without limitation confidential information, trade secrets, and know how in the possession of Seller) necessary to permit the conduct by [SRM] from and after the Closing Date of the Business as it is being and has been normally conducted." *Id.* at Section 4.19(d).

3

Among the trade secrets SRM purchased were tens of thousands of proprietary drawings and documents used to build, manufacture, service, and support Kodiak snow blower machines. *Groves Decl.* ¶¶ 5, 28.

**B.    Brek's & Scott's Covenants Not to Improperly Use SRM's Trade Secrets.**

In the Asset Purchase Agreement, Brek had personally covenanted to SRM that he would not "communicate, publish, or disclose to any Person or any entity anywhere or use any Confidential Information for any purpose" and moreover that he would "at all times hold in confidence and safeguard any Confidential Information to ensure that any unauthorized Persons do not gain possession of any Confidential Information . . . ." owned by SRM. *Groves Decl.*, ¶ 3, Exhibit 1, *Asset Purchase Agreement*, Section 6.5(e).

In his Independent Contractor Agreement with SRM, Scott acknowledged that he would receive confidential and proprietary information as President of SRM and agreed to only use such information to benefit SRM. *Id. at* ¶ 4, Exhibit 2, *Independent Contract Agreement*, Section 8. He also agreed "to always act in the best interest of the [SRM] in negotiating terms of . . . contracts" with SRM's customers. *Id.* at Section 1.

**II.    MISAPPROPRIATION OF SRM'S TRADE SECRETS**

**A.    <u>The Trade Secret Defendants work in concert to misappropriate SRM's trade secrets</u>.**

**1.    The relationship among Trade Secret Defendants Scott, Brek, Yamada and Sawtooth, IIOVIII, and Intermountain Living.**

Documents filed with the Idaho Secretary of State establish that, beginning in April 2023, Arthur Sadampi Yamada was a Governor, Registered Agent, Organizer, and Member of Sawtooth. *Declaration of John E. Cutler in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Cutler Decl.") ¶¶ 9–10, Exhibits 6–7. The Annual Report filed for Sawtooth in April

2024 reflects that Yamada was removed as a Member and as the Registered Agent, and Scott was added as the Manager and Registered Agent. *Id.* at ¶ 11, Exhibit 8.

Documents filed with the Idaho Secretary of State also establish that, beginning in April 2023, Yamada was a Governor, Registered Agent, and Organizer of IIOVIII. *Cutler Decl.* ¶ 12, Exhibit 9. In April 2024, Scott filed an Annual Report for IIOVIII removing Yamada as a Member and as the Registered Agent, adding himself as the Manager and as the Registered Agent. *Id.* at. ¶ 13, Exhibit 10.

Documents filed with the Idaho Secretary of State establish that, beginning in September 2019, Scott was the Governor, Registered Agent, and Organizer of Intermountain Living. *Cutler Decl.* ¶ 14, Exhibit 11. On August 5, 2020, Scott filed an Annual Report for Intermountain Living adding Brek Pilling as a member. *Id.* at ¶ 15, Exhibit 12. Scott signed that document as President of the company. *Id.* In the most recent Annual Report filed for Intermountain Living on August 3, 2023, Scott listed himself as Manager and President of the company and again included Brek as a Member. *Id.* at ¶ 16, Exhibit 13.

These filings establish that Scott and Yamada are, or have been during relevant times, closely affiliated with each other and Trade Secret Defendants Sawtooth and IIOVIII, and Scott and Brek are, or have been during relevant times, closely affiliated with each other and Trade Secret Defendant Intermountain Living. *See Cutler Decl.* ¶¶ 9–16, Exhibits 6–13.

> ### 2.  Carolyn Shoemaker copies SRM's emails and trade secrets and leaves SRM to work for Scott.

Carolyn Shoemaker was employed as an accountant with SRM until January 31, 2023, when she voluntarily terminated her employment. *Declaration of Trevor Rice in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Rice Decl.") ¶ 6. A forensic analysis of Shoemaker's SRM computer revealed that she violated SRM's company policies with various

unauthorized activities during her employment with SRM. *Declaration of Geoffrey ("Geo") Brown in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Brown Decl.") ¶¶ 17–18; *Rice Decl.* ¶¶ 7–8. Specifically, Shoemaker regularly utilized a USB storage device that contained company administrative files stored within a folder call "KODIAK AMERICA." *Brown Decl.* ¶ 17, Exhibit 4. She also stored an offline copy of her SRM e-mail. *Brown Decl.* ¶ 18. In addition, Shoemaker forwarded more than 400 SRM e-mails to a non-SRM e-mail account of Carolyn.kodiak@outlook.com. *Id.*, Exhibit 5. There was no legitimate business purpose for Shoemaker to copy company information or to maintain a non-SRM email address to conduct SRM business, and such conduct violated SRM's company policies. *Rice Decl.* ¶¶ 7–8.

After copying SRM's confidential information, Shoemaker went to work for Scott at IIOVIII. *See Declaration of Tom Clayville in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Clayville Decl.") ¶ 14, Exhibit 17, p.6 (showing an email address for Shoemaker of Carolyn.iioviii@outlook.com, which is consistent with her use of the email Carolyn.kodiak@outlook.com while working for SRM).

### 3. LuRene Dille copies SRM's emails and trade secrets while working for SRM and Brek.

LuRene Dille was employed in SRM's accounting department until she voluntarily terminated her employment on January 31, 2023.[1] *Rice Decl.* ¶ 9. During her employment with SRM, Dille also worked for companies owned by Brek. *LuRene Dille's Answer to Verified Complaint and Demand for Jury Trial*, at 3, ¶ 10 (May 8, 2024).

A forensic analysis of Dille's SRM computer revealed that she violated SRM's company policies with various unauthorized activities during her employment with SRM. *Brown Decl.* ¶¶

---

[1] Despite terminating her employment in January 2023, LuRene continued to do some work in the accounting department until February 2023. *Rice Decl.* ¶ 9.

4881-1680-7623.v9

21–22; *Rice Decl.* ¶¶ 10–11. Specifically, Dille regularly utilized a USB storage device that contained company administrative files stored within a folder called "Office Assistant" and a 'General' thumb-drive named "BACKUPS" that contained a file called "backup.pst". *Brown Decl.* ¶ 21, Exhibit 6. The "Office Assistant" folder matches by name to a network share on a server and is consistent with a backup of the whole network share. *Id.* The file "backup.pst" is a file typically used to export e-mail, calendar, contacts and tasks from a user's mailbox to a single file. *Id.* In addition, Dille's computer stored an offline copy of her SRM e-mail. *Id.* at ¶ 22. Analysis of Dille's e-mail also revealed an attachment called "Customer List.xlsx" sent in July 2022 to a non-SRM e-mail account of LuRene.kodiak@outlook.com. *Id.* The file contains a list of organizations and contact details. *Id.*

There was no legitimate business purpose for Dille to copy company information or to maintain a non-SRM email address to conduct SRM business, and such conduct violated SRM's company policies. *Rice Decl.* ¶¶ 10–11.

    **B.**     <u>Scott uses SRM's trade secrets to steal SRM's customers and employees and compete against SRM in the marketplace.</u>

        **1.**     **Scott uses SRM's trade secrets to bid against SRM while employed by SRM.**

As President of SRM from 2022–2023, Scott had access to SRM's intellectual property and proprietary information, including its customer lists, vendor lists, drawings, and schematics, in all formats, including digital, written, and printed. *Groves Decl.* ¶ 5. He was also familiar with SRM's pricing structure for Kodiak equipment. *Declaration of Shane Pierce in Support of SRM-Kodiak America's Motion for Preliminary Injunction* ("Pierce Decl.") ¶ 23.

While working for SRM, Scott was permitted to use SRM's proprietary information for, among other things, compiling and submitting bids to sell SRM's Kodiak snow blower equipment. *Groves Decl.* ¶ 5; *Pierce Decl.* ¶ 2. After Scott left the company, SRM discovered that while he

7

worked for SRM, he had used SRM's proprietary pricing model to submit several bids on behalf of his entities Sawtooth and Intermountain Living in competition with bids he had submitted for SRM. *Rice Decl.* ¶¶ 15–16, Exhibits 4–8. Specifically, on April 10, 2023, Scott submitted three nearly identical bids to the same potential customer, FAA Vancouver. *Id.*, ¶ 15, Exhibits 4–6. One bid was submitted on behalf of SRM, another on behalf of Sawtooth, and the third on behalf of Intermountain Living. *Id.* All these bids include Scott's name as the "Salesperson." *Id.*

On March 29, 2023, Scott submitted a bid to Wolf Creek Ski Area on behalf of SRM for a Kodiak snow blower machine. *Rice Decl.* ¶ 16, Exhibit 7. Then, on April 5, 2023, Scott submitted a separate bid to Wolf Creek Ski Area on behalf of Intermountain living for what appears to be a used Kodiak snow blower machine bearing a similar model number as that in the SRM bid. *Id.* The Intermountain Living bid undercut SRM's bid by nearly $72,000. *Id.*, Exhibit 8. Both of these bids include Scott's name as the "Salesperson." *Id.*, Exhibits 7–8.

### 2. Scott copies SRM's trade secrets before returning his SRM-issued computer.

Despite that Scott left SRM at the end of June 2023, he did not return his SRM-issued laptop until after July 6, 2023. *Rice Decl.* ¶ 12. The forensic analysis conducted on Scott's laptop revealed that the operating system was reinstalled on or around June 28, 2023, which was the Wednesday of Scott's last week at SRM. *Brown Decl.* ¶ 11. While the operating system reinstallation caused some information to be lost, a significant number of files, folders, and forensic artifacts showing use of files remained after the reinstallation. *Brown Decl.* ¶ 11.

The forensic analysis of Scott's computer also revealed that Scott used a personal iCloud account that synchronized files from his laptop to an online account and then to any number of devices that were connected to that account. *Id.* at ¶ 13. Scott's use of this personal account created an easy way for him to transfer SRM files from his laptop to other personal computers. *Id.* In

addition, the folder structure of Scott's personal iCloud drive contains root folders called "SRM Kodiak" and "Sawtooth Industrial," which contain proprietary engineering and pricing information. *Id.*

Scott also used a personal OneDrive account, which synchronized files from his laptop to his OneDrive account and then to other devices connected to that account. *Id.* at ¶ 14. Scott's personal OneDrive account was setup on his laptop in June 2022 and files were removed in April 2023, leaving only the folder structure. *Id.* However, the forensic analysis revealed that his personal OneDrive account contained SRM's confidential information, including historical bid information. *Id.* at ¶ 14, Exhibit 3.

Not only did Scott violate SRM's company policies by copying its documents and information, but there was also no legitimate business purpose for him to do so because those things were accessible to him during his employment via the company's OneDrive database. *Rice Decl.* ¶¶ 4,

### 3. Scott and Brek conspire to divert business from SRM for the manufacture of Kodiak machines in India.

Among the documents recovered from Scott's SRM laptop are emails between Scott and a company named Elecon Group of Companies ("Elecon") out of India. *Rice Decl.* ¶ 14, Exhibits 2–3. These emails demonstrate that in November 2022, a representative from Elecon named Gagandeep Singh Rupaal reached out to Scott at his SRM email address looking to collaborate with "KODIAK" to sell snow cutter and blower equipment to the Indian Armed Forces. *Id.*, Exhibit 2, p. 11. Rupaal provided Scott, as President of SRM, the technical specifications for the snow cutters and blowers. *Id.* at pp. 6–7.

From the end of November 2022 to early January 2023, Rupaal had several communications with Scott at his SRM email address regarding a collaboration between SRM and

Elecon. *Id.* at pp. 4–7. On January 26, 2023, however, Scott emailed Rupaal, stating, "I wrote you an email from my personal email. Please respond there. We are going through some company email changes for a little bit and I'm having problems with my email." *Id.* at p. 4. Scott continued to correspond with Elecon representatives using both his SRM email and his personal email. *See Scott Pilling's Answer to Verified Complaint and Demand for Jury Trial and Counterclaim* at 11, ¶ 76 (April 30, 2024) (admitting paragraph 181 of SRM's verified complaint).

The following day, Rupaal emailed Scott at his SRM email and included Scott's personal email, attempting to set up a meeting on January 30, 2023, at 9:00 AM MT. *Rice Decl.* ¶ 14, Exhibit 2, p. 3. Scott then requested that the meeting be moved to the following day. *Id.* On January 29, 2023, Rupaal provided a link to a meeting that was to occur between the parties on January 31, 2023, at 9:00 AM MT. *Id.* at p. 1.

At 9:51 AM on Tuesday, January 31, Scott again emailed Rupaal from his personal email account, stating, "Thank you for meeting this morning. I will stay in touch on our trip to India. Let's continue communication on this specific email chain moving forward." *Rice Decl.* ¶ 14, Exhibit 3. In this email string, Scott excluded his SRM email and included his father, Brek Pilling, in the email conversation. *Id.* No other parties at SRM were involved in Scott's communications with Elecon. *See id.*, Exhibits 2–3.

In August 2023, just two months after Scott left SRM, Scott and Brek both met in person with representatives of Elecon. *See Brek Pilling's Answer, Counterclaim, and Demand for Jury Trial* at 7, ¶ 40 (May 1, 2024) (admitting that this meeting occurred).

### 4. Scott poaches numerous SRM employees having SRM's proprietary information.

Through the forensic analysis of Scott's laptop, SRM also discovered a document on his computer titled, "Business Ideas.xlsx," which includes the heading "Sawtooth Industrial," and a

column titled "Employee Poach." *Rice Decl.* ¶ 14, Exhibit 1; *Groves Decl.* ¶ 6. The "Employee Poach" column includes a list of first names, such as "Drew," "Paula," "Eric," and "Gary." *Rice Decl.*, Exhibit 1. Every name listed in this column corresponds to the name of an individual who worked for SRM at the time Scott worked for SRM. *Groves Decl.* ¶ 6. The document also includes wage information, insurance information, and salary information for specific employees and specific position categories, which reflect sums comparable to those SRM paid its employees. *Id.*

In addition to poaching nearly all the employees listed in the Business Ideas.xlsx document, Scott was also successful in poaching other SRM employees to work for him at Sawtooth and/or IIOVIII, most of whom had access to SRM's proprietary information before leaving the company. *Id.* at ¶ 7.

**5.    A Sawtooth employee posts photos showing SRM components being manufactured at Sawtooth/IIOVIII.**

Photos posted on April 6, 2024, to the Facebook account of an employee Scott poached from SRM—Eric Arausa—show builds of SRM machine components in the Sawtooth and/or IIOVIII facility. *Declaration of Jody Young* ("Young Decl.") ¶¶ 1–6, Exhibits 1–16. Eric himself appears in several of the photos next to the components. *Id.* The components pictured in the posts could not be built without the use of SRM's trade secret schematics. *Id.* at ¶ 6.

**6.    Scott diverts SRM's contracts and deceives SRM's customers into thinking Sawtooth is affiliated with SRM.**

a.    Scott diverts SRM's Lassen Volcanic National Park Purchase Order to Sawtooth.

On April 18, 2023, the National Park Service, a bureau of the Department of the Interior for the United States Government ("NPS"), emailed Scott at his SRM email address awarding SRM with Purchase Order No. 140P8423P0020. *Cutler Decl.* ¶ 3, Exhibit 2, *NPS's Response to FOIA Request Concerning Lassen Volcanic National Park* ("Lassen FOIA"), p. 25. Pursuant to

the Purchase Order, SRM was to perform upgrades to a gear box on a Kodiak snow blower machine previously purchased by NPS and used at Lassen Volcanic National Park in California (the "Lassen PO"). *Id.* at pp. 26–29. The Lassen PO reflected a $53,109.32 contract between NPS and SRM. *Id.*

That same day, on April 18, 2023, Scott responded to NPS from his SRM email address stating,

> We are working through restructuring and preparation for this project to make sure we can accommodate this work. Please cancel and I will be in touch for a re-issuing of an award when we are ready to receive.
>
> Thank you
>
> Scott Pilling
> President
> SRM-Kodiak

*Id.* at p. 32.

Just minutes after instructing NPS to cancel the award, Scott emailed NPS again from a separate outlook.com email address. *Id.* at pp. 30–31. His email included the subject: "Sawtooth Industrial" and, in the body, stated the following:

> Thank you for the call. Please email me what you need. Our Sam.gov credentials should be issued soon.
>
> As mentioned, we are splitting departments. The service department will remain under my oversight. The same techs will be performing the work. The company credentials will be the different item.
>
> Thank you
>
> Scott Pilling
> President
> SRM-Kodiak

4881-1680-7623.v9

*Id.* The following day, NPS emailed Scott requesting that he "please sign the modification for the termination of the contract." *Id.* at p. 32. Scott responded, filling out and signing the document as requested. *Id.* at pp. 37–40.

Then, on Tuesday, June 27, 2023, days before Scott voluntarily terminated his employment with SRM, he emailed NPS from his new Sawtooth email address, scott@sawtoothindustrial.com. *Cutler Decl.* ¶ 3, Exhibit 2, *Lassen FOIA*, p. 50. Scott's email included the subject: "Blower repair po," and the body of the email stated, "Please use this email going forward. Please send modified PO here." *Id.*

On July 19, 2023, approximately three weeks after Scott left SRM, NPS inadvertently emailed a Novation Agreement Letter to Scott's SRM company email address, stating, in relevant part:

> Dear Mr. Pilling,
>
> We are in receipt of your written request to recognize Sawtooth Industrial LLC, as a successor in interest to Contract No. 140P8423P0020 … we request that your firm, SRM-KODIAK AMERICA, LLC, submit the information necessary to evaluate the proposed agreement for recognizing a successor in interest….

*Id.* at pp. 44, 56–57.

Because Scott did not respond to that email, the letter was subsequently forwarded to Scott at his Sawtooth email on July 31, 2023. *Id.* at p. 51. Eight days later, on August 8, 2023, Scott responded to NPS stating,

> Sawtooth Industrial is not a successor to SRM Kodiak. Snake River Manufacturing (SRM) acquired certain assets from Kodiak America (Including the name) in 2021. The name was officially changed to SRM-Kodiak. Since that time, Snake River Manufacturing has lost every manufacturing employee in their snow blower sector, does not have a service department, or a parts department. They have changed direction as a company and are no longer able to provide service work, such as this gearbox upgrade to the Park's snow blower.

> Sawtooth Industrial is not affiliated with SRM-Kodiak. We are the original group of Kodiak Employees that have continued to service and provide parts for Kodiak equipment. I won't be able to fill out this paper because we are not a successor. Please let me know how you'd like to move forward. There is nobody @ SRM-Kodiak that can perform the work on this snow blower, everybody who worked at Kodiak works for Sawtooth Industrial. I know this may seem complicated, please call me for further clarification.

*Id.* at p. 67.

On August 9, 2023, NPS asked Scott if he "still ha[d] access to SRM Kodiak so [NPS] c[ould] canccel [sic] the award" and, if not, whether Scott knew "who [NPS] c[ould] reach out to for this?" *Id.* at p. 66. That same day, Scott responded directing NPS to send the document to Gary Wickersham at SRM, and stating,

> I still worked at SRM-Kodiak when the award was made, but because of this whole transfer issue, it was never put into their system. To-Date, SRM-Kodiak does not have anything in their system about this job, so I don't think you'd have to reach out. If you had to, reach out to gwickersham@srm-mfg.com. I think Gary's last day is Friday and they don't have a replacement. I'm not sure who else to reach at the company, nobody really works in their snow blower division anymore. If you were able to send to gary [sic] tomorrow am, he would get it.

*Id.* Not surprising, Gary was leaving SRM to work for Scott at Sawtooth. *See* Groves Decl. ¶ 7.

Upon receiving Scott's response, NPS emailed Gary Wickersham at his SRM email address, attaching a termination of the NPS contract and asking him to sign it on behalf of SRM. *Cutler Decl.*, ¶ 3, Exhibit 2, *Lassen FOIA*, p. 59. Minutes later, Gary responded to NPS's email attaching the executed termination. *Id.* at pp. 59–60.

On August 10, 2023, having become aware of the Novation Agreement Letter sent to Scott's SRM email address, SRM sent a letter to NPS informing it that Scott no longer worked for SRM and that SRM was not affiliated in any way with Sawtooth. *Cutler Delc.* ¶ 17, Exhibit 14. SRM stated its belief that Scott "Pilling ha[d] made material misrepresentations to [NPS] in effort to fraudulently procure Contract No. 140P8423P0020." *Id.* SRM further informed NPS that,

contrary to any claims propagated by Scott, SRM was fully committed and prepared to fulfill NPS's purchase order. *Id.*

On August 10, 2023, NPS told Scott to "stop all work on the snow blower at this time." *Id.* at ¶ 3, Exhibit 2, *Lassen FOIA*, p. 63. Then, on August 16, 2023, NPS issued a formal letter to Scott and Sawtooth explaining that it had come to their attention that Sawtooth was not affiliated with SRM in any way "and thus should not be performing repairs on the blower." *Id.* at p. 81. The letter further stated, "The contract for these repairs was awarded to SRM-Kodiak America, LLC and they are the only company authorized to repair the equipment." *Id.* In addition, the letter noted that,

> When the equipment was picked up by Sawtooth Industrial LLC it was with the understanding that the two companies were closely affiliated and a novation agreement would be prepared by the contractor to transfer the contract to the new company. However, at this time it appears the equipment was obtained by Sawtooth Industrial LLC under false pretenses.

*Id.*

Scott subsequently delivered the machine to SRM to complete the work. *See* Scott Pilling's Answer to Verified Complaint and Demand for Jury Trial and Counterclaim at 9, ¶ 62 (April 30, 2024) (admitting paragraph 150 (in part)).

b. <u>Scott Diverts SRM's Contract with RDO Equipment to Sawtooth.</u>

In April 2023, Scott, on behalf of SRM, quoted a Kodiak snow blower for the Central Wyoming Regional Airport in Riverton, Wyoming (the "Riverton Project"). *Pierce Decl.* ¶ 3. The quote was requested by a company called Honnen Equipment Co. ("Honnen"), which has since been acquired by RDO Equipment ("RDO"). *Id.* On April 13, 2023, Scott emailed the quote from his SRM email account to an agent of Honnen, Tony Steen. *Id.* at ¶ 4, Exhibit 1.

Sometime between April 13, 2023, and July 19, 2023, Scott persuaded Tony that his new company, Sawtooth Industrial, LLC ("Sawtooth"), was affiliated with SRM and was the correct

entity to move forward with the Riverton Project. *Id.* at ¶¶ 5–7, Exhibits 2–3. Scott also began emailing Tony from his Sawtooth email address. *Id.*

A comparison of the bid Scott submitted on behalf of SRM in April 2023 and the purchase order Honnen issued to Sawtooth in July 2023 shows that Scott used SRM's proprietary pricing information to copy SRM's bid almost verbatim and submit it under the Sawtooth name, modifying only the name of the snow blower from "2023 Kodiak LMSC4852" to "2024 Sawtooth L52 Self Contained Snow Blower." *Id.* at ¶ 9, Exhibits 1, 4.

Around April 2024, RDO reached out to SRM about the Riverton Project believing that SRM remained responsible for the job. *Pierce Decl.* at ¶ 10. RDO was under the impression that Sawtooth was part of SRM and were surprised to learn that it was a separate company. *Id.* at ¶ 11. At that time, RDO asked if SRM could take the Riverton Project from Sawtooth and SRM agreed. *Id.* at ¶¶ 12–13, Exhibit 5. As a result of Scott's actions with respect to the Riverton Project, SRM had to rebuild its reputation with Honnen/RDO and nearly lost a ~$370,000 project. *Id.* at ¶ 14.

**7.  Scott gives SRM's trade secrets to Christensen Machine, Inc. to manufacture snow blower components for IIOVIII/Sawtooth.**

From August 22, 2023, through September 14, 2023, just months after Scott left SRM, Scott sent numerous schematics to a third-party parts manufacturer, Christensen Machine Inc. ("CMI"), asking for quotes to manufacture several parts for IIOVIII/Sawtooth. *Clayville Decl.* at ¶¶ 4, 8–10, Exhibits 1, 5–11.[2] The schematics Scott submitted for these parts are substantively identical to SRM's trade secret schematics in every way. *Compare id. with Groves Decl.* ¶¶ 11–26, Exhibits 3–10. The primary difference in the schematics is that the name "Kodiak Northwest" was conspicuously removed from the schematics Scott submitted to CMI. *See Clayville Decl.*,

---

[2] SRM is producing the engineering schematics referenced herein as sealed, attorney eyes only documents, pursuant to the Stipulated Protective Order in this case.

Exhibits 1, 5–11. Tellingly, however, a notation in small print on the lower left of one schematic Scott provided to CMI still states, "NOTE: DRILL HOLES AT **KODIAK** PLANT LOCATION. SIZES MAY VARY." *Id.*, Exhibit 7 (emphasis added).

Notably, the drawing number associated with each of the copied drawings Scott provided to CMI mimics the numbering scheme historically used by Kodiak Northwest and Kodiak America, and the one currently used by SRM, to number and designate its engineering drawings. *Groves Decl.* ¶ 27. The drawing numbers SRM uses have no functional purpose and are not used by SRM's competitors. *Id.*

In October 2023, shortly after Scott had provided CMI copies of SRM's trade secret schematics, he asked CMI to execute confidentiality agreements with Sawtooth and IIOVIII. *Clayville Decl.* ¶ 11, Exhibits 12–13.

8.      **Scott and Sawtooth Use SRM's trade secrets to win bid for new snowblower at Yosemite National Park.**

In July 2024, the National Park Service ("NPS") began soliciting bids for a new snow removal machine at Yosemite National Park (the "Yosemite Project"). *Pierce Decl.* ¶ 16. Notably, SRM's Kodiak snow blower formed the basis of the specifications for the snow blower portion of the machine the park was requesting. *Id.* at ¶ 18, Exhibit 7. Indeed, the specifications indicated that a "Kodiak LMSC3644 or equal" was required. *Id.*

NPS was very interested in SRM submitting a bid for this project, and SRM was interested in winning the bid, as the contract was worth ~$286,000 to SRM for its portion of the machine. *Id.* at ¶¶ 19–24, Exhibits 8–10 But, although the specifications for the snowblower required SRM's Kodiak machine (or equivalent), and NPS seemingly wanted SRM to win the bid, Mr. Pierce was informed on August 15, 2024, that SRM lost the contract for the Yosemite Project because its bid was "blown out" by Sawtooth. *Id.* at ¶¶ 23–24, Exhibit 6. NPS awarded the contract to Sawtooth

17

on August 12, 2024. *Cutler Decl.* ¶ 7, Ex. 5, *NPS's Response to FOIA Request Concerning Yosemite National Park* ("Yosemite FOIA"), pp. 31–45.

Email exchanges between Scott and NPS before Sawtooth submitted its bid demonstrate that Scott had inquired about the specifications for the snow blower component and whether, "in lieu of a Kodiak LMSC3544" snow blower, NPS would accept a "Sawtooth L44 snowblower," which Scott informed NPS had "superior electronics system, upgraded gearbox sizes, a superior primary drivetrain, lower overall height profile, and some other minor differences." *Id.* at p. 18. Notably, the nomenclature Sawtooth adopted for its machine—"L44"—appears to be an abridged version of Kodiak's LMSC3544 machine. *See id.*

Given that Scott's Contractor Agreement made clear all intellectual property was owned by SRM, Scott's assertion that Sawtooth can manufacture comparable equipment to SRM in the short time since Scott left SRM is yet more evidence showing that Scott has taken the Kodiak snow blower design (by taking SRM's proprietary information) and built upon it to create his own "improved" snow blower product with a name that harkens back to where its design originated— at SRM. *See* Groves Decl. 9–28. As a result of Scott's unauthorized use of SRM's proprietary information, SRM lost hundreds of thousands of dollars in revenue for the Yosemite Project. *See id.*; *Pierce Decl.* ¶¶ 25–26, Exhibit 10.

## LEGAL STANDARD

Pursuant to the federal Defend Trade Secrets Act ("DTSA"), "An owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA also authorizes courts to "grant an injunction" in order "to prevent any actual or threatened misappropriation" and injunctive relief may require "affirmative actions to be taken to protect the trade secret." *Id.* § 1836(b)(3)(A)(i), (ii).

"A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (applying preliminary injunction factors in trade secret context).

## ARGUMENT

All four factors the Court must consider in evaluating a motion for preliminary injunction weigh heavily in favor of SRM here. SRM's trade secrets are highly valuable and clear evidence demonstrates that the Trade Secret Defendants have misappropriated them. This misappropriation is causing irreparable harm to SRM's business, reputation, and customer relationships, which will continue in the absence of preliminary relief. In addition, the equities and public policy favor injunctive relief against the Trade Secret Defendants.

### A.     **SRM is likely to succeed on the merits.**

"Likelihood of success on the merits 'is the most important'" factor in determining whether a preliminary injunction should issue. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). To demonstrate likelihood of success on the merits in a trade secret case, the moving party must "show that it possesse[s] a trade secret, that the defendant misappropriated the trade secret, and that the defendant's conduct damaged the plaintiff." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019)).

#### 1.     **SRM owns trade secrets.**

19

Under the Defend Trade Secrets Act ("DTSA"), a "trade secret" is defined to include:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3)(A)-(B)).

In exchange for SRM's payment of $6,000,000 and other valuable consideration, Sold Kodiak, Brek, and BAUB transferred all rights in Sold Kodiak's Assets and Intellectual Property to SRM with the Asset Purchase Agreement executed in 2021 (the "Agreement"). *Groves Decl.*, ¶ 3, Exhibit 1, *Asset Purchase Agreement*, Sections 3.1(a), 4.19(d). They also covenanted that they would not "communicate, publish, or disclose to any Person or any entity anywhere or use an Confidential Information for any purpose" and moreover that "each of them will at all times hold in confidence and safeguard any Confidential Information to ensure that any unauthorized Persons do not gain possession of any Confidential Information . . . ." *Id.* at Section 6.5(e).

"SRM maintains secret its financial, business, scientific, technical, economic, or engineering information . . . ." *Verified Complaint* at 35 ¶ 221. Specifically, SRM has imposed "physical access restraints on trade secret materials including locked cabinets" and "digital access restraints on trade secret materials." *Id.* at ¶ 222. SRM's digital access restraints are imposed by

(a) limiting the number of people with digital access to those with a need to know the information for their jobs, (b) establishing employee policies that require maintenance of the confidentiality of company information, and (c) employing information technology specialists to ensure the protection of company trade secrets from internal and external threats.

*Id.* The independent economic value (actual or potential) that SRM's trade secrets derive from not being generally known (or readily ascertainable through proper means) is evidenced by (among other things) (1) SRM's willingness to pay Sold Kodiak, BAUB, and Brek $6,000,000 under the Asset Purchase Agreement for these trade secrets, (2) the serious protections established for these trade secrets under the Confidentiality terms (and enforcement mechanisms) in the Asset Purchase Agreement, (3) Elecon's interest in partnering with SRM to develop snow blowers and snow cutters for the government of India, and (4) SRM's numerous contracts to manufacture and service industrial snow removal equipment for government (and private) clients across the country." *See Id.* at ¶ 224.

> **2.     The Trade Secret Defendants have misappropriated SRM's trade secrets.**

Misappropriation of a trade secret is split into two broad categories. *See* 18 U.S.C. § 1839(5). First, misappropriation includes acquiring "a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* at § 1839(5)(A). Second, misappropriation includes disclosing or using a trade secret of another without express or implied consent by a person who—

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that--
>
>> (I) the trade secret was a trade secret; and

21

> (II) knowledge of the trade secret had been acquired by accident or mistake;

*Id.* at § 1839(5)(B). Under the statute "improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but it "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* at § 1839(6).

Here, Scott contractually agreed and acknowledged that in his work for SRM he would "receive information that is confidential and/or proprietary to" SRM and its affiliates. *Groves Decl.*, Exhibit 2, *Independent Contractor Agreement*, Section 8. Scott also agreed that SRM's "Confidential Information" included but was not limited to "all information belonging to or used by" SRM

> relating to internal operations and procedures, finances, strategies, pricing, compensation and other personnel information, client lists and contact information, sales lists, technology, source codes, programs, costs, plans, systems, inventions, developments, and trade secrets of every kind and character, whether or not they constitute a trade secret under applicable law, including such of the foregoing developed by [Scott] while performing Services pursuant to this Agreement.

*Id.* Scott also covenanted and agreed "not to make any unauthorized disclosure of the Confidential Information and to use the Confidential Information only in connection with providing Services pursuant to" his contract with SRM. *Id.* In addition, he agreed "to always act in the best interest of the [SRM] in negotiating terms of . . . contracts" with SRM's customers. *Id.* at Section 1.

Thus, the evidence, including allegations Scott has admitted to, shows that Scott breached these terms of his Contractor Agreement. Scott has used SRM's confidential information to divert contracts with NPS and RDO to his new business—commencing those efforts while employed at SRM. He has also submitted bids to compete against SRM, also while employed at SRM. Scott has used his access to employee information to prepare a poach list with detailed information on

employee compensation in violation of his Contractor Agreement. And with that information, he successfully poached numerous SRM employees, many of whom have knowledge of SRM's proprietary information as a result of their former jobs with SRM. And Scott has stolen SRM's trade secret schematics, removed the "Kodiak" labeling identifying them as SRM's property, and sent those schematics to third-party Christensen Machine Inc. ("CMI") for use in supporting his businesses Sawtooth and IIOVIII.

The evidence also shows that Scott diverted Elecon's outreach to SRM to his own private channels of communication with his father, Brek. Elecon contacted SRM about a partnership in which SRM would provide the intellectual property needed to manufacture industrial snow removal equipment and Elecon would provide the manufacturing facilities to construct the machines within India. Scott has admitted to engaging in communications with Elecon through his personal email. And Brek has admitted that he and Scott met with Elecon representatives in Idaho in August of last year. Taken together, these facts show that Scott and Brek continue to work with Elecon on fulfilling the role in the arrangement that was anticipated for SRM.

But Scott does not personally own the plans, designs, or other intellectual property necessary to manufacture industrial snow removal equipment, and neither does Brek. Scott's only access to this technology was as the President of SRM with duties of confidentiality not to use SRM's trade secrets for anything outside of his work for SRM. Even without any additional discovery at this time, there is clear evidence that Scott is in possession of SRM engineering documents and proprietary information, and that he has used them unlawfully with CMI. Taken together, this evidence along with the evidence of Scott's diversion of Elecon representatives to a personal email thread establishes a high likelihood that Scott's dealings with Elecon are premised on his unlawful use and disclosure of SRM's trade secrets that he misappropriated while working

23

as SRM's president. Scott's conduct with respect to SRM's proprietary information constitutes not only trade secret misappropriation but egregious violations of both his Contractor Agreement and his fiduciary duties to SRM.

Similarly, Brek (together with BAUB and Sold Kodiak) sold to SRM every interest he had in the trade secrets, intellectual property, and other confidential information of Sold Kodiak. *See supra* Argument, Section I.A (quoting from the Asset Purchase Agreement). As such, Brek no longer owns any intellectual property that could be supplied to Elecon, and his admitted meeting with Elecon in August 2023 substantiates a high likelihood that Brek is working in concert with Scott to unlawfully disclose and use SRM's trade secrets.

The evidence further shows that Scott is working through his entities Intermountain Living, IIOVII Precision, and Sawtooth in his use of the misappropriated SRM trade secrets. The evidence shows that Intermountain Living is one of the entities Scott is using to submit competing bids for work using SRM's trade secret customer data. IIOVII is the entity associated with the emails Scott sent to CMI with SRM's trade secret schematics. And Sawtooth and IIOVIII are the companies Scott used to employ the SRM employees he poached using confidential personnel data that he misappropriated for his own use while working as SRM's president.

### 3. The Trade Secret Defendants' misappropriation has harmed SRM.

The Trade Secret Defendants' conduct has already caused significant harm to SRM. Scott's diversion of SRM's contracts with RDO and NPS nearly lost SRM many thousands of dollars and damaged its reputation with those companies. In addition, SRM recently lost a contract to build a new snowblower machine for Yosemite National Park to Sawtooth, resulting in a loss of nearly $300,000 in revenue for SRM. The evidence concerning the Yosemite National Park project further shows that Scott is using SRM's trade secrets to compete with SRM in the marketplace and

improve upon its Kodiak snow blower designs. It also suggests a high likelihood that Sawtooth is using SRM's trade secrets to fulfill its contract with Yosemite National Park.

The Trade Secret Defendants have stolen SRM's trade secrets, poached SRM's employees who have knowledge of SRM's trade secrets, and sought to have third parties such as CMI manufacture snow blower parts using SRM's trade secrets, all in furtherance of their efforts to compete against SRM.

In short, the evidence SRM has (even without any discovery) establishes a high likelihood of success on the merits of its claim that the Trade Secret Defendants have misappropriated SRM's trade secrets and that their conduct is causing SRM significant and irreparable harm.

**B.      A preliminary injunction is necessary to avoid and redress irreparable injury to SRM in the unlawful use and distribution of its trade secrets.**

Courts within the Ninth Circuit have regularly recognized that "[a] finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV181882JGBSHKX, 2023 WL 8168854, at *18 (C.D. Cal. Oct. 6, 2023) (quoting *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, at *2 (N.D. Cal. Sept. 30, 2022)). Not only have courts regularly reached this conclusion, it also makes sense given that disclosure of trade secrets results in "a loss of competitive advantage" arising from the loss of "exclusivity of [the plaintiff's] trade secret information." *Id.*

In the above cited *Monster Energy* case, the Court explained that "[b]y accessing [the site] where 'all of [Monster's] vision and strategy' reside, [defendant] had access to Monster's competitive pricing strategies, innovative ideas, and 'institutional knowledge' about Monster's bottlers that [defendant] could use to its advantage against Monster." *Id.* (quoting trial testimony). The Court concluded that "[defendant's] use of Monster's trade secret information gives it an unfair advantage in a competitive beverage industry." *Id.* And, the court explained, "[i]t is well

4881-1680-7623.v9

established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *Id.* (quoting *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019)). Accordingly, "[a]n injunction may be used to 'eliminate any unfair head start a defendant may have gained by improper use of confidential information' and to place the defendant in the position it would have occupied if the misconduct had not occurred." *Id.* at *19.

For these same reasons, the Court should hold that SRM has experienced, and continues to experience, irreparable harm arising from the Trade Secret Defendants ongoing misappropriation of its trade secrets—harm that is appropriately remedied through issuance of immediate injunctive relief.

**C.     The balance of equities and the public interest both favor entry of a preliminary injunction.**

The balance of equities or hardships favors injunctive relief, as the injunction "would not work any hardship on [the defendants], which ha[ve] no right to use the information in the first place." *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV181882JGBSHKX, 2023 WL 8168854, at *19 (C.D. Cal. Oct. 6, 2023) (quoting *Vinyl Interactive, LLC v. Guarino*, No. C 09–0987 CW, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009)); *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) ("[H]arm caused by illegal conduct does not merit significant equitable protection."); *iBASEt v. Exacore, LLC*, Case No.: SACV 13-01781-CJC(DFMx), 2014 WL 12576816, at *5 (C.D. Cal. March 24, 2014) ("Defendants cannot claim legitimate hardship resulting from an injunction prohibiting them from engaging in . . . misappropriation of trade secrets.").

Here, the balance of equities tips even more strongly in SRM's favor given the concrete evidence of the Trade Secret Defendants' misappropriation and their efforts to delay the commencement of these proceedings by evading personal service.

4881-1680-7623.v9

The same is true for the public interest factor. "Courts in trade secret cases have consistently held that the public interest favors the vindication of intellectual property rights." *Monster Energy Co.*, 2023 WL 8168854 at *19 (quoting *Comet Techs. USA Inc. v. XP Power LLC*, No. 20-CV-06408-NC, 2022 WL 4625149, at *3 (N.D. Cal. Sept. 30, 2022)). It is also in the public interest to require parties—such as Brek and Scott—to comply with their agreements and refrain from disclosing trade secrets. *See Maximus, Inc. v. Holdren*, No. 24-CV-395, 2024 WL 1756342, at *3 (E.D. Va. Mar. 15, 2024).

**D.** **Appropriate injunctive relief encompasses both determining the scope and scale of the misappropriation and alleviating the ongoing harm arising from the Trade Secret Defendants' unlawful conduct.**

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). But the injunctive relief "must be tailored to remedy the specific harm alleged." *Id.* Here, SRM has put forward concrete proof of the defendants' misappropriation, but the scope and scale of the defendants' misconduct must still be determined. Accordingly, injunctive relief in this case should be tailored to ensure an expedited and comprehensive discovery of the full breadth of the Trade Secret Defendants' misappropriation while also prohibiting further dissemination and use of the misappropriated trade secrets.

**1.** **The Court's injunction should facilitate an expedited assessment of the scope of the Trade Secret Defendants' misappropriation by requiring them to identify all physical and electronic storage devices in their possession and to forensically images these repositories.**

SRM has produced conclusive evidence of misappropriation of its trade secrets, but the full scope of the misappropriation must be discovered in this lawsuit. In the stipulated discovery plan, the defendants have agreed to preserve

> Phone records; emails; all text messages (SMS, imessage, etc.) with individuals who have potentially discoverable information; text

4881-1680-7623.v9

> messages (SMS, imessage, etc.) on subjects potentially relevant to
> the litigation with other individuals; instant messages; calendar
> entries; social media data from Facebook, Instagram, and any other
> utilized social media platform.

*Discovery Plan*, Dkt. 49, a 3 (June 5, 2024). In addition to preservation of these documents, which the defendants have agreed to, the Court should require that the Trade Secret Defendants specifically identify all physical or electronic storage devices that they use or have used since January 2021 (including but not limited to physical storage cabinets, digital cloud storage, laptops, desktop computers, cell phones, CDs/DVDs, USB storage devices, hard drives, and other similar media).

In addition to identifying all physical and electronic storage devices, the Trade Secret Defendants should be ordered to identify and forensically image all physical or electronic storage devices (including but not limited to such devices described above) on which they have ever conducted any business related to the sales, service, manufacture, or other business involving commercial snow removal equipment—whether Kodiak brand equipment or otherwise—since January 2021.

Finally, the Trade Secret Defendants should be ordered to provide certification of their compliance with these obligations by declaration of a third-party or internally employed professional setting forth the method employed to forensically image and preserve the information consistent with the Court's order.

This aspect of the injunctive relief is necessary to expedite the ability for SRM to determine the full scope of the misappropriation of trade secrets by the Trade Secret Defendants. SRM has put forward evidence establishing actual misappropriation of documents and efforts to cover up this misappropriation by diverting communications from company emails to personal emails, or by deleting documents from the company system before leaving. Even with the Trade Secret

Defendants' agreement to preserve information, an order expediting the process for identifying the location of all potentially relevant information and a certification that the data has been preserved in a manner that preserves the integrity of the data will avoid the potential for discovery disputes to slow the process by which SRM can discover the scope of the Trade Secret Defendants' misappropriation of trade secrets.

> **2.** **The Court's injunction should facilitate an expedited assessment of the scope of the Trade Secret Defendants' misappropriation by allowing SRM to review Sawtooth's schematics to verify whether they are copies of or are derived from SRM's proprietary schematics.**

Before leaving SRM, Scott copied its proprietary information onto his personal OneDrive and Cloud accounts. Since that time, SRM has become aware that Scott has submitted at least seven of its schematics to third-party parts manufacturer Christensen Machine Inc. (CMI) to fabricate parts for snow blower machines that he is selling and/or servicing through Sawtooth and IIOVIII.

In the first six months after leaving SRM, Scott used SRM's schematics without incorporating the Sawtooth brand on them, but he has since become more sophisticated and has begun branding schematics with his own Sawtooth mark. Out of an abundance of caution, counsel for SRM has not delivered schematics bearing Sawtooth's name to SRM to review. Because of that, SRM has not yet conducted the analysis required to establish whether any Sawtooth schematics are actually SRM's schematics disguised under the Sawtooth brand. Notably, SRM has more than one hundred thousand documents reflecting its trade secret schematics, but the people most familiar with those schematics have not yet been given access to compare them with Sawtooth's documents. Because it will take a significant amount of time to compare the documents, SRM would like to get started as soon as possible.

4881-1680-7623.v9

Given the expedited timing of Scott's entry into the market to compete against SRM, and the examples of stolen schematics SRM knows of, SRM has cause to believe at least some of the Sawtooth-branded schematics are also copied from its own schematics. As part of injunctive relief requested herein, SRM requests permission to review and compare Sawtooth's schematics to its own.

> **3.  The Court should prohibit the Trade Secret Defendants, their agents, and anyone acting in concert with them from using SRM's trade secrets, and the Court should require the Trade Secret Defendants' cooperation in identifying third parties with whom SRM's trade secrets have been shared and in recovering SRM's data from them.**

"An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). In the trade secret context, the Ninth Circuit has held that "[a] worldwide injunction" can be "consistent with those goals because it places the defendant in the position it would have occupied if the breach of confidence had not occurred prior to the public disclosure." *Id.* (cleaned up). "Allowing [defendants to use SRM's trade secrets] at all will permit [them] to profit from [their] head start and to shut [SRM] out of new markets it is trying to reach." *See id.* Likewise, anything short of a complete injunction on the use of SRM's trade secrets would afford the Trade Secret Defendants an unfair advantage in competition in the markets SRM currently services. *See id.*

Accordingly, SRM moves the Court to enter a preliminary injunction against the Trade Secret Defendants, and others acting in concert with them, as follows. For purposes of the injunction entered by the Court the "Misappropriated Information" is defined to include both (1) SRM's engineering drawings, customer contact information, parts lists or information, and supplier lists or information, and (2) the Trade Secret Defendants own materials that have been

developed, modified, or improved using SRM's engineering drawings, customer contact information, parts lists or information, and supplier lists or information.

1. The Court should prohibit these defendants from using or disseminating the Misappropriated Information.

2. The Court should require that these defendants immediately identify all third parties to whom they have disseminated the Misappropriated Information.

3. The Court should require that these defendants take all steps in their power to secure the return from third parties of any Misappropriated Information they disseminated. This includes exercising all rights defendants have to require the return of the Misappropriated Information.

4. The Court should require that these defendants identify any third parties that refuse to return any Misappropriated Information.

5. The Court should prohibit these defendants from using or further disseminating any of their own materials that have been developed, modified, or improved using SRM's engineering drawings, customer contact information, parts lists or information, and supplier lists or information.

6. This Court should require that all Misappropriated Information returned be forensically imaged and securely stored to prevent further misuse.

7. This Court should require that the Trade Secret Defendants provide a certification of their compliance with their obligations to forensically image and securely store the returned data by declaration of a third-party or internally employed professional setting forth the method employed to forensically image and preserve the information consistent with the Court's order.

As set forth above, the Trade Secret Defendants have no rights to the Misappropriated Information. And SRM will face grave irreparable injury if the assets that it recently paid millions

of dollars to acquire are used or disseminated by competing companies including those of the Trade Secret Defendants and their third-party partners, including Elecon.

      **4.**      **No bond should be required with respect to the injunctions' impact on Brek, as he affirmatively waived any right to a bond in the Asset Purchase Agreement. Further, no bond should be required to protect any Trade Secret Defendants due to the likelihood that SRM will succeed on the merits in this case.**

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite the seemingly mandatory language of Rule 65(c), however, the Rule "invests the district court 'with discretion as to the amount of security required, *if any.*'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original) (quoting *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)); *see also IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032, 2024 WL 4314714, at *11 (E.D.N.Y. Mar. 13, 2024) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("District courts are 'vested with wide discretion' to determine the appropriate amount of the bond" in a preliminary injunction matter.)).

"The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen*, 320 F.3d at 919. "Further, 'the likelihood of success on the merits . . . tips in favor of a minimal bond or no bond at all.'" *Samick Music Corp. v. Gordon*, No. SACV 20-395-GW-JDEX, 2020 WL 3210613, at *11 (C.D. Cal. Mar. 26, 2020) (requiring no bond where plaintiff established likelihood of success for trade secret claims) (quoting *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985)). Indeed, "[t]he greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and

consequently that [the defendant] will be found to have wrongfully suffered harm." *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011); *see also IME Watchdog*, 2024 WL 4314714, at *11 (No bond required in trade secret misappropriation case where the plaintiff was "highly likely to prevail on the merits" and "the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal.").

Courts have also determined that a bond is not required in the preliminary injunction context where a party has contractually waived its right to a bond. *See Morris CM Enterprises, LLC v. Wingstop Franchising, LLC*, No. 219CV02306KJMCKD, 2020 WL 42241, at *6 (E.D. Cal. Jan. 3, 2020) (requiring no bond where the party expressly waived right to bond in a franchise agreement and noting that "other district courts in this circuit have held such bond waiver clauses enforceable."); *see also Just Tacos, Inc. v. Zezulak*, No. CV 11-00663 DAE-KSC, 2011 WL 6140866 at *11 (D. Haw. Dec. 9, 2011) (requiring no bond where right to bond waived in contract); *Maximus, Inc. v. Holdren*, No. 24-CV-395, 2024 WL 1756342, at *3 (E.D. Va. Mar. 15, 2024) (requiring no bond where right to bond waived in Confidentiality Agreement).

Under the Confidentiality provision in the Asset Purchase Agreement with SRM (the "Agreement"), Brek contractually agreed that injunctive relief is among the remedies for violation of the Confidentiality requirements in the Agreement, and he further agreed that entry of an injunction is appropriate "without the requirement of posting a bond or proving actual damages." *See Groves Decl.*, Exhibit 1, *Asset Purchase Agreement*, Sections 6.5(e)–(f). Brek has breached the Confidentiality provision by, among other conduct, disclosing SRM's confidential information to third parties (e.g., Scott and Elecon) in his attempts to divert business away from SRM. Because Brek has contractually waived his right to a bond, the Court should find that SRM does not have

to post a bond for Brek's benefit. *See Morris CM Enterprises*, 2020 WL 42241, at *6; *Maximus, Inc.*, 2024 WL 1756342, at *3.

Moreover, given the wealth of evidence establishing the Trade Secret Defendants' misappropriation of SRM's trade secrets and the harm it has caused, SRM is likely to succeed on the merits in this litigation; therefore, the hardship to the Trade Secret Defendants imposed by a preliminary injunction, if any, would be minimal. *See Jorgensen*, 320 F.3d at 919; *IME Watchdog*, 2024 WL 4314714, at *11; *Eastman Kodak Co.*, 821 F. Supp. at 590. Here, the likelihood of SRM's success on the merits tips in favor of no bond. *See Samick Music Corp.*, 2020 WL 3210613, at *11. *IME Watchdog*, 2024 WL 4314714, at *11; *Jorgensen*, 320 F.3d at 919. As a result, a bond should not be required with respect to any of the Trade Secret Defendants. *See id.*

In the event the Court determines a bond is necessary, SRM requests the imposition of a minimal bond in light of its tailored request to prohibit the Trade Secret Defendants from continuing to use and disseminate its trade secrets, and the minimal harm to defendants imposed by the injunction. *See Logistics Guys Inc. v. Cuevas*, No. 2:23-CV-01592-DAD-CSK, 2024 WL 3011216, at *12 (E.D. Cal. June 13, 2024) (requiring minimum bond of $5,000 where injunction was narrowly tailored and likelihood of harm to defendants was low).

## <u>CONCLUSION</u>

Because SRM is likely to succeed on the merits of its trade secret misappropriate claim and will suffer irreparable harm in the absence of preliminary relief, and the balance of equities and the public interest both favor entry of a preliminary injunction, the Court should grant SRM's Motion and enter the preliminary injunction requested.

4881-1680-7623.v9

DATED this 14th day of October 2024.

PARSONS BEHLE & LATIMER

*/s/ John E. Cutler*

Lee Radford
John E. Cutler
Daniel Biddulph

*Attorneys for Plaintiff SRM-Kodiak*
*America, LLC*

4881-1680-7623.v9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of October, 2024, I caused a true and correct copy of the foregoing document to be served on counsel for the party of interest via email, as follows:

Bren Mollerup                                          *benoitlaw@benoitlaw.com*
BENOIT, ALEXANDER, MOLLERUP &
DANIELSON, PLLC
P.O. Box 366
Twin Falls, ID  83303
*Attorneys for Defendant Carolyn Shoemaker*

David W. Gadd                                          *dwg@magicvalleylaw.com*
STOVER GADD & ASSOCIATES, PLLC
905 Shoshone St. N.
P.O. Box 1428
Twin Falls, ID  83303-1428
*Attorneys for Defendants Brek Pilling, Kodiak*
*America, LLC, Baub, LLC, Kodiak Northwest, Inc.,*
*PFT Enviro Investments, LLC, and Brek Pilling as*
*Trustee of the Pilling Family Trust*

Kyle Eric Bastian                                      *kbastian@wrightbrotherslaw.com*
WRIGHT BROTHERS LAW OFFICE, PLLC
P.O. Box 5678
Twin Falls, ID  83303
*Attorneys for Defendants Scott Pilling, IIOVIII*
*Precision, LLC, Sawtooth Industrial, LLC, and*
*Intermountain Living, LLC*

Marty R. Anderson                                      *marty@eastidaholaw.net*
SMITH WOOLF ANDERSON
& WILKINSON, PLLC
3480 Merlin Drive
Idaho Falls, Idaho 83404
Telephone: (208) 525-8792
*Attorneys for Defendant Budget Truck Center, LLC*

Peter M. Wells                                         *pete@mrwlaw.net*
MAY, RAMMELL & WELLS, CHARTERED
216 W. Whitman
PO Box 370
Pocatello, ID  83204-0370
*Attorneys for Defendant Gary Wickersham*

4881-1680-7623.v9

Mark O. Morris                          mmorris@swlaw.com
Tara Martens Miller                     tmmiller@swlaw.com
Benjamin J. Mills                       bemills@swlaw.com
SNELL & WILMER, LLP
Key Business Center
702 W. Idaho Street, Ste 1100
Boise, ID  83702
*Attorneys for Defendants Brek Pilling, Baub, LLC,*
*Kodiak America, LLC, The Pilling Family Trust,*
*PFT Enviro Investments, Kodiak Northwest, Inc.,*
*and Brek Pilling as Trustee of the Pilling Family*
*Trust*


Kim J. Trout                            ktrout@trout-law.com
TROUT LAW, PLLC
3778 N. Plantation River Drive, Ste 101
Boise, ID  83703
*Attorneys for Defendant Lurene Dille*

     I HEREBY FURTHER CERTIFY that on the above stated day, I caused a true and correct copy of the foregoing document to be served on the following parties by U.S. Mail and E-Mail at the addresses listed below. To the extent these individuals are eligible for and have signed up for electronic notices through ECF, they will also have received the filing through that means as well.

Arthur Sadampi Yamada
930 Snowflake Drive
Hailey, ID  83333-8474
(208) 490-1125
rideinxs@gmail.com
*Pro Se Defendant*

                */s/ John E. Cutler*_____
                Lee Radford
                John E. Cutler
                Daniel Biddulph

4881-1680-7623.v9