Kyle E. Bastian [ISB No. 10059]
WRIGHT BROTHERS LAW OFFICE, PLLC
1440 Blue Lakes Blvd. N., Suite A
P.O. Box 5678
Twin Falls, ID  83303-5678
Telephone No. (208) 733-3107
Fax No. (208) 733-1669
E-mail: kbastian@wrightbrotherslaw.com

*Attorneys for Defendants Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SRM-KODIAK AMERICA, LLC, an Idaho limited liability company, | Case No. 4:24-cv-00112-DCN |
| Plaintiff, | **RESPONSE TO SRM-KODIAK AMERICA'S MOTION FOR PRELIMINARY INJUNCTION [Dkt. 65]** |
| vs. | |
| BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., and Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, and Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, and individual; LURENE DILLE, an individual; DOE DEFENDANTS I-XX; and ROE | |

ENTITY DEFENDANTS I-XX,

      Defendants.

SCOTT PILLING, an individual,

      Counterclaimant,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,

      Counterdefendant.

BREK PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; and PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company,

      Counterclaimants,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,

      Counterdefendant.

Defendants Scott Pilling ("Scott"), Sawtooth Industrial, LLC ("Sawtooth"), IIOVIII Precision, LLC ("IIOVIII"), and Intermountain Living, LLC ("IML") submit this *Response to SRM-Kodiak America's Motion for Preliminary Injunction* [Dkt. 65]. This Response is supported by the *Declaration of Scott Pilling in Support of Response to SRM-Kodiak America's Motion for Preliminary Injunction* (the "*Pilling Decl.*"), the *Declaration of Kenneth Randall in Support of Response to SRM-Kodiak America's Motion for Preliminary Injunction* (the "*Randall Decl.*"), the *Declaration of Paula Shockey in Support of Response to SRM-Kodiak America's*

*Motion for Preliminary Injunction* (the "*Shockey Decl.*"), and the *Declaration of Ricky Bernstrauch in Support of Response to SRM-Kodiak America's Motion for Preliminary Injunction* (the "*Bernstrauch Decl.*"), submitted concurrently herewith.

## INTRODUCTION

In September 2021, Plaintiff SRM-Kodiak America, LLC ("SRM") entered into an agreement to purchase certain assets of Kodiak America, LLC ("Sold Kodiak"), a manufacturer of custom snow removal equipment.  The agreement required SRM to vacate a manufacturing facility in Paul, Idaho and remove all items SRM desired by early 2022.  SRM intentionally abandoned numerous items, including drawings, schematic prints, and parts, in the Paul facility.  Now, more than eight months after commencing this lawsuit, SRM moves for a preliminary injunction to bar various defendants from using the very items SRM abandoned at the Paul facility, many of which it appears have been owned for decades by non-parties to the purchase agreement.

SRM's allegations that Scott, Sawtooth, IIOVIII, and IML somehow misappropriated SRM's trade secrets are based on highly speculative, circumstantial evidence that is subject to significant factual disputes.  SRM has failed to make a clear showing that it is entitled to the extraordinary and drastic injunctive relief it seeks.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 29, 2024, SRM entered into an Asset Purchase Agreement (the "APA"), whereby SRM agreed to purchase "all assets, properties and rights of" Sold Kodiak, including all customer lists, documents, drawings, and other written materials of Sold Kodiak.  *Declaration of Tyler Groves in Support of SRM-Kodiak America's Motion for Preliminary Injunction* (the "*Groves Decl.*") ¶3, Exhibit A (sealed), at §§ 1.1, 2.1.  Pursuant to the APA, SRM was required

to vacate the real property commonly known as 50 East Ellis Street, Paul, Idaho (the "Paul

Facility") and remove all items SRM desired by January 31, 2022.  *Id.* at § 3.2; *Pilling Decl.* ¶5.

That deadline was later extended through approximately March 31, 2022.  *Pilling Decl.* ¶5.

As of September 29, 2021, numerous old drawings, schematic prints, and floppy discs

containing prints of Kodiak Northwest, Inc. ("Kodiak NW") and Idaho Norland Corporation

("Idaho Norland") from the late 1990s / early 2000s timeframe, as well as many miscellaneous

parts, were strewn throughout the shop at the Paul Facility.  *Pilling Decl.* ¶6; *Randall Decl.* ¶7.

Following execution of the APA, SRM management was made aware by multiple employees of

SRM that there were numerous drawings, schematic prints, and floppy discs containing prints, as

well as miscellaneous parts, at the Paul Facility.  *Pilling Decl.* ¶7; *Shockey Decl.* ¶¶6, 9;

*Bernstrauch Decl.* ¶7.  Employees of SRM repeatedly urged SRM management to retrieve such

items from the Paul Facility.  *Pilling Decl.* ¶7; *Shockey Decl.* ¶7; *Bernstrauch Decl.* ¶¶6–7.

SRM management, including CEO Grant Flaherty and Operations Manager Jody Young,

consistently stated that SRM had no interest in removing and would not support drawings, prints,

or parts over ten years old left in the Paul Facility because SRM was going to sell "new

machines."  *Pilling Decl.* ¶8; *Shockey Decl.* ¶8; *Bernstrauch Decl.* ¶¶5, 9.  This statement of

policy was conveyed by SRM management both formally and informally on multiple occasions

in different contexts, from supervisor meetings with SRM management on Monday mornings to

verbal conversations with employees about part orders to answering questions about product

design.  *Shockey Decl.* ¶9; *Bernstrauch Decl.* ¶¶5, 9.  SRM had every opportunity to remove the

old drawings, prints, and parts from the Paul Facility but declined to do so.  *Pilling Decl.* ¶7;

*Shockey Decl.* ¶¶8-9, 12; *Bernstrauch Decl.* ¶8.

On August 1, 2022, Scott signed an Independent Contractor Agreement provided by SRM. *Pilling Decl.* ¶9. It appears that SRM never signed this document. *See Pilling Decl.* ¶9. The Independent Contractor Agreement identifies Scott as both an independent contractor and the President of SRM. *Pilling Decl.* ¶10. In reality, SRM treated Scott as a glorified sales and service representative without any real authority, as evidenced by the admissions of multiple SRM board members that Scott held a "monarch" position that was just for show. *Pilling Decl.* ¶10. Nevertheless, Scott was expected to be the face of the company, travel extensively for sales and service visits, and interact face to face with customers. *Pilling Decl.* ¶11.

Because Scott needed to access large work files while on the road and SRM was still working on a remote desktop access solution, Scott sought and obtained approval from SRM CEO Grant Flaherty to use his personal accounts, including without limitation Scott's personal iCloud account, to store work files. *Pilling Decl.* ¶12. SRM was certainly aware that Scott was using his personal accounts to store work files and consented to it. *Pilling Decl.* ¶12. After SRM hired Trevor Rice as Information Technology Manager, Scott still lacked remote desktop access, spoke with Trevor to address that issue, and was told Trevor was working on a permanent solution. *Pilling Decl.* ¶13. Trevor sometimes accessed Scott's SRM-issued laptop to perform troubleshooting and mass deletions of files. *Pilling Decl.* ¶13. Scott also deleted emails and other files from his SRM-issued laptop on a regular basis to keep things organized and free up space. *Pilling Decl.* ¶13. As of the spring of 2023, SRM's share point system was still having issues, causing Scott's browser to freeze up. *Pilling Decl.* Exhibit 1.

In late 2022, Scott began exchanging emails with Elecon Group of Companies in India ("Elecon") regarding potential arrangements and opportunities involving multiple industries, including snow removal and drilling. *Pilling Decl.* ¶14. At the time, Scott was experiencing

some issues with all of his sales emails being sent to his junk folder and emailed Trevor Rice about this issue. *Pilling Decl.* ¶14, Exhibit 1. Trevor indicated he was working on a solution, but it took SRM's IT Department quite a while to resolve that issue, so Scott started using his personal email account to communicate with Elecon. *Pilling Decl.* ¶14. Shortly after Scott started using his personal email account, SRM's board advised Scott that Brian Tibbets was in charge of international affairs, that SRM's dealer in India had indicated it would handle its own manufacturing, and that SRM had no interest in pursuing a partnership with Elecon. *Pilling Decl.* ¶14. Scott continued to keep in touch with Elecon regarding opportunities unrelated to snow removal and as a potential backup plan for SRM before his departure from SRM. *Pilling Decl.* ¶14. After leaving SRM, Scott continued to communicate with Elecon by email and, in February 2024, Scott visited Elecon in India on behalf of Sawtooth to discuss potential arrangements and opportunities in India and beyond. *Pilling Decl.* ¶14. To date, such discussions have been hypothetical in nature, no contract or agreement has been executed, and no work has been performed by Sawtooth or Elecon. *Pilling Decl.* ¶14. To date, no confidential proprietary information or data of SRM has been provided or used in communications with Elecon. *Pilling Decl.* ¶15, Exhibit 2.

In early 2023, Scott grew increasingly frustrated and dismayed with SRM's direction, declining product quality, and poor customer service. *Pilling Decl.* ¶16. Around that time, Scott had been exploring several potential new ventures in other industries, including mobile hydraulics and drilling rigs manufacturing. *Pilling Decl.* ¶17. Sawtooth and IIOVIII were initially formed in connection with those efforts, but those efforts did not ultimately pan out. *Pilling Decl.* ¶17.

Sawtooth and IIOVIII were formed in April 2023.  *Pilling Decl.* ¶17.  Arthur Yamada was initially a member of both Sawtooth and IIOVIII who provided consulting services on an as-needed basis, but was removed from both Sawtooth and IIOVIII shortly after formation and has had no involvement since.  *Pilling Decl.* ¶¶18–19.

In April 2023, Scott submitted three bids to a potential customer, FAA Vancouver, which had requested both new and used snow blower options.  *Pilling Decl.* ¶20.  Scott submitted multiple bids because FAA Vancouver had requested multiple options and SRM had no used equipment that met FAA Vancouver's specific requirements at that time.  *Pilling Decl.* ¶20.  Scott submitted the first bid on behalf of SRM for a new snow blower.  *Pilling Decl.* ¶20.  Since SRM had no used options at the time that met FAA Vancouver's specific requirements, Scott submitted a second bid on behalf of IML for a used snow blower he owned personally and, after realizing that IML was not registered on SAM.gov, submitted a third bid on behalf of Sawtooth for the same used snow blower.  *Pilling Decl.* ¶20.

In March and April 2023, Scott also submitted two bids to a potential customer, Wolf Creek Ski Area.  *Pilling Decl.* ¶21.  Once again, Scott submitted multiple bids because Wolf Creek Ski Area had requested multiple options and SRM had no used equipment that met Wolf Creek Ski Area's specific requirements at that time.  *Pilling Decl.* ¶21.  Scott submitted the first bid on behalf of SRM for a new snow blower, but Wolf Creek Ski Area had indicated it could not justify the cost and was looking for used options.  *Pilling Decl.* ¶21.  A few weeks later, Scott submitted the second bid on behalf of IML for an entirely different, used snow blower SRM had no interest in that Scott was in the process of personally acquiring from a third party. *Pilling Decl.* ¶21.

**RESPONSE TO SRM-KODIAK AMERICA'S MOTION FOR PRELIMINARY INJUNCTION – 7**

Scott submitted his resignation to SRM on June 29, 2023. *Pilling Decl.* ¶22. Due to out-of-state travel, weekends, and the Fourth of July holiday, Scott had no access to his SRM-issued laptop from June 22 through July 5, 2023. *Pilling Decl.* ¶23, Exhibits 1, 3. Ultimately, Scott was unable to retrieve the laptop and bag until July 5, after which he returned the laptop to SRM on July 6, 2023. *Pilling Decl.* ¶23, Exhibit 1, 3.

Following Scott's resignation from SRM, IIVOIII became a manufacturer of custom snow removal equipment and Sawtooth became its distributor. *Pilling Decl.* ¶24. Proprietary information and data used to develop and design products manufactured by IIOVIII and distributed by Sawtooth have been developed independently using primal knowledge and, in some instances, reverse engineering without referencing, using, or relying on any proprietary information or data of SRM. *Pilling Decl.* ¶25; *Randall Decl.* ¶13.

Shortly after IIVOIII began operating, there were some instances in which IIOVIII referenced or used old drawings, prints, or parts left in the shop at the Paul Facility on a limited basis as a starting point for product designs. *Randall Decl.* ¶14. Given the age of such drawings, prints, and parts, however, they were seldomly used initially and have not been used in any way for at least eight months. *See Randall Decl.* ¶14. There have also been a few instances in which unaffiliated customers or suppliers of IIOVIII have provided drawings or prints bearing the "Kodiak" name to IIOVIII unilaterally. *Randall Decl.* ¶15.

In approximately late August 2023, Scott began exchanging email correspondence with Christensen Machine Inc. ("CMI") for the purpose of ordering parts IIOVIII needed to manufacture equipment. *Pilling Decl.* ¶26. Before Scott sent any drawings to CMI, however, CMI already had in its possession numerous older drawings and prints bearing the "Kodiak" name from previous jobs. *Pilling Decl.* ¶26. Because IIOVIII's engineering department was just

getting off the ground, in August and September 2023, Scott sent CMI redacted copies of a few drawings that had been left on various shelves in the shop at the Paul Facility. *Pilling Decl.* ¶¶26–29. All such drawings were drawings of Kodiak Northwest, LLC created between 1996 and 2004. *See Pilling Decl.* ¶¶26–29, Exhibits 4–10 (sealed). It was Scott's understanding that the drawings had been abandoned at the Paul Facility. *Pilling Decl.* ¶26. Scott removed Kodiak NW's name from the drawings upon CMI's request because CMI already had in its possession numerous drawings and prints bearing the "Kodiak" name in its shop from previous work CMI had performed and desired to keep everything separate on their end. *Pilling Decl.* ¶26. Neither IIOVIII nor Sawtooth is currently referencing, using, or relying on any proprietary information or data of SRM in the development or design of products manufactured by IIOVIII and distributed by Sawtooth. *Pilling Decl.* ¶30; *Randall Decl.* ¶16.

On February 26, 2024, SRM filed a *Verified Complaint and Demand for Jury Trial* (the "*Complaint*") commencing this action. [Dkt. 1]. Nearly eight months later, SRM filed *SRM-Kodiak America, LLC's Motion for Preliminary Injunction*. [Dkt. 65]. Scott, Sawtooth, IIOVIII, and IML hereby object to SRM's Motion for Preliminary Injunction based on the reasons, points, and authorities set forth below.

## LEGAL STANDARD

Motions for preliminary injunctions are governed by Federal Rule of Civil Procedure 65. Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *BigRentz, Inc. v. KGM Enterprises, LLC*, No. 1:22-cv-00430-AKB, slip op. at 1 (D. Idaho Nov. 13, 2023) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "The purpose of a preliminary

injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

A plaintiff seeking a preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first element—likely success on the merits—is the most important. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## ARGUMENT

SRM has failed to make "a clear showing" that it is likely to succeed on the merits on its Defend Trade Secrets claim and that it is likely to suffer irreparable harm absent preliminary injunctive relief. Neither the balance of equities nor the public interest favors entry of a preliminary injunction. Finally, even if this Court concludes that some form of preliminary relief is appropriate, such relief should be narrowly tailored to remedy the specific harm alleged and a bond should be required.

### A.    SRM is not likely to succeed on the merits.

SRM alleges it is likely to succeed on the merits of its Defend Trade Secrets Act claim set forth in the First Cause of Action of the *Complaint*. SRM does not appear to contend it is likely to succeed on the merits of any other claim (Second Cause of Action through Twelfth Cause of Action) set forth in the *Complaint*, at least not for purposes of SRM's Motion for Preliminary Injunction.

The Defend Trade Secrets Act of 2016 ("DTSA") creates a private right of action whereby "a[n] owner of a trade secret that is misappropriated may bring a civil action[.]" 18 U.S.C. § 1836(b). The DTSA defines a "trade secret" as information that "the owner thereof has

taken reasonable measures to keep . . . . secret" and that "derives independent economic value, actual or potential, from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information[.]"  18 U.S.C. § 1839(3).

The DTSA defines "misappropriation" as: (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent.  18 U.S.C. §§ 1839(5)(A), 5(B).  At this stage, SRM has failed to clearly establish that Scott, Sawtooth, IIOVIII, or IML misappropriated any trade secret of SRM under the DTSA.

1.    *SRM has not clearly established ownership of the information at issue.*

Despite the APA's broad definition of information included in the assets SRM acquired from Sold Kodiak, SRM has specifically identified only a handful of items it alleges were misappropriated, and there are significant factual disputes as to whether SRM even owns those items.

SRM has specifically identified seven (7) drawings Scott sent to Christensen Machine Inc. ("CMI") it alleges were confidential intellectual property and trade secrets of SRM.  *See Groves Decl.* ¶¶ 11–14, 17–18, 21–26; *Declaration of Tom Clayville in Support of SRM-Kodiak America's Motion for Preliminary Injunction*, ¶¶4, 8–10, Exhibits 1, 5, 7–8, 10–12 (sealed); *Pilling Decl.* ¶¶26–29, Exhibits 4–10 (sealed).  However, such drawings were created by a third party, Kodiak NW, between 1996 and 2004.  There is no evidence that these drawings were ever acquired by SRM, at the time of the APA or otherwise.  The evidence, in fact, suggests that these drawings are the property of Kodiak NW, a non-party to the APA.

Even if SRM somehow acquired the seven (7) drawings at issue, there is overwhelming evidence that SRM no longer owns such drawings because SRM intentionally abandoned such drawings more than two years ago at the Paul Facility.  The evidence shows that SRM had no interest retrieving any drawings of Kodiak NW or Idaho Norland left at the Paul Facility after being afforded every opportunity to do so.  Multiple SRM employees advised SRM management that there were numerous drawings, in addition to schematic prints, floppy discs containing prints, and miscellaneous parts, located in the shop at the Paul Facility and repeatedly urged SRM management to retrieve them.  SRM's consistent statement of policy at the time was that SRM had no interest in removing and would not support drawings, prints, or parts left in the Paul Facility over ten years old because it was going to sell new machines.  There is no evidence that SRM took any measures whatsoever, much less any reasonable ones, to keep such information secret.

SRM specifically identifies the names of several former SRM employees that IIOVIII later employed, alleging that most of the names appear on an "Employee Poach" list created by Scott before he left and that such former employees had access to SRM's confidential information.  It is true that IIOVIII employed several former employees of SRM.  Even so, such former employees' names, standing alone, are certainly not trade secrets.  Moreover, SRM has failed to specifically identify any confidential information that such former employees had access to that was allegedly misappropriated.

SRM has failed to clearly show that it owns any specifically identifiable information that was allegedly misappropriated.  Entry of a preliminary injunction is inappropriate on this basis.

   2.  *SRM has not clearly shown that Scott acquired any trade secret of SRM by improper means.*

SRM alleges that Scott misappropriated SRM's trade secrets by acquiring them through improper means.  Specifically, SRM alleges that Scott violated his Independent Contractor Agreement and SRM policy by transferring and deleting SRM's confidential information from his SRM-issued laptop.

As a preliminary matter, it appears that SRM never signed the Independent Contractor Agreement Scott signed on August 1, 2022.  Enforceability of the Independent Contractor Agreement is somewhat unclear.

SRM's argument that Scott improperly copied SRM's confidential information from his SRM-issued laptop is based on speculative, circumstantial evidence.  SRM alleges that Scott acted improperly because he deleted certain files, drawing unwarranted assumptions based on file names alone.  Such evidence does not clearly show Scott improperly copied confidential information of SRM from his laptop.  Moreover, SRM's suggestion that Scott reinstalled his laptop operating system on or around June 28, 2023 is simply false, as Scott was in Montana at the time and left his laptop in the backseat of an SRM service truck parked at SRM's facility in Burley from approximately June 22 through July 5, 2023.

The evidence shows that Scott sought and obtained approval from SRM CEO Grant Flaherty to use his personal accounts, including his personal iCloud account, to store company files out of necessity because he lacked remote desktop access when he was traveling for work.  The evidence also shows that as late as May 2023, SRM Information Technology Manager Trevor Rice was still working on a solution to resolve this issue, knew full well that Scott was still transferring company files to his personal accounts out of necessity, and even performed

mass file deletions from Scott's computer himself.  There is no evidence that SRM has been damaged in any way as a result of the copying of any information from Scott's laptop.

> 3.  *SRM has not clearly shown that Scott, Sawtooth, IIOVIII, or IML disclosed or used any trade secret of SRM without SRM's consent.*

SRM has failed to clearly show that Scott, Sawtooth, IIOVIII, or IML misappropriated any trade secret of SRM through unauthorized disclosure or use.  Most of SRM's allegations on this point are highly general and speculative.  SRM's allegations relating to the seven specific drawings do not clearly establish misappropriation.  As noted above, there are significant factual disputes as to whether SRM even owns such drawings.  Likewise, SRM's allegations about bids and purchase orders involving specific customers do not clearly establish misappropriation.

Courts generally recognize customer information, such as a customer list, as a trade secret, but a plaintiff seeking a preliminary injunction must still clearly establish that its customer information was, in fact, misappropriated.  *See BigRentz*, slip op. at 4.  The Ninth Circuit Court of Appeals has ruled that "the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition" and that "the common law right to compete fairly and the right to announce a new business affiliation have survived[.]"  *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).

SRM alleges that Scott, Sawtooth, IIOVIII, and IML misappropriated SRM's trade secrets by diverting customers and potential customers from doing business with SRM both before and after Scott's resignation.  SRM alleges that, before Scott's resignation, Scott sent two completing bids to FAA Vancouver and one competing bid to Wolf Creek Ski Area in approximately April 2023.  Scott indeed sent one bid to FAA Vancouver on behalf of IML, one bid to FAA Vancouver on behalf of Sawtooth, and one bid to Wolf Creek Ski Area on behalf of

IML.  However, all of these bids were for entirely different, used snow blowers in which SRM had no interest that Scott owned personally or was in the process of acquiring.  The bids were not in competition with SRM, as both FAA Vancouver and Wolf Creek Ski Area had requested multiple options and SRM had not used equipment that met their specific requirements at that time.

SRM further alleges that Scott diverted Elecon from doing business with SRM both before and after his resignation.  However, the evidence shows that SRM's board advised Scott that SRM had no interest in pursuing a partnership with Elecon.  Moreover, Scott's discussions with Elecon were purely hypothetical in nature and, by Elecon's own written admission, no confidential proprietary information or data of SRM has been provided or used.

SRM alleges that Scott diverted Lassen Volcanic National Park, Honnen Equipment Co., and Yosemite National Park from doing business with SRM after Scott's resignation.  However, the evidence shows that Scott did not improperly divert SRM's Lassen purchase order, as SRM was unable and unwilling to provide the service work at issue, and disclosed in writing that he was not affiliated with SRM.  The evidence also shows that Scott did not persuade Honnen Equipment Co. that Sawtooth was affiliated with SRM or use trade secrets of SRM to submit a bid on behalf of Sawtooth.  It appears that Honnen Equipment Co. accepted SRM's bid.  Finally, SRM's argument that Scott used SRM's trade secrets to win a bid on behalf of Sawtooth for a new snowblower at Yosemite National Park is based on speculative, circumstantial evidence, at best.  The snow blower portion of Sawtooth's accepted bid was actually higher than the snow blower portion of SRM's bid.  Sawtooth neither used an out-of-state loader dealer nor used SRM's pricing scheme.  Scott did not use trade secrets of SRM in making any of the foregoing bids.

**RESPONSE TO SRM-KODIAK AMERICA'S MOTION FOR PRELIMINARY INJUNCTION – 15**

The evidence establishes that proprietary information and data used to develop and design products manufactured by IIOVIII and distributed by Sawtooth have been developed independently using primal knowledge and, in some instances, reverse engineering without referencing, using, or relying on any proprietary information or data of SRM. SRM has failed to clearly establish that Scott, Sawtooth, IIOVIII, or IML misappropriated any trade secret of SRM within the meaning of the DTSA. SRM is not likely to succeed on the merits of its DTSA claim, thus precluding entry of a preliminary injunction at this juncture.

**B.    SRM is not likely to suffer irreparable harm absent preliminary injunctive relief.**

SRM has failed to make "a clear showing" that irreparable injury is likely in the absence of a preliminary injunction. A plaintiff seeking preliminary relief "must demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The United States Supreme Court has observed that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*).

"Generally, an 'economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *BigRentz*, slip op. at 4 (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). "Courts regularly view a delay in seeking a preliminary injunction as indicative of a lack of urgency and irreparable harm." *Id.*

Here, SRM has failed to make "a clear showing" that irreparable injury is likely—as opposed to possible—in the absence of a preliminary injunction. SRM has alleged solely economic injuries and fails to articulate why a damage award cannot remedy business losses that

trade secret misappropriation purportedly caused.  Moreover, SRM's eight-month delay in

seeking a preliminary injunction—from February 2024 when it filed the *Complaint* until October

2024 when it filed the instant Motion for Preliminary Injunction—undercuts SRM's argument

that it will suffer irreparable harm absent injunctive relief.  SRM has not clearly shown that

irreparable injury is likely in the absence of preliminary injunctive relief.

     **C.**    <u>**Neither the balance of equities nor the public interest favors entry of a**</u>
           <u>**preliminary injunction.**</u>

Finally, SRM has failed to clearly show that the balance of equities and the public interest

favor entry of a preliminary injunction.  The Supreme Court has observed that "[t]he policy

against the imposition of judicial restrains prior to an adjudication of the merits becomes more

significant when there is reason to believe that the decree will be burdensome."  *Winter*, 555 U.S.

at 27 (citing Wright & Miller § 2948.2, at 167–168).

SRM argues that an injunction would work no hardship on "the Trade Secret Defendants"

because they have no right to use the information in the first place.  SRM further contends that

the balance of equities should favor entry of a preliminary injunction given concrete evidence of

"the Trade Secret Defendants'" misappropriation and their efforts to delay the commencement of

these proceedings by evading personal service.

SRM overlooks that the evidence is not at all concrete.  There are significant factual

disputes as to whether SRM owns the information at issue in the first place.  It is certainly

neither equitable nor in the public interest to preclude "the Trade Secret Defendants" from using

information that was never acquired or intentionally abandoned by SRM more than two years

ago.  SRM's suggestion that there were efforts to delay these proceedings is not only

unsupported, but it is somewhat ironic, given SRM's own delay of nearly eight months in

bringing the instant Motion for Preliminary Injunction.  The balance of equities and the public interest favor denial of the motion.

> **D.    If this Court grants preliminary relief, such relief should be narrowly tailored to remedy the specific harm alleged and a bond should be required.**

As SRM acknowledges, any injunctive relief ordered in this proceeding "must be tailored to remedy the specific harm alleged."  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).  Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Even if this Court concludes that preliminary injunctive relief in some form is appropriate, such relief should be narrowly tailored to remedy the specific harm alleged.  SRM's request for an order requiring defendants to identify and forensically image all physical or electronic storage devices on which any business involving commercial snow removal equipment has ever been conducted since January 2021 is a precisely the kind of overbroad, unduly burdensome, and unnecessary remedy Rule 65 prohibits.  So is the scope of SRM's desired injunction, particularly the proposed prohibition on defendants' use and dissemination of their own materials.  If this Court grants preliminary relief, SRM should be required to post a bond as required by Rule 65(c).

**RESPONSE TO SRM-KODIAK AMERICA'S MOTION FOR PRELIMINARY INJUNCTION – 18**

## <u>CONCLUSION</u>

SRM has failed to make "a clear showing" that it is likely to succeed on the merits on its Defend Trade Secrets claim and that it is likely to suffer irreparable harm absent preliminary injunctive relief.  Neither the balance of equities nor the public interest favors entry of a preliminary injunction at this juncture.  The Motion for Preliminary Injunction should be denied.

DATED this 4th day of November, 2024.

WRIGHT BROTHERS LAW OFFICE, PLLC

By:   */s/ Kyle E. Bastian*
      Kyle E. Bastian
      *Attorneys for Defendants Scott Pilling,*
      *Sawtooth Industrial, LLC, IIOVIII Precision,*
      *LLC, and Intermountain Living, LLC*