IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., an Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, an Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, and individual; LURENE DILLE, an individual; DOE DEFENDANTS I-XX; and ROE ENTITY DEFENDANTS I-XX,<br><br>      Defendants. | Case No. 4:24-cv-00112-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

SCOTT PILLING, an individual,

      Counterclaimant,

v.

SRM-KODIAK AMERICA, LLC, an
Idaho limited liability company,

      Counterdefendant.

---

BREK PILLING, an individual;
KODIAK AMERICA, LLC, a Delaware
limited liability company; and PFT
ENVIRO INVESTMENTS, LLC, an
Idaho limited liability company,

      Counterclaimants,

v.

SRM-KODIAK AMERICA, LLC, an
Idaho limited liability company,

      Counterdefendant.

## I. INTRODUCTION

Before the Court is Plaintiff SRM-Kodiak America, LLC's ("SRM") Motion for a
Preliminary Injunction (Dkt. 65) and Motion to Seal (Dkt. 66), and Defendants IIOVIII
Precision, LLC, Intermountain Living, LLC, Scott Pilling, and Sawtooth Industrial, LLC's
(collectively "Pilling Defendants") Motion to Seal (Dkt. 74).

On January 17, 2025, the Court held oral arguments and took the Motions under
advisement. Upon review, and for the reasons set forth below, the Court GRANTS in
PART and DENIES in PART the Motion for a Preliminary Injunction, GRANTS SRM-

Kodiak's Motion to Seal, and GRANTS the Pilling Defendants' Motion to Seal.

## II. BACKGROUND

### A. Factual Background

SRM is a business which deals in commercial and industrial snow blowers. In September 2021, SRM entered into an Asset Purchase Agreement (the "APA") with Sold Kodiak[1] for $6,000,000. Dkt. 65-82, at 2; 65-1, at 8. As part of the APA, SRM purchased all assets, properties, and rights of Sold Kodiak, which included customer lists, documents, drawings, intellectual property, and other written materials previously owned by Sold Kodiak. Dkt. 65-82, at 7–8. As an exception, Sold Kodiak owned a warehouse at 50 East Ellis Street in Paul, Idaho, which it retained in the sale. *Id.* at 16. SRM had to remove all its newly purchased assets such as documents and machines from the property on or before January 31, 2022, or it would be responsible for all utilities until it vacated. *Id.* In addition, the APA contained a confidentiality provision which prohibited Sold Kodiak from disclosing any of SRM's confidential information. *Id.* at 31.

In August 2022, Brek Pilling's son, Scott Pilling, signed an Independent Contractor Agreement (the "ICA") provided by SRM, which identified Scott as the President of SRM and an independent contractor. Dkt. 75-4, at 3–4; 65-83, at 2. As part of the ICA, Scott agreed to receive confidential information and use such information only for the benefit of SRM. Dkt. 65-1, at 7. Specific information considered confidential under the ICA included:

> …all information belonging to or used by [SRM]…relating to internal operations and procedures, finances, strategies, pricing, compensation and

---

[1] Kodiak is a popular brand of commercial and industrial snowblowers, which often sell for hundreds of thousands of dollars. Sold Kodiak owned rights to the Kodiak brand prior to SRM buying out the company.

> other personnel information, client lists and contact information, sales lists, technology, source codes, programs, costs, plans, systems, inventions, developments, and trade secrets of every kind and character, whether or not they constitute a trade secret under applicable law…[.]

Dkt. 65-83, at 3. Scott agreed he would not make unauthorized disclosures of confidential information and to only use such information when providing services under the ICA. *Id.* Also pertinent, Scott was given the authority to enter new customer contracts on SRM's behalf and agreed to act in the best interest of SRM in negotiating the terms of the contracts. *Id.* at 2.

At the most basic level, this case largely stems from allegations that Scott failed to fulfill his obligations under the ICA, and the other Defendants aided him in his willful misuse of confidential information. As such, the Court will primarily explore SRM's allegations against Scott and address the other Defendants' alleged involvement where necessary.

### 1. Storing Work Files on Personal Devices

Scott served as President of SRM from 2022 to 2023, until he submitted his resignation on June 29, 2023. Dkt. 75, at 8. As President, Scott had access to SRM's intellectual property and other confidential information. Dkt. 65-1, at 13. During his time with SRM, Scott used his personal iCloud account to synchronize files from his work laptop, which included folders titled "SRM Kodiak" and "Sawtooth Industrial," containing proprietary engineering and pricing information. Dkt. 65-1, at 14–15. He also used a personal OneDrive account which could synchronize files from his work laptop to his other personal devices. *Id.* at 15. While documents were removed in April 2023, forensic analysis

revealed Scott's OneDrive account had contained SRM's confidential information.[2] *Id.*

Scott alleges he had permission from SRM's CEO, Grant Flaherty, to use his personal accounts to store work files because SRM did not have a remote desktop access solution, and he needed access to the files while traveling for work. Dkt. 75, at 5. Scott additionally claims SRM's Information Technology Manager, Trevor Rice, was aware of this issue and was attempting to find a solution but had not done so as of Spring 2023. *Id.* Rice directly contradicts these statements. Dkt. 78-3, at 3. In approximately December 2022, Scott also followed up with Rice about issues with sales emails going to the junk folder on his work email. Dkt. 75-5, at 2.

### 2. *Diverting the Elecon Deal*

Due to the continual problems with his work email, Scott claims he started communicating with Elecon Group of Companies of India ("Elecon") using his personal email. Dkt. 75, at 6. Elecon had originally contacted Scott in his capacity as president of SRM to collaborate on selling snow cutter and blower equipment to the Indian Armed Forces. Dkt 65-1, at 15. However, on January 26, 2023, Scott replied, "…I wrote you an email from my personal email. Please respond there. We are going through some company email changes for a little bit and [I'm] having problems with my email." Dkt. 65-74, at 5. Scott alleges that shortly after he began using his personal email, SRM told him they had no interest in pursuing a partnership with Elecon. However, Scott contends he remained in

---

[2] It is not entirely clear from the briefing who removed the documents from Scott's OneDrive account, or whether those documents were retained elsewhere by Scott after removal. As the Court understands it, there is only concrete evidence Scott had personal access to these files until April 2023, which was against company policy.

contact with Elecon "regarding opportunities unrelated to snow removal and as a potential backup plan for SRM before his departure from SRM." Dkt. 75, at 6.

On January 31, 2023, Scott sent an email to Gagandeep Singh Rupaal, an Elecon representative, with the subject line, "Potential Manufacturing Collaboration: Kodiak." Dkt. 65-75, at 2. Scott's email stated: "Thank you for meeting this morning. I will stay in touch on our trip to India. Let's continue communication on this specific email chain moving forward.". The email chain excluded Scott's SRM email and included his father, Brek Pilling's, email address. Dkt. 65-1, at 16. After Scott left SRM in June 2023, he met in person with representatives of Elecon in August 2023. *Id.* Brek was present for this meeting but claims the purpose of the meeting was "related to the manufacture of drilling equipment for water wells, an industry unrelated to SRM and its business." Dkt. 71, at 4. Somewhat contradictorily, Scott claims he initially formed Sawtooth Industrial, LLC ("Sawtooth") and IIOVIII Precision, LLC ("IIOVIII")[3] in April 2023 for him to explore "potential new ventures in other industries, including mobile hydraulics and drilling rigs manufacturing," but "those efforts did not ultimately pan out." Dkt. 75, at 6.

Scott took a trip to India in February 2024 to visit Elecon and "to discuss potential arrangements and opportunities in India and beyond." Dkt. 75, at 6. However, both Scott and Elecon claim that no contract or agreement has been made, Sawtooth has not performed work on behalf of Elecon, and no intellectual property belonging to SRM has been exchanged between the parties. Dkt. 75, at 6; Dkt. 75-6, at 3.

---

[3] IIOVIII is a manufacturer of custom snow removal equipment and Sawtooth is its distributor. Dkt. 75, at 8.

### 3. Submitting Conflicting Bids

As part of his work for SRM, Scott compiled and submitted bids to sell SRM's snow blower equipment. On two different occasions, Scott submitted bids both for SRM, and for his own companies, to the same potential client. The first such instance occurred on April 10, 2023, when Scott submitted competing bids, for new and used snow blower options, to FAA Vancouver. Dkt. 75, at 7. Scott submitted one bid on behalf of SRM, one on behalf of Sawtooth, and one on behalf of another of his businesses, Intermountain Living, LLC ("Intermountain"). Dkt. 75, at 7. The bids submitted on behalf of Scott's two companies were identical and were about $3,000 less than the bid Scott submitted on behalf of SRM. Dkt. 65-76; 65-77; 65-78. Scott suggests he submitted multiple bids because "FAA Vancouver had requested multiple options and SRM had no used equipment that met FAA Vancouver's specific requirements at that time." Dkt. 75, at 7.

Second, Scott entered competing bids in March and April 2023 to another potential customer, Wolf Creek Ski Area. Scott entered two bids, one on behalf of SRM, and one on behalf of Intermountain. *Id.* The Intermountain bid was nearly $72,000 lower than the SRM bid. Scott again justifies the competing bid by claiming the customer requested multiple options, and SRM could not provide what the customer was looking for. Dkt. 65-79; 65-80; 75, at 7.

### 4. Lassen Volcanic National Park and RDO Contracts

On April 18, 2023, the National Park Service (the "NPS") emailed Scott's SRM email and awarded SRM Purchase Order No. 140P8423P0020, which was a contract to perform upgrades to a gear box on a Kodiak snow blower machine being used in Lassen

Volcanic National Park for $53,109.32. Dkt. 65-1, at 17–18. Scott responded and claimed that SRM was restructuring and preparing for the project to accommodate the work, and asked for the Purchase Order to be cancelled until he could "be in touch for a re-issuing of an award when we are ready to receive." Dkt. 65-30, at 46. On the same day he replied, Scott sent the NPS representative an email from a separate Outlook account with the subject "Sawtooth Industrial," stating "…we are splitting the departments. The service department will remain under my oversight. The same techs will be performing the work. The company credentials will be the different item." Dkt. 65-30, at 31.

On June 27, 2023, Scott emailed the NPS representatives from his Sawtooth email with the subject "Blower repair po" and message stating, "Please use this email moving forward. Please send modified PO here." Dkt. 65-30, at 71. Scott continued to correspond with an NPS representative to process a Novation Agreement Letter, which would modify the PO and award Sawtooth the repair job rather than SRM. *Id.* at 64–71.

When the NPS representative continued to request paperwork verifying the change from SRM to Sawtooth, Scott told the representative that Sawtooth was not a successor in interest to SRM, but rather SRM had "lost every manufacturing employee in their snow blower sector, does not have a service department, or a parts department. They have changed direction as a company and are no longer able to provide service work, such as this gearbox upgrade to the Park's snow blower." *Id.* at 68. He continued by claiming Sawtooth was composed of the "original group of Kodiak Employees," and there was no one at SRM who could perform the repair work needed on the snow blower. *Id.*

Upon receiving this information, the NPS representative asked if Scott still had the

authority to cancel the SRM award, and Scott responded with contact information for Gary Wickersham, who was then still working for SRM. *Id.* Wickersham signed the paperwork, and shortly thereafter went to work for Scott. Dkt. 65-1, at 20. On August 10, 2023, SRM became aware of the Novation Agreement Letter which would modify the contract and contacted the NPS to inform it of Scott's misrepresentations and reassure the NPS that SRM was prepared to fulfill the purchase order. *Id.* at 20–21. Sawtooth had already begun work on the snow blower, but the NPS promptly asked Scott to stop all work. Dkt. 65-30, at 64. The NPS subsequently issued a formal letter requiring Sawtooth to return the NPS's snow blower because it had been obtained through false pretenses. *Id.* at 82. Scott delivered the machine to SRM directly so the work could be completed. Dkt. 65-1, at 21.

In April 2023, around the time Scott began negotiating the Lassen contract, he quoted a Kodiak snow blower for the Central Wyoming Regional Airport ("Airport") on behalf of SRM. *Id.* However, SRM claims that, by July 19, 2023, Scott had persuaded RDO Equipment ("RDO")—the company which had requested the bid on behalf of the Airport— that Sawtooth was affiliated with SRM and would be completing the project. *Id.* at 21–22. A comparison between the bid Scott submitted to RDO on behalf of SRM, and the purchase order that RDO ultimately issued to Sawtooth, reveals the bids were nearly identical. SRM argues this similarity is evidence that Scott used SRM's proprietary pricing information when submitting Sawtooth's bid. *Id.* at 22. About a year later, believing Sawtooth was affiliated with SRM, RDO contacted SRM about the project and Scott's actions were discovered. *Id.* RDO promptly asked SRM to complete the project instead of Sawtooth. *Id.*

### 5. *Poaching Employees*

SRM performed a forensic analysis of Scott's SRM laptop and discovered a spreadsheet titled, "Business Ideas.xlsx." Dkt. 65-1, at 16. The spreadsheet included a heading for "Sawtooth Industrial," and a column titled "Employee Poach," listing names of SRM's employees. *Id.*; Dkt. 65-73, at 2. The list of SRM employees included their wage and benefit information, as well as their positions. Dkt. 65-1, at 17. Nearly all of the SRM employees listed on the spreadsheet went to work for Scott's companies, along with others who had access to SRM's proprietary information. *Id.*

### a. Lurene Dille

Lurene Dille was not among the employees poached by Scott, but SRM has accused her of misusing SRM's information on Scott and Brek's behalf. Dille worked in SRM's accounting department until February 2023, although she officially resigned at SRM in January 2023. Dkt. 65-1, at 12. While working for SRM, Dille also worked for Brek's companies. *Id.* During her employment with SRM, Dille maintained a USB storage device that had company administrative files, and what appears to be a backup of SRM's entire shared network. *Id.* at 13. Importantly, Dille had an offline copy of her SRM email account, and one of her emails included an attachment called "Customer List.xlsx." In July 2022, Dille sent the aforementioned email and attachment to her Outlook account, LuRene.kodiak@outlook.com, and the file included information about SRM's customers and their contact details. *Id.* Sending the document to herself violated company policy.

### 6. *Use of Kodiak Schematics in Designs*

SRM alleges—and Scott concedes—that Scott has used old Kodiak schematics in

his new businesses. The parties disagree regarding the extent to which such schematics were used, and whether Scott had a right to reference such schematics.

a. <u>Paul Building</u>

As described above, Brek retained a warehouse in Paul, Idaho during the sale of Sold Kodiak to SRM. Scott contends there were "numerous old drawings, schematic prints, and floppy discs containing prints of Kodiak Northwest, Inc. . . .  from the late 1990s / early 2000s timeframe, as well as many miscellaneous parts [] strewn throughout the shop at the Paul Facility." Dkt. 75, at 4. Scott alleges SRM was aware of these items and was even urged by SRM management to retrieve all such items from the Paul facility. *Id.* However, SRM management was apparently unwilling to remove or consider any documents or parts over ten years old because SRM was interested in selling new machines. *Id.*

SRM counters that all information regarding such alleged schematic abandonment has been offered by individuals with an interest in Scott's companies, and that Scott provided no direct evidence to corroborate such claims. Dkt. 78, at 8. SRM argues it is nonsensical to suggest it would abandon intellectual property which it had just paid millions of dollars to acquire. *Id.* Additionally, SRM CEO Grant Flaherty insists that he was unaware of any schematics at the Paul building beyond documents used in "day-to-day manufacturing work that was conducted in the building." *Id.* at 9. In addition, Flaherty maintains he directed Sold Kodiak to relocate such documents to SRM's facilities. *Id.* Jody Young, a former employee of SRM, corroborates Flaherty's testimony. *Id.* at 9–10.

Whether the schematics were abandoned by SRM or withheld from SRM, Scott

acknowledges, "there were some instances in which IIOVIII referenced or used old drawings, prints, or parts left in the shop at the Paul Facility on a limited basis as a starting point for product designs." Dkt. 75, at 8. However, he still insists, "Proprietary information and data used to develop and design products manufactured by IIOVIII and distributed by Sawtooth have been developed independently using primal knowledge and, in some instances, reverse engineering without referencing, using, or relying on any proprietary information or data of SRM." *Id.* Scott further maintains the schematics were old, "seldomly used initially," and "have not been used in any way for at least eight months." *Id.* Scott does concede, "[t]here have also been a few instances in which unaffiliated customers or suppliers of IIOVIII have provided drawings or prints bearing the 'Kodiak' name to IIOVIII unilaterally." *Id.*

### b. Christensen Machine

Scott resigned from SRM in June 2023. *Id.* Two months later, in August 2023, Scott sought a collaboration with Christensen Machine, Inc. ("CMI") to order parts that IIOVIII needed for manufacturing. *Id.* "Because IIOVIII's engineering department was just getting off the ground…Scott send CMI redacted copies of a few drawings that had been left on various shelves in the shop at the Paul facility." *Id.* at 9. Scott assumed the drawings were abandoned, and he removed the Kodiak name from the drawings "upon CMI's request because CMI already had in its possession numerous drawings and prints bearing the 'Kodiak' name in its shop from previous work CMI had performed and desired to keep everything separate on their end." *Id.*

SRM contends the schematics Scott submitted are "substantively identical to SRM's

trade secret schematics in every way," excluding the name "Kodiak Northwest," which Scott had removed. SRM urges that, upon comparison, the documents Scott said he provided to CMI each have a three-hole punch border and a grainy, photocopied appearance, but the documents provided by CMI—although the same schematics—appear to be "native digital files."[4] Dkt. 78, at 6–7. SRM argues this illustrates Scott must have taken the schematics directly from SRM—not from the Paul facility—and provided them to CMI for use in his own business. *Id.* at 7.

### c.  Photo Evidence

Of note, an employee who previously was employed with SRM, but who has since started working for Scott, posted photos on April 6, 2024, to his Facebook account. Dkt. 65-1, at 17. While the photos depict machine components in a facility allegedly belonging to Scott's companies, SRM contends the machine components appear to be SRM's components, which could not be built without utilizing SRM's schematics. *Id.*

### d.  Yosemite Contract

Finally, in July 2024, the NPS began soliciting bids for a new snow removal machine for Yosemite National Park. Dkt. 65-1, at 23. In soliciting bids, the NPS used a Kodiak snow blower to define the specifications of the machine needed. *Id.* SRM submitted a bid, but it lost the project to Sawtooth. Dkt. 65-49, at 2. Scott had reached out to an NPS representative prior to submitting a bid, asking whether a Sawtooth snow blower would be

---

[4] Both Scott and CMI provided declarations as part of this briefing. Scott provided the grainy, hole punched copies as exhibits to his declaration, claiming they were what he had given to CMI. CMI provided the clear copies as exhibits to its declaration, claiming those were the schematics it received directly from Scott.

accepted instead. Dkt. 65-33, at 2. According to Scott, the Sawtooth machine is "very similar in size," but "[i]t has superior electronics system, upgraded gearbox sizes, a superior primary drivetrain, lower overall height profile, and some other minor differences." *Id.* SRM contends that such a design could not have been completed in the one year between Scott's resignation from SRM and the submission of the bid without Scott's reliance on SRM schematics for the design. Dkt. 65-1, at 24.

### B. Procedural Background

SRM filed the instant lawsuit on February 26, 2024. However, it did not file the Motion for Preliminary Injunction ("PI Motion") (Dkt. 65) until October 14, 2024. SRM filed a Motion to Seal various exhibits in support of the PI Motion on October 15, 2024. Dkt. 66. Several Defendants responded to the PI Motion, including Sold Kodiak, the Pilling Defendants, Dille, and Wickersham. Dkts. 70, 71, 75. The Pilling Defendants also filed a Motion to Seal certain exhibits included with their response to the PI Motion. Dkt. 74.[5]

After SRM filed its Reply in support of the PI Motion (Dkt. 78), the Court held a hearing on the PI Motion on January 17, 2025. After the filing of the PI Motion, but prior to the hearing, the parties submitted a "Stipulated Preliminary Injunction" solely with respect to defendant Carolyn Shoemaker (Dkt. 81), and stipulated to the dismissal of defendant Arthur Sadampi Yamada without prejudice. Dkt. 83.

///

///

///

---

[5] Both Motions to Seal are uncontested, as neither side responded to the other's Motion to Seal.

### III. LEGAL STANDARDS

#### A. Defend Trade Secrets Act

The Defend Trade Secrets Act ("DTSA") allows a private civil action to be brought by the owner of a trade secret that has been misappropriated as long as the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). As a remedy under this provision, the Court may grant an injunction, in relevant part, "to prevent any actual or threatened misappropriation," which can include "requiring affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(i), (ii).

#### B. Preliminary Injunction

The function of a preliminary injunction is to preserve the status quo—the last uncontested status between the parties before the current controversy—pending a final determination on the merits of the case. *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). For SRM to obtain a preliminary injunction, the Court must weigh the four "*Winter* factors": (1) whether SRM is likely to prevail on the merits of its substantive claims, (2) whether it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Petrick ("Petrick")*, 68 F.4th 475, 490 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22–23 (2008)).

The Ninth Circuit has further instructed district courts to evaluate these factors "on a sliding scale, such that a stronger showing of one element may offset a weaker showing

of another." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (cleaned up).[6] This approach permits the imposition of a preliminary injunction where there are "serious questions going to the merits," and the balance of hardship "tips sharply toward the plaintiff," assuming the other two elements of the *Winter* test are also met. *Petrick*, 68 F.4th at 490–91 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)). The "serious questions" standard is satisfied when a plaintiff raises questions "that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Id.* at 497 (cleaned up); *see also Fellowship of Christian Athletes*, 82 F.4th at 684 (explaining a showing of "serious questions" is "a lesser showing than likelihood of success"). Still, even when the plaintiff raises legal questions not directly answered by past precedent or requiring further investigation, a court cannot forgo the merits assessment. *Petrick*, 68 F.4th at 497.

    *1. Scope*

    When granting a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Under Rule 65, the Court must (1) state the reasons why the preliminary injunction issued; (2) identify its terms specifically; and (3) describe in reasonable detail any acts restrained or required. Fed. R. Civ. Pro. 65(d)(1)(A–C).

---

[6] As the Ninth Circuit has noted, there is a growing circuit split on the question of whether the sliding-scale approach is consistent with the Supreme Court's opinion in *Winter*. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 n.12 (9th Cir. 2024). The Court will continue to apply the sliding-scale approach because the Ninth Circuit has expressly held the approach is consistent with *Winter*. *Id.*

*2. Bond*

Under Rule 65, the Court may only issue a preliminary injunction where the moving

party provides a security, to pay any costs and damages sustained by any party if they are

wrongfully enjoined or restrained, in an amount the Court deems proper. Fed. R. Civ. Pro.

65(c). The Court may exercise its discretion to waive the bond requirement in the absence

of evidence that the enjoined party will suffer damages as a result of the injunction.

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir.

2003). A bond is not required if the enjoined party fails to establish the type and amount

of damages it will incur if enjoined. *Id*.

## IV. DISCUSSION

### A. Preliminary Injunction

*1. Likelihood of Success on the Merits*

In a trade secrets case, the party seeking an injunction must show they are likely to

succeed on the merits because: (1) they possess a trade secret; (2) which was

misappropriated; and (3) the misappropriation was harmful. *WeRide Corp. v. Kun Huang*,

379 F. Supp. 3d 834, 845 (N.D. Cal. 2019).

A "trade secret" is information that: (1) derives independent economic value, actual

or potential, from not being generally known to, or readily ascertainable by, other people

who can obtain economic value from its disclosure or use; and (2) is subject to reasonable

efforts to maintain its secrecy. 18 U.S.C. § 1839(3). "Misappropriation" means acquisition

of a trade secret through means that the party knew or should have known were improper—

such as theft or breach of a duty to maintain secrecy—but does not include reverse

engineering or other lawful means of acquisition. 18 U.S.C. § 1839(5–6). District courts within the Ninth Circuit have acknowledged that "direct evidence of misappropriation is rare," and circumstantial evidence can be enough to weigh in favor of the likelihood of success on the merits at the preliminary injunction stage. *WeRide Corp.*, 379 F.Supp.3d at 848 (quoting *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F.Supp.3d 977, 984 (N.D. Cal. 2018)).

Turning to the first element, SRM does possess trade secrets. As the evidence shows, the snow blowers that SRM—and Kodiak before it—has developed and produces are unique and worth hundreds of thousands of dollars apiece. The Kodiak machines are presumably a pillar in the industry, as evidenced by the many customer requests for a Kodiak machine detailed herein. The schematics for these machines have been developed over decades, and SRM has policies in place to protect the confidentiality of those designs. Beyond that, Brek in the APA, and Scott in the ICA, contractually agreed to maintain the confidentiality of such machines and specifications.  It is apparent that, if every company involved in the development of commercial snow blowers had access to SRM schematics, they would have an advantage in an industry where such snow blowers bring in a hefty income for manufacturers. Thus, SRM possesses trade secrets.

The briefing on the PI Motion is also replete with both direct and circumstantial evidence that Scott misappropriated SRM's trade secrets. While perhaps one instance alone would not justify a preliminary injunction, the many acts of misappropriation, taken together, illustrate Scott knew or, at the very least, should have known, that he improperly disclosed SRM's proprietary information, including by breaching his duty to maintain

secrecy under the ICA and as SRM's President.

The Court will first address the instances in which there is direct evidence that Scott acted inappropriately. On the two different occasions when Scott submitted bids from his own companies which competed with those he submitted on behalf of SRM, he inevitably used the confidential information he obtained through SRM to advance his own position. Scott was in a unique position to not only understand what the companies seeking bids were looking for, but to also submit a bid on behalf of SRM, and use that information to submit a more attractive bid on behalf of his own companies. Had he not held his position with SRM, Scott would not have had the advantage of knowing the amount and substance of SRM's bid and could not have adjusted his own bids accordingly.

Scott's redirection of the Lassen contract to Sawtooth from the NPS is particularly egregious. Scott made representations to NPS that were, to the Court's understanding, blatantly false. SRM was prepared to complete the repair job, and Scott clearly advised NPS that SRM was incapable of doing so, even claiming that SRM was no longer able to manufacture snow blowing equipment. Scott was so vague about the relationship Sawtooth had with SRM that the NPS assumed Sawtooth was SRM's affiliate. It follows that, had Scott been successful in his attempt to obtain the Lassen contract, he would have needed to produce a machine equivalent to that the NPS expected from SRM. As such Scott would have needed to utilize SRM's proprietary information to produce such a machine just as he was simultaneously leaving SRM.

Scott has also admitted that he at least referenced schematics from Sold Kodiak when he was in the early days of developing his designs at IIOVIII. Such schematics were

provided to CMI for manufacturing. Regardless of whether Scott assumed the schematics were abandoned, or if CMI already had access to the schematics, using the proprietary information contained within the schematics for his own business raises a very serious question as to whether he misappropriated the old designs.

The circumstantial evidence in this case also weighs against Scott. Scott and Brek's continued discussions with Elecon raise a serious question as to whether Scott inappropriately poached the customer from SRM. While Brek claims the continued discussions with Elecon in the fall of 2023 centered on drilling contracts rather than snow removal contracts, Scott instead maintains that any ventures for Sawtooth and IIOVIII outside of snow removal (such as drilling) ceased after the formation of such companies. In addition, Scott has since visited India, illustrating he appears to be soliciting Elecon as snow removal customer, and is attempting to divert Elecon's potential business from SRM.

While less direct, the other documents discovered on Scott's computer are telling. From the "Employee Poach" list with the names of SRM employees in Scott's emails, to the SRM work files stored on Scott's personal devices, there is plenty of evidence to suggest Scott improperly used SRM's confidential information. The Court is especially curious as to how IIOVIII was able to place bids for snow blowers meeting Kodiak-machine specifications in just a few short months, when it took Sold Kodiak and other companies decades to develop such designs.

In short, SRM has presented enough evidence to both establish a serious question as to whether Scott and the other Defendants misappropriated SRM's trade secrets, and to show SRM is likely to succeed on the merits of its misappropriation claim. This factor

weighs heavily in favor of SRM.

  *2. Irreparable Harm*

  Irreparable harm can come in many different forms in trade secret cases. Disclosing a trade secret can itself constitute irreparable harm because disclosure causes the owner to lose its competitive advantage and market position and gives the misappropriating party an unfair advantage. *See WeRide Corp.*, 379 F. Supp. 3d at 853–54. Irreparable harm can also come in the form of damaged customer relationships and reputation. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."). "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3rd Cir. 1992).

  SRM is likely to suffer such irreparable harm if a preliminary injunction is not awarded at this stage. If Sawtooth, or any of the Defendants, can continually submit bids for machines that were developed using SRM's confidential information, SRM will continue to lose its market advantage, and its designs will be in less demand. Additionally, SRM is at risk of continually losing out on bids if Defendants can provide the same machine for less money, even though the designs were developed with SRM's proprietary information. SRM has already provided evidence that Scott attempted to steal SRM's clients—such as the NPS and RDO—through misrepresentations regarding SRM. Finally, Scott has neither established, nor even represented, that he intends to halt the production of snow removal equipment in the absence of a preliminary injunction. His failure to do

so, almost "certainly show[s] irreparable harm." *Campbell Soup Co.*, 977 F.2d at 92–93. As such, this second factor weighs in favor of granting a preliminary injunction.

### 3. Balance of Equities

In trade secrets cases, courts have held an injunction focused on preventing the defendant from unlawfully using trade secrets to solicit customers does not cause significant hardship because it only requires the defendant to abide by existing laws. *See Pyro Spectaculars North, Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. 2012); *see also WeRide*, 379 F. Supp.3 d at 854. A preliminary injunction to protect the plaintiff's trade secrets does not prevent lawful competition, and any harm suffered is slight in comparison to the irreparable harm the owner of the trade secret will suffer in the absence of an injunction. *Pyro*, 861 F. Supp.2d at 1092.

Here, SRM essentially requests an injunction to prevent Defendants from using its trade secrets. Notably, SRM also requests extensive forensic analysis of Defendants' devices and physical documentation to determine the scope of trade secret usage to this point, as well as mitigating steps to reduce the effect of any previous use. The Court will address concerns regarding the scope of the preliminary injunction *infra*. However, at its core, the requested injunction only requires Defendants to comply with what the law already mandates. As such, the balance of equities tips in favor of SRM.

### 4. Public Interest

Where, as here, a trade secret case involves a former employee, there are generally two traditional competing public interests: open competition and protecting intellectual property rights. *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1210

(E.D. Cal. 2020). A preliminary injunction narrowly tailored to prevent the disclosure of trade secrets still facilitates open competition, as the enjoined defendants may still conduct a competing business, just one built on its own two legs. The competing interest of protecting intellectual property rights is served without burdening fair competition. Because SRM's requested injunctive relief is to prevent the disclosure of its trade secrets, the Court finds the public interest is served by granting the preliminary injunction.

### 5. Scope and Bond

Because all four *Winter* factors weigh in favor of granting a preliminary injunction, the Court must determine both the scope of the injunction and whether a bond should be set. SRM requests a rather broad preliminary injunction which would require each of the Defendants to: (1) identify all physical and electronic storage devices that they use, or have used, since January 2021; (2) identify and forensically image all devices on which they have ever conducted any business related to commercial snow removal equipment; and (3) provide certification of their compliance with these requirements. Dkt. 65-1, at 35. SRM would also like permission to review and compare Sawtooth's schematics with its own. *Id.* at 36. Finally, SRM seeks "a complete injunction on the use of SRM's trade secrets," which includes requirements to both stop revealing any trade secrets and to take affirmative steps to remedy any disclosure of trade secrets that has happened in the past. *Id.* at 36–38.

This case currently has 13 defendants. Of those, Defendant Carolyn Shoemaker would not be subject to this preliminary injunction, as she has already reached a stipulation with SRM. The Court is compelled to limit the list of remaining Defendants who should be subject to the injunction. In its PI Motion, SRM made specific allegations and proffered

evidence as to Brek, Scott, Sawtooth, IIOVIII, Intermountain Living, Wickersham, and Dille. Defendants, Kodiak America, LLC, Kodiak Northwest, Inc., and Baub LLC were only identified as Brek's businesses and mentioned vaguely in passing. In addition, PFT Enviro Investments, LLC and Budget Truck Center, LLC, were not mentioned in SRM's PI Motion.

The Court denies injunctive relief with respect to PFT or Budget because SRM did not make the requisite showing to obtain preliminary relief with respect to those parties. However, although Brek's businesses were only mentioned briefly, the Court finds an injunction that is applicable to only Brek, and not to his businesses, would be futile because any misuse of SRM's trade secrets by Brek would presumably be through his businesses. As such, the injunction will apply to Brek's businesses and to each of the other Defendants who have not been explicitly excluded herein.

Next, the scope of SRM's requested injunction is too broad. The Court is most concerned with SRM's desire to force the enjoined Defendants to perform tasks which would traditionally be reserved for discovery—such as identifying physical and electronic files for the past four years, forensically imaging those files, and turning over schematics for comparison—in order to "determine the full scope of misappropriation of trade secrets" and to "avoid the potential for discovery disputes." Dkt. 65-1, at 34–35. At the hearing, SRM explained that it seeks such measures because traditional discovery involves an objection process and rules which would impede SRM's ability to "quarantine" and "claw back" information that has been taken, and plainly admitted the need for overbreadth where rules like proportionality and relevance might get in the way.

MEMORANDUM DECISION AND ORDER - 24

While the Court appreciates SRM's candor, it will not issue an injunction that bypasses the protections the rules of discovery offer to essentially facilitate an unlimited fishing expedition into multiple Defendants' personal and professional files. The rules of discovery are meant to protect against abuse of process, undue burden, and expense, while also promoting fairness and integrity. *See* Fed. R. Civ. Pro. 26(b). While the Court acknowledges bypassing such rules could make the gathering of evidence much easier, that something is easy does not always mean it is just. The parties will have to utilize the traditional channels of discovery to obtain evidence regarding the extent of any misappropriation, both in identifying the specific information taken and uncovering how such information has been used by Defendants.[7]

The Court's rejection of the precise injunction SRM seeks does not mean SRM is without redress. The Court's injunction protects SRM from any further misappropriation of its trade secrets. Defendants are enjoined from using or disseminating any of SRM's: (1) engineering drawings (including any that might have been left in the Paul facility); (2) customer contact information; (3) parts lists or information; (4) supplier lists or information; (5) employees or employee information; (6) and confidential information related to SRM's pricing models and resulting bids. Defendants are also prohibited from using their own materials which have been developed, modified, or improved through using any of the aforementioned information, including any designs where SRM's

---

[7] The Court acknowledges such a holding will likely lead to extensive discovery. The Court encourages the parties to work together to facilitate all discovery in a way that preserves judicial economy. This includes by complying with Dist. Loc. Civ. R. 37.1, which requires the parties to meet and confer informally, and, in the event such is unsuccessful, attempt to reach an informal resolution with the law clerk assigned to the case before pursuing formal motions practice.

engineering drawings were used as a "starting point" for Defendants' designs. If Defendants have shared any such information with third parties, they must make every reasonable effort to secure its return. Should the parties proceed with traditional avenues of discovery and find Defendants have failed to comply with this Order, they may be held in contempt.

Plaintiff urges the Court to issue the preliminary injunction without a bond. While the Court has attempted to limit this order to only restrict Defendants from acting in a way that would otherwise be prohibited by law, it recognizes the limits placed today apply broadly to many parties, and a bond will mitigate any risks of potential damages. As such, Plaintiff will be required to pay a $5,000 bond.

## B. Motions to Seal

As noted, both SRM and the Pilling Defendants filed Motions to Seal concurrently with their briefs related to the Motion for a Preliminary Injunction. Dkts. 66, 74. The Court has reviewed the documents that would be subject to the seal, and because such documents contain SRM's proprietary and sensitive business information and are already subject to nondisclosure under the terms of the Parties' protective order (Dkt. 51), the Court will grant the Motions and allow the documents to be filed under seal.

## V. CONCLUSION

SRM has shown they are likely to succeed on the merits, and, at the very least, have raised serious questions as to the extent and scope of the enjoined Defendants' alleged misappropriation. In addition, SRM has established it would be irreparably harmed in the absence of a preliminary injunction. Finally, given the nature of SRM's misappropriation

claim, the balance of equities and the public interest will both be served by a preliminary injunction. While the Court finds a preliminary injunction must be entered, SMR's requested scope of the injunction is too broad. As such, the Motion for a Preliminary Injunction is GRANTED in PART and DENIED in PART in accordance with the order below.

## VI. ORDER

1. Plaintiff SRM-Kodiak America, LLC's Motion for Preliminary Injunction (Dkt. 65) is GRANTED in PART and DENIED in PART.

   a. It is DENIED with respect to Defendants PFT Enviro Investments, LLC, Budget Truck Center, LLC, and Carolyn Shoemaker, who are not subject to the terms of this injunction. It is further DENIED with respect to SRM's request that the enjoined Defendants be required to identify physical and electronic files for the past four years, forensically image such files, turn over schematics for comparison, or take other affirmative actions.

   b. It is GRANTED in all other respects.

2. Specifically, all other Defendants are hereby ENJOINED from any further misappropriation of SRM's confidential information and/or trade secrets.

   a. In addition, all other Defendants are prohibited from using or disseminating any of SRM's engineering drawings (including any that might have been left in the Paul facility), customer contact information, parts lists or information, supplier lists or information, employee information, or confidential information related to SRM pricing models and resulting bids.

   b. The Defendants are prohibited from using their own materials which have been developed, modified, or improved using any of this information, including any designs where SRM's engineering drawings were used as a "starting point" for Defendants' designs.

   c. If Defendants have shared any of the above information with third parties, they must make reasonable efforts to secure its return.

      d.  Plaintiff shall post a $5,000 bond, pursuant to Federal Rule of Civil Procedure 65(c), which shall be remitted to the Clerk of the Court within seven (7) days of the issuance of this order.

3. Plaintiff SRM-Kodiak America, LLC's Motion to Seal (Dkt. 66) is GRANTED.

4. Defendants IIOVIII Precision, LLC, Intermountain Living, LLC, Scott Pilling, and Sawtooth Industrial, LLC's Motion to Seal (Dkt. 74) is GRANTED.

DATED: February 6, 2025

David C. Nye
Chief U.S. District Court Judge