Kyle E. Bastian [ISB No. 10059]
WRIGHT BROTHERS LAW OFFICE, PLLC
1440 Blue Lakes Blvd. N., Suite A
P.O. Box 5678
Twin Falls, ID 83303-5678
Telephone No. (208) 733-3107
Fax No. (208) 733-1669
E-mail: kbastian@wrightbrotherslaw.com

*Attorneys for Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,

Plaintiff,

vs.

BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., and Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, and Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, and individual; LURENE DILLE, an individual; DOE DEFENDANTS I-XX; and ROE

Case No. 4:24-cv-00112-DCN

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS**

ENTITY DEFENDANTS I-XX,

Defendants.

---

SCOTT PILLING, an individual,

Counterclaimant,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,

Counterdefendant.

---

BREK PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; and PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company,

Counterclaimants,

vs.

SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,

Counterdefendant.

---

Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC (collectively, the "Scott Pilling Parties") submit this *Memorandum in Opposition to Plaintiff's Motion for Discovery Sanctions*. This memorandum supported by the *Declaration of Jordan Nielsen*, the *Declaration of Kenneth Randall*, the *Declaration of Scott Pilling*, and the *Declaration of Counsel*, submitted concurrently herewith.

## INTRODUCTION

At the commencement of this litigation, counsel for Plaintiff SRM-Kodiak America, LLC ("SRM") proposed a discovery plan, sent a draft to opposing counsel, and held a conference call with opposing counsel to finalize the plan. The discovery plan SRM's own counsel drafted contains the following notable provisions governing preservation and production of electronically stored information (ESI) in this litigation:

> iii. **<u>ESI Retention Protocols:</u>** Going forward, the parties agree not to modify their respective document and ESI retention/destruction protocols—except as necessary to preserve the documents identified in this Discovery Plan.
>
> . . . .
>
> d. **<u>ESI File Format:</u>** The parties agree to produce documents in the following file format[s] PDF, TIFF, and/or Native.
>
> e. **<u>ESI Production Format:</u>** The parties agree that documents will be produced:
> ☒with logical document breaks;
> ☒as searchable;
> ☒with load fields enabling review in common litigation databases such as Summation and Concordance;
> ☐with any available metadata.

By stipulation, the parties agreed at the outset of this litigation that documents could be produced in PDF, TIFF, or native format; that available metadata need not be produced; and that the parties would not modify their existing document retention practices. IIOVIII's longstanding practice of archiving its three-dimensional models and PDFs, but not its drawing files, predates this litigation and has not changed.

Counsel for SRM and all remaining defendants in this action approved the foregoing provisions of the stipulated Discovery Plan [Dkt. 49], entered June 5, 2024 (*see* pp. 3, 5–6). Nevertheless, on May 9, 2025, SRM served the Scott Pilling Parties with requests for production

seeking, among other things, "original, native Computer-Aided Design (CAD) digital files" and "all metadata associated with the digital CAD files[.]"

On September 10, 2025, this Court entered a discovery order [Dkt. 121] requiring the Scott Pilling Parties "to produce, within 30 days of today, the design schematics of the snow removal machines that they have developed since January 2021 to the present. Production of these materials shall be made in their native SolidWorks program format and ensure the feature trees' function is available." The Scott Pilling Parties timely produced approximately 1,800 native part and assembly files in October 2025. Those are working files with intact design history.

The Scott Pilling Parties are now producing 1,085 native SolidWorks drawing (.slddrw) files relating to the models produced in discovery in October 2025. Because IIOVIII Precision, LLC ("IIOVIII") lacks the costly Product Data Management ("PDM") add-on SRM maintains, over 80% of those files appear to have severed file links and may not open properly. Nevertheless, in a showing of good faith, those files are being produced concurrently herewith.

Not only is SRM's requested relief severe and extraordinary, but it is unjustified by the facts of this case. The Court should deny SRM's motion for terminating sanctions against the Scott Pilling Parties.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 26, 2024, SRM filed a *Verified Complaint and Demand for Jury Trial* [Dkt. 1] (the "Complaint") alleging that, "on information and belief," the Scott Pilling Parties had stolen SRM's trade secrets and used them to further their own economic interests. The Complaint was signed under penalty of perjury by SRM's chairman of the board, Wayne Powell. *Id.* p. 54. When pressed about those allegations during his December 3, 2024 deposition, Mr.

Powell repeatedly disclaimed having any personal knowledge of specific allegations of the Complaint, claiming "it will come out in the documents." *Declaration of Counsel*, ¶3, Exhibit 1 (ll. 152:17–156:23).

**A. Course of Discovery**

Contrary to SRM's contentions, the Scott Pilling Parties have now produced over 25,000 pages of documents in discovery. Those documents include over 3,700 native SolidWorks files. In the mountains of discovery produced thus far, there is no direct evidence that any trade secrets of SRM were actually used. There is, however, overwhelming evidence that SRM failed to take reasonable measures to keep its proprietary information secret by, among other things, intentionally abandoning a host of drawings, floppy discs, and parts at the Paul facility. *See* 18 U.S.C. § 1839(3).

There is also evidence of reverse engineering by IIOVIII. *Id.* § 1839(6) ("the term 'improper means' . . . does not include reverse engineering independent derivation, or any other lawful means of acquisition"). SRM claims that because some of IIOVIII's components that were reverse engineered have identical dimensions, that must mean IIOVIII's machines were not designed independently from the ground up. But creating identical dimensions is the point of reverse engineering. Reverse engineering is a common practice in the snow removal equipment manufacturing industry. *Declaration of Jordan Nielsen*, ¶8. One of the most common methods of reverse engineering is to create a new SolidWorks model by taking physical measurements of an acquired part and inputting those measurements into SolidWorks. *Id.* Provided that the part is lawfully acquired, there is nothing inherently improper about reverse engineering using this method. *Id.*

Unable to establish direct copying, SRM now alleges the Scott Pilling Parties are willfully withholding or destroying files. That allegation is false. In making assumptions about IIOVIII's SolidWorks software, SRM is not comparing apples to apples.

**B. SolidWorks Product Data Management (PDM) Add-On**

As SRM's own expert acknowledges, SolidWorks is a three-dimensional Computer-Aided Design ("CAD") software used to model parts and assemblies. *Declaration of Kenneth Randall*, ¶11; *see also Declaration of Counsel*, ¶6, Exhibit 4 (ll. 96:1-8). Three-dimensional CAD models, such as the native .sldprt and .sldasm files the Scott Pilling Parties produced in discovery on October 17, 2025 as SP&E 21453–23262,[1] are viewed in three dimensions and include design history, the step-by-step record of how a part or assembly was built. *Id.* A SolidWorks drawing file is a two-dimensional representation of three-dimensional part or assembly. *Declaration of Jordan Nielsen*, ¶13. A two-dimensional drawing file has no independent geometry, as it is derived from a three-dimensional part or assembly model. *Id.* While a drawing file's FeatureManager tree lists its own sheets and views, any model design history shown through a view belongs to the model file, not the drawing file. *Id.*

The SolidWorks PDM add-on is optional. *Id.* ¶14. PDM's main purpose is to provide a secure vault with version and revision history and check-in and check-out control. *Id.* PDM tracks where parts and assemblies are used in other assemblies or referenced in drawings, but it is very expensive and is not worth the return on investment for smaller manufacturing companies like IIOVIII. *Id.*; *Declaration of Kenneth Randall*, ¶15.

At the time of SRM's purchase of Kodiak America, LLC assets in September 2021, the Kodiak engineering files were stored on a server with no PDM, automated revision control, or

[1] These files were originally produced on October 10, 2025, but were reproduced on October 17, 2025 to correct a file naming issue.

backups. *Declaration of Kenneth Randall*, ¶¶4–6; *Declaration of Jordan Nielsen*, ¶7. Subsequently, SRM began moving engineering files to a secure vault with revision control that Double L was using at the time. *Id.* ¶7; *see also Declaration of Counsel*, ¶5, Exhibit 3 (ll. 39:18–41:24).

SolidWorks functions without PDM, but there are significant limitations. *Declaration of Jordan Nielsen*, ¶15. Without PDM, there is no centralized, automatic part or assembly tracking. *Id.* All part, assembly, and drawing files must be organized manually. *Id.* There is no design/revision history or logs and file name duplication in different folders is permitted, which may cause issues when sharing files. *Id.* A SolidWorks drawing file stores the file location and path name of each three-dimensional model it references. *Id.* ¶16. Without PDM, if a referenced model is moved, renamed, saved over outside SolidWorks, or opened where the stored location does not exist, the model file link becomes severed from the drawing, and the drawing file may not open properly. *Id.*

Former SRM President Tyler Groves, who just resigned last month, acknowledged in his deposition that two-dimensional files within SolidWorks "are derived from the 3-D CAD files." *See Declaration of Counsel*, ¶6, Exhibit 4 (ll. 96:25–97:9). Former SRM production manager Jody Young concurred. *See Declaration of Counsel*, ¶4, Exhibit 2 (ll. 98:24–99:2). Tyler Groves further acknowledged in his deposition that the engineering department at SRM maintains SolidWorks files that show "the three-dimensional geometry of the file" and that "a physical paper is not the full picture of how these parts were made." *Declaration of Counsel*, ¶6, Exhibit 4 (ll. 188:2–189:7). He also testified that "[i]t's very easy, with a CAD file, to pull that third dimension." *Declaration of Counsel*, ¶6, Exhibit 4 (ll. 76:2-8).

### C. IIOVIII Does Not Have PDM

While the final work product in SolidWorks is generally a two-dimensional drawing (.slddrw) or cutting (.dxf) file for production, at IIOVIII only the three-dimensional part (.sldprt) and assembly (.sldasm) model files are archived. *Declaration of Kenneth Randall*, ¶12. IIOVIII does not archive the drawing or cutting files, which are outputs of the model. *Id.*

Every new machine IIOVIII manufactures is unique. *Id.* ¶16. IIOVIII archives SolidWorks three-dimensional part (.sldprt) and assembly (.sldasm) files for its general process in IIOVIII's archived CAD files, located in the "completed projects folder," but does not archive two-dimensional SolidWorks drawing (.slddrw) files. *Id.* Drawing files are stored separately in IIOVIII's working CAD folders. *Id.*; *see also Declaration of Jordan Nielsen*, ¶12. Since IIOVIII does not have PDM, drawing files carry no design history of their own and may not open properly due to severed file links. *Declaration of Kenneth Randall*, ¶16. A drawing file becomes severed from the model it references if the model is moved, renamed, saved over, saved outside SolidWorks, or opened where the stored location does not exist. *Id.* In that situation, IIOVIII's general practice is to recreate the drawing file rather than repairing it. *Id.*

IIOVIII archives three-dimensional model files and pdf files so IIOVIII can reference in the future what it built in the past. *Id.* ¶17. Two-dimensional drawing files do not help IIOVIII achieve that and take up space on the server, so IIOVIII does not archive them. *Id.*

### D. October 2025 Production

In September 2025, IIOVIII gathered native part and assembly files from IIOVIII's archived CAD files, located in the completed projects folder, after which IIOVIII produced

approximately 1,800 native part and assembly files in discovery on October 10, 2025.[2] *Id.* ¶¶18-19. Those are working files with intact design history. *Declaration of Jordan Nielsen*, ¶11.

Because SolidWorks drawing (.slddrw) files are not stored in IIOVIII's archived CAD files, no drawing files were included in that production, with one exception. *Declaration of Kenneth Randall*, ¶20. The drawing (.slddrw) file referenced in Paragraph 9 of the Declaration of David Smith [Dkt. 160-2] will not open because the file link was severed at some point. *Id.* ¶23. The file did not originate from IIOVIII's archived CAD files, but rather from separate Microsoft Teams files submitted by Scott Pilling. *Id.* That context is important. *Id.* Shortly after IIOVIII commenced operations, IIOVIII experimented with different release methods to see if IIOVIII could store and share files on platforms such as Microsoft Teams rather than purchasing PDM. *Id.* Ultimately, the Microsoft Teams trial run was unsuccessful. *Id.* As with the other SolidWorks drawing files produced concurrently herewith, IIOVIII did not delete the non-functioning drawing file (SP&E 23154) used in connection with that particular trial run, as IIOVIII is not in the habit of deleting files arbitrarily. *Id.*

At the time of the October 2025 production, IIOVIII was aware that some SolidWorks drawing (.slddrw) files existed in IIOVIII's working CAD folders. *Id.* ¶21. However, IIOVIII understood the production to consist of gathering the archived part and assembly model files containing each design's history, not the drawing files lacking such history, the vast majority of which have severed file links and may not open properly. *Id.* at ¶¶ 21-22.

### E. Subsequent Communications

In late February 2026, Scott Pilling became aware that counsel for SRM was seeking production of SolidWorks drawing files by IIOVIII in supplemental discovery. *Declaration of*

---

[2] These files were reproduced on October 17, 2025 to correct a file naming issue.

*Scott Pilling*, ¶3. Mr. Pilling searched IIOVIII's archived CAD files in the completed projects folder and did not locate any drawing files. *Id.* ¶4. Based on that search and Mr. Pilling's understanding at the time, Mr. Pilling believed IIOVIII did not keep drawing files, and did not search the engineering working CAD folders. *Id.* That understanding was incorrect: drawing files are kept in the working CAD folders, although they are not archived. *Id.*

### F. November 2026 Production

1,085 SolidWorks drawing (.slddrw) files relating to native CAD models produced in discovery in October 2025 have been located in IIOVIII's working CAD folders. *Declaration of Kenneth Randall*, ¶22; *Declaration of Scott Pilling*, ¶5. Over 80% of those files appear to have severed file links and may not open properly. *Id.* However, in a showing of good faith, IIOVIII is producing those files to SRM's counsel in their existing state, without repair, in supplemental discovery concurrently herewith.[3] *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 "vests district courts 'with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.'" *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1089 (9th Cir. 2025) (citing *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)). Pursuant to Federal Rule of Civil Procedure 34(b)(2)(E), a party must produce documents and electronically stored information "as they are kept in the usual course of business" unless otherwise stipulated or ordered by the court.

Rule 37(b)(2)(A) provides that the court "may issue further just orders" if a party "fails to obey an order to provide or permit discovery[.]" The rule goes on to enumerate a graduated

[3] Since October 2025, IIOVIII has completed the L52 design. In a further showing of good faith, currently available L52 files, consisting of 538 part and assembly files and 344 drawing files, are also being produced to SRM in a separate folder in supplemental discovery concurrently herewith. Those files were gathered using the SolidWorks "Pack and Go" feature, which updates the saved date on some files. *Id.*

menu of available sanctions, including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims" and "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" *Id.*

Under Ninth Circuit precedent, "A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Only willfulness, bad faith, or fault can justify such severe relief, and the court must consider the availability of lesser sanctions. *See id.*

The Ninth Circuit has constructed a five-part test, with three subparts to the fifth part, to determine whether a case-dispositive sanction under Rule 37(b)(2) is just: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003)). "The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions." *Id.*

Rule 37(e), by contrast, prohibits "the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones v. Riot Hosp. Group, LLC*, 95 F.4th 730, 735 (9th Cir. 2024). "Rule 37(e) applies when ESI 'that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery.'" *Id.* at 734–35. There is no evidence that the Scott Pilling Parties willfully destroyed any evidence. In fact, the

record establishes the opposite is true—that evidence was preserved. Rule 37(e) is inapplicable here. Thus, the sanctions enumerated therein, including the presumption and adverse jury instruction described in Rule 37(e)(2), are unavailable to SRM.

## ARGUMENT

SRM's motion for terminating sanctions against the Scott Pilling Parties is heavy on conjecture, but light on supporting facts and prejudice. SRM's motion should be denied for at least three reasons: (1) SRM failed to comply with the procedural prerequisites before filing its discovery motion; (2) the Scott Pilling Parties have in good faith complied with the Court's September 2025 discovery order; and (3) terminating sanctions are unwarranted. Each of the foregoing will be addressed in turn.

### 1. SRM failed to comply with the Court's procedural requirements before filing its motion for terminating sanctions.

As a preliminary matter, SRM failed to comply with the Court's procedural requirements before filing its motion for terminating sanctions. Under District of Idaho Local Rule 37.1, "Before filing any motion relating to discovery under Federal Rules of Civil Procedure 26-37, counsel for the parties must confer, unless exempted by an applicable rule, in a good-faith effort to resolve or narrow any specific discovery issues and/or disputes to the extent possible." The rule clarifies the meaning of the term "confer" as follows:

> To confer means to speak directly with opposing counsel or a self-represented litigant in person, by video, or by telephone, to identify and discuss disputed issues and to make a reasonable effort to resolve the disputed issues. The sending of an electronic or voice-mail communication does not satisfy the requirement to "confer."

Under the Court's Fourth Amended Scheduling Order [Dkt. 157], prior to filing any discovery motions, "[t]he parties will strictly comply with the meet and confer requirements of Local Rule 37.1" and "counsel must certify, not only that they have complied with Local Rule

37.1, but that they have complied with the foregoing procedures." Additionally, "The parties will comply with the procedures established by Magistrate Judge Grasham before filing any discovery motions." *Id.* Generally, those procedures are "for the parties to contact chambers before filing any discovery motion and the law clerk will have a telephonic conference with all counsel to attempt to informally resolve the dispute and/or narrow the issues." *Declaration of Counsel*, ¶7, Exhibit 5.

SRM did not comply with any of the foregoing requirements before filing its motion for terminating sanctions. Apart from exchanging several emails with counsel between February 16 and March 13, 2026, SRM made no efforts to meet and confer following the October 2025 production. No telephone or video conference was held among counsel or the law clerk. Given the complexity of the technical issues raised by this motion and the Scott Pilling Parties' voluntary production of 1,967 additional native SolidWorks files concurrently herewith, it is likely that a law clerk conference would have been productive and resulted in a supplemental production short of motion practice.

**2. The Scott Pilling Parties have complied in good faith with the Court's September 2025 discovery order [Dkt. 121].**

Contrary to SRM's contentions, the Scott Pilling Parties have complied in good faith with the Court's September 10, 2025 discovery order [Dkt. 121]. The purpose of that order was to "ensure the feature trees' function is available." On October 10, 2025, the Scott Pilling Parties produced approximately 1,800 native SolidWorks part and assembly files in discovery. Counsel was notified of a potential file naming issue with the production and promptly reproduced the files on October 17, 2025 to correct that issue. Those are working files with intact design history.

To be clear, at the time of the October 2025 production, IIOVIII was aware that some two-dimensional SolidWorks drawing (.slddrw) files existed in IIOVIII's working CAD folders. But those files have little to no value for purposes of the order. Those files have no independent design history, which is derived from the three-dimensional model files IIOVIII produced in October 2025. In other words, SRM's counsel already has the design history sought by this motion. Over 80% of the files relating to native CAD models produced in discovery in October 2025 appear to have severed file links and may not open properly. However, in a showing of good faith, IIOVIII is producing those files to SRM's counsel in their existing state, without repair, in supplemental discovery concurrently herewith. Since October 2025, IIOVIII has completed the L52 design. In a further showing of good faith, currently available L52 files, consisting of 538 part and assembly files and 344 drawing files, are also being produced in supplemental discovery concurrently herewith.

IIOVIII's failure to produce the two-dimensional drawing files in October 2025 was understandable, given the stated purpose of the discovery order. It was not due to some elaborate plan to deceive SRM. At most, the omission of the drawing files reflected a good-faith understanding that the order's purpose—preserving each design's feature-tree history—was served by producing the native part and assembly files, an understanding that has now been addressed by producing the drawing files as well.

**3. Terminating sanctions are unjustified.**

Even if this Court determines that a violation of the discovery order occurred, terminating sanctions are unjustified. "A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe." *Conn. Gen. Life Ins. Co. v. New Images of*

*Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Only willfulness, bad faith, or fault can justify such severe relief, and the court must consider the availability of lesser sanctions. *See id.*

Just last year, the Ninth Circuit Court of Appeals stated that discovery involving trade secrets in Defend Trade Secrets Act (DTSA) litigation presents a "delicate problem," observing as follows:

> Because trade secrets derive their value from nondisclosure, discovery involving trade secrets presents a delicate problem. That is, how can a court secure the right of one litigant to get relevant and necessary evidence and to protect the other litigant from disclosing secrets which are not relevant and necessary?

*Quintara* at 1088 (citing *Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961)) (internal citations and quotation marks omitted). The court went on to analyze the five (5) factors and held the district court abused its discretion in functionally dismissing a party's claim on the merits—"a fact question . . . that should be resolved on summary judgment or at trial—" as a discovery sanction. *Id.* at 1091 (citing *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658–59 (9th Cir. 2020)). "A dismissal based on a failure to comply with a pretrial order is a harsh penalty that, given its severity, should be dispensed only in a limited set of 'extreme circumstances.'" *Id.* at 1090 (citing *Thompson v. Hous. Auth. of City of L.A.*, 782 F.2d 829, 831 (9th Cir. 1986)).

There is no evidence of willfulness, bad faith, or fault on the part of the Scott Pilling Parties here. At most, the omission of the drawing files reflected a good-faith understanding that the order's purpose—preserving each design's feature-tree history—was served by producing the native part and assembly files in October 2025.

The context of the March 13, 2026 representation by counsel that "no .slddrw SolidWorks files or their equivalents in another program were located" is important. In late

February 2026, Scott Pilling searched IIOVIII's archived CAD files in the completed projects folder, where no drawing files are stored. Based on that search, Mr. Pilling believed IIOVIII did not keep drawing files and did not search the engineering working folders. That understanding was incorrect, but it has now been corrected by the production made concurrently herewith. As with October 2025 production, there is no evidence that this representation was made in bad faith or with any intent to deceive.

The Court never warned the Scott Pilling Parties about the possibility of case-dispositive sanctions, and SRM's delay in filing this motion is notable. Following the undersigned's March 13, 2026 email (referenced above), SRM waited nearly seven months before bringing this motion. SRM's counsel has had the native part and assembly models, together with their complete design history, since October 2025. The drawing files produced concurrently herewith add no additional design history. As SRM's own expert acknowledges, "[t]he drawing file does not contain independent geometry; it references the underlying part or assembly model[.]" Declaration of David Smith [Dkt. 160-2], ¶14. The January 29, 2027 discovery cutoff is still more than two months away, and the depositions of Kenneth Randall and Scott Pilling (scheduled for November 10 and 20, 2026, respectively) have yet to be taken. There is no risk of prejudice to SRM.

SRM's request for an order precluding the Scott Pilling Parties from offering evidence that their machines were independently designed is based on the unwarranted presumption that IIOVIII's designs were copied. There is no direct evidence to support that presumption. A presumption of copying, coupled with a bar on independent-design evidence, would effectively decide SRM's DTSA claim on a discovery motion. SRM's request for terminating sanctions involves factual questions that should be resolved on summary judgment or at trial, not on a

motion for discovery sanctions. The severe and extraordinary relief sought by SRM is unjustified by the facts of this case.

Finally, SRM's request for an award attorney fees should be denied. Under Rule 37(b)(2)(C), an award of expenses or attorney fees is inappropriate if "the failure was substantially justified or other circumstances make an award of expenses unjust." The Scott Pilling Parties reasonably understood the order's stated purpose—functioning feature trees—to be satisfied by the production of native part and assembly models in October 2025. Under the circumstances, an award of attorney fees would be unjust.

## CONCLUSION

The Scott Pilling Parties have complied in good faith with the Court's September 2025 discovery order. Terminating sanctions are unjustified by the facts. The Scott Pilling Parties respectfully request that this Court enter an order denying *Plaintiff's Motion for Discovery Sanctions Against the Scott Pilling Defendants* [Dkt. 160] in its entirety.

DATED this 2nd day of November, 2026.

WRIGHT BROTHERS LAW OFFICE, PLLC

By: */s/ Kyle E. Bastian*
Kyle E. Bastian
*Attorneys for Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC*