Kyle E. Bastian [ISB No. 10059]
WRIGHT BROTHERS LAW OFFICE, PLLC
1440 Blue Lakes Blvd. N., Suite A
P.O. Box 5678
Twin Falls, ID 83303-5678
Telephone No. (208) 733-3107
Fax No. (208) 733-1669
E-mail: kbastian@wrightbrotherslaw.com

*Attorneys for Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BREK PILLING, an individual; SCOTT PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; KODIAK NORTHWEST, INC., and Idaho Corporation; BAUB LLC, an Idaho limited liability company; PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company; BUDGET TRUCK CENTER, LLC, an Idaho limited liability company; SAWTOOTH INDUSTRIAL, LLC, an Idaho limited liability company; IIOVIII PRECISION, LLC, an Idaho limited liability company; INTERMOUNTAIN LIVING, LLC, and Idaho limited liability company; BREK PILLING AS TRUSTEE OF THE PILLING FAMILY TRUST, an Idaho Trust; ARTHUR SADAMPI YAMADA, an individual; GARY WICKERSHAM, an individual; CAROLYN SHOEMAKER, and individual; LURENE DILLE, an individual; DOE DEFENDANTS I-XX; and ROE | Case No. 4:24-cv-00112-DCN<br><br>**DECLARATION OF COUNSEL** |

| | |
|---|---|
| ENTITY DEFENDANTS I-XX,<br><br>Defendants. | |
| SCOTT PILLING, an individual,<br><br>Counterclaimant,<br><br>vs.<br><br>SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>Counterdefendant. | |
| BREK PILLING, an individual; KODIAK AMERICA, LLC, a Delaware limited liability company; and PFT ENVIRO INVESTMENTS, LLC, an Idaho limited liability company,<br><br>Counterclaimants,<br><br>vs.<br><br>SRM-KODIAK AMERICA, LLC, an Idaho limited liability company,<br><br>Counterdefendant. | |

Kyle E. Bastian of Wright Brothers Law Office, PLLC, declares as follows:

1) My name is Kyle E. Bastian. I am an attorney at Wright Brothers Law Office, PLLC, attorneys of record for Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC (collectively, the "Scott Pilling Parties") in this action.

2) I have personal knowledge of the factual information in this declaration.

3) On December 3, 2024, I attended the videotaped deposition of Wayne Powell on behalf of the Scott Pilling Parties. Daniel Biddulph of Parsons Behle & Latimer was present on

behalf of Plaintiff SRM-Kodiak America, LLC ("SRM") and Mr. Powell. Attached hereto as **Exhibit 1** are true and correct copies of pages 12–13 and 152–156 from the confidential transcript of said deposition.

4) On October 7, 2026, I took the videotaped deposition of Jody Young on behalf of the Scott Pilling Parties. Mr. Biddulph was present on behalf of SRM and Mr. Young. Attached hereto as **Exhibit 2** are true and correct copies of pages 98–99 from the confidential transcript of said deposition.

5) On October 8, 2026, I took the videotaped deposition of Trevor Rice on behalf of the Scott Pilling Parties. Mr. Biddulph was present on behalf of SRM and Mr. Rice. Attached hereto as **Exhibit 3** are true and correct copies of pages 39–41 from the confidential, AEO redacted transcript of said deposition.

6) On October 9, 2026, I took the videotaped deposition of Tyler Groves on behalf of the Scott Pilling Parties. Mr. Biddulph was present on behalf of SRM and Mr. Groves. Attached hereto as **Exhibit 4** are true and correct copies of pages 74–77, 94–101, 162–169, and 186–189, from the confidential, AEO redacted transcript of said deposition.

7) Attached hereto as **Exhibit 5** is a true and correct copy of email correspondence I received from Judge Grasham's law clerk, Lauri Thompson, on May 21, 2025.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on this 2nd day of November, 2026.

WRIGHT BROTHERS LAW OFFICE, PLLC

By: *_/s/ Kyle E. Bastian_*
Kyle E. Bastian
*Attorneys for Scott Pilling, Sawtooth Industrial, LLC, IIOVIII Precision, LLC, and Intermountain Living, LLC*

# Exhibit 1

A. I understand.
Q. I know why we're here, Mr. Powell.
A. Good. Okay.
Q. How many times have you been deposed in your life?
A. Three.
Q. When was the last one?
A. Ten -- 19 years ago.
Q. Okay. And you're telling us there's no reason why you didn't want to review any documents and have a good memory for us today?
A. Sir, I'm here to give my deposition, and that's what I'm here to do.
MR. BIDDULPH: And I just want on the record, same objection. I think he's answered your question, Counsel. I think we're baselessly digging in to hypotheticals, and I think just move forward with your questions.
Q. (BY MR. MORRIS) Is there a reason why you haven't tried to refresh your memory with any documents?
A. No.
Q. Okay. You're the one that signed or verified the complaint that was filed in this case, aren't you?



Page 12

A. Yes. If my signature is on it, I did.

MR. MORRIS: Well, Counsel on Zoom, I'm showing the witness the Verified Complaint and Demand for Jury Trial. I don't feel like I need to make it an exhibit since it's already a document of record.

THE WITNESS: Okay.

Q. (BY MR. MORRIS) If you'll go to page 54 of the document. I'm not sure you're on the right page.

A. I see it here.

Yes, that is my signature.

Q. Okay. Do you know why you were the one to verify the complaint that was filed in this case?

A. Yes, because I'm chairman of the board of SRM Holdings.

Q. What is the business of SRM-Kodiak America?

A. Building snow blowing equipment.

(Mr. Cutler joined the Zoom.)

Q. (BY MR. MORRIS) Is that its only business?

A. Snow-related blowing, brooms, those types of things, yes.

Q. Okay. How long has SRM-Kodiak been in the snow blowing machinery business?



Page 13

MR. BIDDULPH: Object to form.

THE WITNESS: Prior to the -- prior to Scott resigning his position as an independent contractor, we were in a meeting where it was brought up that we were aware that he went to India. He told us that he was there because he didn't think we wanted to work, da, da, da. About halfway through that meeting he switches and goes, "Oh, I was really there for you."

So our intent is he has already invested time to go to India. He has now resigned and left the company. There are two Indian guys that happened to be in Burley, Idaho, at a snow blowing company that I don't have firsthand knowledge of but secondhand knowledge that had reported being here. So do I feel -- and I'm very comfortable that will come out during this hearing.

Q. (BY MR. BASTIAN) But you don't have any personal knowledge with respect to this allegation in 197, correct?

A. Under the term of what we're talking about, no.

Q. Okay. And let me ask you: You do acknowledge that Scott presented Elecon as an opportunity to SRM's board at some point, correct?

A. He -- well, it was because we heard



Page 152

about it, and we called him in. So it was not a voluntary, number one. We called him in and was like, "Hey, man, we hear this is going on."

He started telling us about his -- that he was planning on -- you know, we weren't interested in this, da, da, da, and then later on we're like, "We've never given you permission to promote our product, our" -- because we really knew it wasn't our product that he was promoting. At that point, "So what I was actually doing was advanced work for y'all and I was going to get this package together and bring it back to you."

Q. Can you tell me when that meeting took place, approximately?

A. It was within the 60 days of his termination -- or, excuse me, his resignation.

Q. Prior to his resignation?

A. That is correct.

Q. All right. And did SRM's board ever make a decision as to whether they wanted to pursue the Elecon opportunity?

A. The Elecon opportunity was continued to be discussed, then he resigned, he went off on his own, and we know where that stands today.

Q. But wouldn't you agree that SRM's board,



Page 153

at some point in the first half of 2023, made the decision to not move forward with that Elecon opportunity?

A. I would not make that testimony.

Q. So what was the decision with respect to Elecon prior to Scott's resignation?

A. It was out there trying to figure out what was actually happening because we weren't sure where the truth was.

Q. Is it your testimony as you sit here today, that SRM's board made no decision on that opportunity prior to Scott resigning?

A. As I recall, that is correct.

Q. Did SRM's board ever make a decision about that opportunity?

A. It never become -- it never became a viability because, as you're well aware, and what we allege in our complaint is Scott left and went off on his own and went to India to pursue that opportunity on his own.

Q. And after Scott resigned, did SRM's board make any decision with respect to that -- the India or the Elecon opportunity?

MR. BIDDULPH: Object to form.

THE WITNESS: Well, if the Elecon opportunity



Page 154

was available, we could pursue it today. So the point is there was no action taken because there was no action to take.

Q. (BY MR. BASTIAN) Let's go to 212. There's an allegation 212 that "Scott sent competing quotes to representatives of Wolf Creek Ski Area, the Jackson Hole Airport, Conam Company, and FAA in Vancouver."

Do you see that?

A. I do see that.

Q. Do you have any personal knowledge about any of those quotes or anything related to that?

A. In our complaint, we have that outlined. Personally, I was not involved in receiving the information. I was on the other end when he sent it, so no.

Q. And you would have personal knowledge about that?

A. Well, we have the information in our complaint. So the personal knowledge, the way you're asking your question, would only be Scott. But we have the complaint, we have the information from the forensic experts.

Q. Okay. But that's not your personal knowledge, correct?



Page 155

A. That we have the information for the forensic expert?

Q. That information from a forensic expert, that's not based on your personal knowledge, correct?

A. Yeah, because you asked the question two different ways. I did not -- based on the way I have to answer the question, I do not have firsthand knowledge, but it will come out in the documents.

Q. And paragraph 213, the next paragraph alleges that Scott and others acting in concert with him continue to make false and misleading statements to the public.

A. As I've stated --

Q. Do you have any personal knowledge on that?

A. As I have stated before, the information will continue to come out that we already have. Personal knowledge, I was not there to overhear it. So no, I do not have personal knowledge.

Q. And do you know who would have personal knowledge about that?

A. As we say in our complaint, it would be the information we have in our complaint.

Q. Go to 225. You were asked about this. I'm going to ask a slightly different question. So



Page 156

# Exhibit 2

12:10:51 **is exactly like Kodiak? Is that your testimony?**
12:10:56 A. From my knowledge, yeah. I mean, it looks like a Kodiak machine.
12:11:10 **Q. Let's go to Exhibit Number 5. Can you tell me what that shows?**
12:11:21 A. This shows the front of the loader mount.
12:11:25 **Q. And same question on this one. Can you identify anything in this picture that could not be built without Kodiak IP?**
12:11:33 A. The gearbox.
12:11:37 **Q. And how do you know that that could not be built that way --**
12:11:41 A. And the ribbons, the way the ribbons twist and stuff, you're not going to be able to get that without a drawing.
12:11:48 **Q. How are those ribbons made, do you know?**
12:11:51 MR. BIDDULPH: Object to form.
12:11:52 THE WITNESS: You already asked that question. They're cut with a plas table and then they're put through --
12:11:58
12:11:58 BY MR. BASTIAN:
12:11:58 **Q. I recall, I recall your testimony about that.**
12:12:00 **So if you have a plas table, could you do it that way without a drawing?**

12:12:04 A. No. You need to have a DXF, which is created from a model, to be able to cut it.
12:12:10 **Q. And you're talking about SOLIDWORKS when you say that, right?**
12:12:14 A. Any CAD program.
12:12:16 **Q. Okay. How much experience do you have with those CAD programs?**
12:12:19 A. Not much.
12:12:20 **Q. Can you tell me the extent of your experience, generally?**
12:12:22 A. So we used eDrawings to view all of our drawings for Double L. And I use it today for all the models we do in my current position.
12:12:31 **Q. Okay. And the program you're using today, is that essentially the same programming as the -- that was being used by SRM when you were there?**
12:12:38 A. Yeah.
12:12:48 **Q. Do you know what the term "flights" means?**
12:12:51 A. Yeah.
12:12:52 **Q. What are flights?**
12:12:53 A. That's the ribbon.
12:12:55 **Q. So are you using those two terms interchangeably?**
12:12:59 A. Yeah.
12:12:59 **Q. Yeah. And when I say, the flights are built**

# Exhibit 3

Q. Were you present for the signing of that agreement?
A. No.
Q. You were not?
Do you have any knowledge about different versions of that agreement being brought to the signing?
A. No.
MR. BIDDULPH: Object to form.

BY MR. BASTIAN:
Q. So it's your testimony you have no knowledge whatsoever about the execution of that agreement?
MR. BIDDULPH: Object to form.
THE WITNESS: That would be correct.

BY MR. BASTIAN:
Q. All right. I want to talk to you about SRM-Kodiak's IT systems, and I want to start with some general questions about the systems.
When did you -- when did you first become involved with overseeing those systems?
A. December of 2021.
Q. All right. And can you tell me what those systems were at that point in time?

MR. BIDDULPH: I'm going to object to form.

THE WITNESS: At that time, like, how they were set up --

BY MR. BASTIAN:

**Q. Yes.**

A. -- or how they were configured?

**Q. Both.**

A. They were set up -- when I took over, they were in a old server that was, at that time, under my knowledge, SRM-Kodiak's property. And I worked with another firm that also helped with IT work to migrate all engineering files that were possible to a more secure file vault that Double L was using that kept revision control.

**Q. And so, that migration that took place, I'm going to talk to you about where the files came from.**

**You said that it was your understanding that SRM-Kodiak had access to that server, right?**

A. Correct.

MR. BIDDULPH: Object to form.

BY MR. BASTIAN:

**Q. And so, what was that server?**

MR. BIDDULPH: Just slow down a little bit so

I can get my objections in.

THE WITNESS: Okay. The server was a Dell server running on 2019 Server Essentials with just a single large drive and no backups.

BY MR. BASTIAN:

**Q. And how were those files being stored?**

A. Just with user sign-in access that was given.

**Q. Okay. And how was that server designated at that point in time?**

A. It was designated by me and the IT firm that it was a security risk.

**Q. Why was it a security risk?**

A. Because it could not be joined to the domain as a proper thing, so it was decommissioned very shortly after I took over. And everything was moved from it to the domain which had better security protocols that we had set up.

**Q. And the new domain with better security protocols, how was that set up?**

A. It was set up as a restricted domain computer access. So only computers and users with given folder permissions could access the files as they were given permission requested by management.

**Q. When did that first -- when did that server**

# Exhibit 4

**snowblower. You don't have documentation for that, right? So how do you go about doing that?**

MR. BIDDULPH: Object to form.

THE WITNESS: Kodiak builds a lot of fans, and this is a good example of we have a customer who has a unit; the documentation was not preserved for, maybe, which fan they built. And we make a judgment based on other documents we have for how that fan could be recreated. So Kodiak largely uses their archived drawings as references for how to build another fan. So we would use our internal documents to create that fan. We would not measure a fan in order to replicate the fan.

BY MR. BASTIAN:

**Q. And my question, really, is about what if you don't have any internal documentation whatsoever for the part that the customer's asking for? It could be anything; it could be a fan or something else. How do you go about doing that?**

MR. BIDDULPH: Object to form.

THE WITNESS: I would say we do have some level of documentation. The quality may not be what we would like due to the age of the drawing; it may be a handwritten drawing; it maybe has a few details that we

can enhance with the computer-aided design. But I would say Kodiak has enough information that we can extract from the archives to recreate or design components for Kodiak equipment.

BY MR. BASTIAN:

**Q. And we're going to -- in a little bit we're going to talk more specifically about the older documentation, but --**

A. Okay.

**Q. -- generally speaking, the older Kodiak documentation, to your knowledge, are there mistakes in those documents?**

A. There's mistakes in all documents.

**Q. And so, if the document, if the engineering document has a mistake in it, that's not going to be super useful if you're trying to replicate that item, is it?**

A. Let me clarify. When I say, "mistakes in all documents," I'm referring to globally, documents, right? The White House produces documents that have errors, right? The engineering documentation, if it's digital, which is highly advantageous, they may leave off information, but it is very easy to provide the missing information. So if I create a drawing, and the

drawing has two dimensions that show the size of a box, boxes are defined by three dimensions. It's very easy, with a CAD file, to pull that third dimension.

And so, I would say that even though the information may be incomplete, and you can -- but it is very easy with digital documentation to get the information you need to create the item that you're looking for.

**Q. Does a drawing exist for every part, every Kodiak part, to your knowledge?**

A. Every part, no. There are parts that we do not intend to create. Wires, for example. It's not worth engineer's time to create a part for a wire that costs very little. But for major components that define the structure, Kodiak, as any engineering company, would define those parts and have a bill of material for those.

**Q. And I think you mentioned, I think you touched on the difference between 3-D and 2-D modeling, correct?**

A. Mm-hmm.

COURT REPORTER: Was that a "yes"?

THE WITNESS: Pardon me?

COURT REPORTER: Was that a "yes"?

THE WITNESS: Maybe ask the question again so

we're on the same page.

BY MR. BASTIAN:

**Q. Yeah. So just be careful about that.**
**I think you did mention earlier the difference -- you testified about 3-D models, I think, right?**

A. Yeah. So I work with both 3-dimensional and 2-dimensional models. And the software I brought up, primarily one was a 2-dimensional and one was 3-dimensional.

**Q. And 3 dimensional, that would be in CAD, right?**

A. So CAD is computer-aided design, which could be 2-D or 3-D. So CAD is not differentiated between dimensions.

**Q. Do 3-D models exist for every Kodiak part, to your knowledge?**

A. No, there is not drawings for every component.

**Q. So if you don't have a drawing for a component that you want to manufacture on the engineering side, how do you go about doing that?**

A. Some models aren't required. If I buy a bearing, for example, from somebody off the shelf, I

time's 1:02.

BY MR. BASTIAN:

**Q. Thank you.**

**All right, Tyler. You're still under oath, I wanted to remind you. I have a couple of follow-up questions, then we'll get to some exhibits here.**

**So I wanted to rewind back to the time that you were first hired as engineering manager at SRM-Kodiak. I have some questions for you about CAD files at that point in time. I think you said September/October time frame 2022; is that -- is that right?**

A. Mm-hmm.

COURT REPORTER: Is that "yes"?

THE WITNESS: Yes.

BY MR. BASTIAN:

**Q. So did you have access to the CAD files at that point in time --**

A. Yes.

**Q. -- that were owned by SRM-Kodiak?**

A. Yes.

**Q. So I want to ask you, first of all, about 3-D CAD files.**

**Based on your access to those documents at that point in time, can you confirm whether all 3-D CAD files were 100 percent accurate at that point in time?**

MR. BIDDULPH: Object to form.

THE WITNESS: I guess that's -- I wouldn't say a loaded question, but there was Double L CAD files, there was Hagoth CAD files, there was Kodiak files. I think there was probably 40,000 different files at Snake River Manufacturing. And to indicate they were complete or incomplete, I can't say that they were all complete because the volume of the files, but I would indicate that they weren't perfect.

BY MR. BASTIAN:

**Q. What about the 2-D CAD files, same questions for those.**

MR. BIDDULPH: Same objection.

THE WITNESS: Majority of the CAD files, whether they were Kodiak, Hagoth, or Double L, natively are three dimensional and you create a two-dimensional view from those files.

BY MR. BASTIAN:

**Q. Are there any standalone 2-D CAD files in that system? And I'll be specific on the time frame.**

**As of the time that you were first hired as an engineering manager, to your knowledge at that point in time, were there standalone 2-D CAD files or were they all tied to 3-D CAD files?**

A. Kodiak uses SOLIDWORKS, which is inherently a three-dimensional CAD file system. I don't think Kodiak or Double L uses any software that is two dimensional. Now, with that said --

MR. BIDDULPH: Can we just hold on a minute? If we're going the start getting into specifics of Kodiak CAD files and stuff, then we need to at least mark the deposition as confidential if we're going to start getting into specifics and operations and what they do.

MR. BASTIAN: That's your prerogative, Dan.

MR. BIDDULPH: Yeah.

MR. BASTIAN: And so, where I'm at right now were those were the questions I had for him on the CAD files. I don't intend to go anymore in-depth than that --

MR. BIDDULPH: Okay.

MR. BASTIAN: -- I just need an answer to the question and I'm prepared to move on.

MR. BIDDULPH: Okay.

THE WITNESS: So -- so SOLIDWORKS is a

3-dimensional software. In order to -- there are derivative files that are within the Kodiak system, and they are referred to as a DXF file, but they are derived from the 3-D CAD files. So you could not have the DXF file without the 3-D --

BY MR. BASTIAN:

**Q. Thank you.**

A. -- CAD file.

**Q. We'll go ahead and move on.**

**You testified previously about measuring tools. You went through some of the measuring that you're familiar with. You recall that testimony?**

A. Yes.

**Q. And so, I want to circle back to that briefly.**

**I think during that testimony, you mentioned depending on the tool you're using, you talked about how close you could get to replicating an item, correct?**

A. Yes.

**Q. And so, my follow-up question on that is if -- I wondered if you could walk through the tools that you had mentioned. I think you talked about a tape measure, you talked about caliper, you talked**

**about digital scan. And so, for those tools, each of those, how close can you get? What's the tolerance in your --**

A. Sure.

**Q. -- to your knowledge?**

A. Tape measure, you could probably get within maybe a 64th of an inch. Most people probably are only going to get within maybe even a 16th. A lot of tape measures don't even have increments that go the 64th. Most of them are maybe a 32nd, but a lot them are only 16th graduations on the tape measure. But if I was to measure one of those, I would have a picture. Typically, I would take a picture of object, and I would handwrite all of the dimensions that I was copying, if you will. And I would have a record of all of those notes that were used to copy said item, and then I would transfer that into the computer.

I don't think there's -- the way that the metal is cut today, you can't get a quality cut without using CNC equipment, which is computer-numerically controlled. And in order to have that computer cut the metal, somebody, an engineer or draftsman, has to take those handwritten notes, if that's what they are, and put them into the computer, such as SOLIDWORKS, and there would be a paper trail of that recreation, if you

will.

**Q. And so, I think you said 1/64th of an inch with a tape measure. What about the caliper? Am I saying that right, caliper?**

A. Yeah, caliper.

Well, calipers can typically only go about six inches. And then beyond that, the calipers are more difficult to obtain, and I don't think calipers even could measure the size of a fan like what we have in terms of diameter.

**Q. And the digital scan, what would be the tolerance for that?**

MR. BIDDULPH: Object to form.

THE WITNESS: I don't know the tolerance. I will say they're quite good and there's a lot of data that is generated when a 3-D scan is created and is very traceable if that type of reverse engineering tool was used.

BY MR. BASTIAN:

**Q. Now, if we're talking about the first method, the tape measure that you mentioned before, I think you said tolerance would be about 1/64th of an inch, correct?**

MR. BIDDULPH: Object to form.

THE WITNESS: I think the tape measure I have at my house probably doesn't go that tight. But you could, I believe, yes, you could go that close.

BY MR. BASTIAN:

**Q. And so, that process of reverse engineering, does that -- I mean, I'm going to use the "term trial and error." Would it be accurate to say the process is kind of like that when you're using the tape measure, kind of trial-and-error type process?**

MR. BIDDULPH: Object to the form.

THE WITNESS: I hope not. I would expect whoever's measuring is more competent than trial and error.

BY MR. BASTIAN:

**Q. Because when you do trail and error, you may be wasting materials and things like that, right?**

A. Correct.

**Q. Okay. But as far as going through that process, I mean, in the context of manufacturing and your experience as an engineer, is that how it plays out sometimes?**

A. I'm going to rewind a little bit on the measuring tools. I did go on site to look at the

equipment, and all I was allowed to use was a tape measure and small set of calipers. The components that I would like to have measured were all internal -- gearboxes, clutch housings -- and those were things I did not have access to. Had I was to reverse engineer those, I would not have used the tools I indicated.

**Q. And are you talking about the July 2025 visit?**

A. When I was on site in Paul?

**Q. Correct.**

A. If that's the date, then yes.

**Q. Okay. And we're going to get to that, so I'll circle back on that part of it.**

**What I would like to do now is ask about your level of involvement, your knowledge, if you have any, regarding moving assets out of the Paul facility. And this is something that occurred back in the period right after the acquisition before you started. And so, my question is: Do you have any knowledge about that process?**

MR. BIDDULPH: Object to form.

THE WITNESS: Process, no. Did I know it happened? Yes. Time frames, no. You know, I knew it happened before I got there. Probably within the time SRM acquired Kodiak and the time I started, there was a

went to see the equipment I don't think I officially met him, but I saw him and there may have been a greeting in passing.

**Q. And apart from the people we're already talked about, do you recall anyone else being there?**

A. No, nobody that would be involved in this.

MR. BIDDULPH: Just for the record, I just want clarification. Are you saying that you went over to the marina with them, or they were there?

THE WITNESS: They were there. The machine was being operated in the river, in a testing environment, I presume, and I drove over there -- I believe I was with Jonathon or another individual from SRM -- to see the equipment, see the piece of equipment.

BY MR. BASTIAN:

**Q. And so, to your knowledge, was anyone else there beyond who you talked about?**

A. No.

**Q. And with regard to your time at the marina, how long were you there for you think?**

A. 15 minutes.

**Q. Okay. How far away from the machine were you, approximately?**

A. I could have touched it.
**Q. Okay. Were you able to observe the entire machine?**
A. Three sides of it.
**Q. What side did you not observe?**
A. The side that was in the water.
**Q. And what part of the machine was in the water?**
A. The front.
**Q. What components were in the water?**
A. The wheels up to the gearbox.
**Q. Okay. Anything else you couldn't observe on the machine?**
A. A lot of internal components on the machine that you can't see without taking it apart. I couldn't observe those.
**Q. Okay. And do you recall any conversations that took place when you were there?**
A. There was some, we'll call them pleasantries that were exchanged between the Snake River Manufacturing employees and Scott, and maybe Gary, as well. Since I didn't know Randall, I didn't interact with him.
**Q. Did you -- do you recall anything that was said at that time?**

A. There was some indication, I believe by Scott, that they were testing a new piece of equipment and he seemed awfully proud of it.

**Q. Okay. Anything else you recall about what was said?**

A. No.

**Q. I would like to go to paragraph 9 of that same declaration. And in this paragraph, you're referring to this sealed Exhibit 1, which is not included here because it's attorneys' eyes only, a snowblower comparative document that you created based on pictures you took. And then you reference, looks like, five models there, correct?**

A. Yes.

**Q. And the drawings that you're referring to here, do you have any understanding as to when those were created or who created them?**

A. Not without looking at the drawing and seeing who the engineer was or the date. I presume, based on the K21400, it's a newer document, but I can't put it into context without referencing the parts database that we have or looking at the drawing so...

**Q. Okay. And then, I'll ask you about paragraph 10 with -- and I'm going to ask you about the last part of that where you say, "I could provide measurements**

**and other data to this Court to further evidence that the designs of the depicted Sawtooth machine are SRM's proprietary designs."**

**Do you see that?**

A. Which paragraph is that?

**Q. That's going to be paragraph 10, but the last part of that paragraph.**

A. Yes.

**Q. Okay. And so, with regard to that -- to that statement, did you ever provide measurements or other data to further evidence the designs?**

A. I was allowed access to the machine for a short period of time. And in that period of time, I was able to acquire, I would say, macro level measurements of the equipment, but I was not able to access or measure many components that are of a higher tolerance level due to the disassembly required in order to gain access to that.

**Q. So here's where I'm going to ask you about what happened in July of 2025, the meeting where you went and observed the machine we're talking about, correct?**

A. The one in the water --

**Q. Yes.**

A. -- at the time? Okay.

**Q. That was provided so you could observe that. How long were you able to access that machine for?**

A. I didn't access it, I simply observed it for a short period of time, 15, 15 minutes, maybe a little longer.

**Q. Okay. What measuring devices did you bring to that visit?**

MR. BIDDULPH: Objection. You guys are clearly talking about two totally separate periods. Like, I think you're talking about at the Paul facility, he's clearly talking about the river, so you've got get in sync.

MR. BASTIAN: I -- so I said July 2025. I think we have an understanding --

MR. BIDDULPH: Clearly, that wasn't being followed.

THE WITNESS: Is this in the water at the time, at the river --

BY MR. BASTIAN:

**Q. Let me be clear.**

**And I appreciate the clarification, Dan.**

**So I'm talking now, not about the river, because I understand your testimony about that.**

A. Sure.

**Q. What I'm asking about now is your visit to Paul, when you were able to either observe or access this machine we're talking about later on, right?**

A. Okay. Sure.

**Q. So my questions are about that visit. Does make sense?**

A. Yes.

**Q. So, regarding that visit, were you able to, in fact, access the machine at that point in time?**

A. Yes.

**Q. To what extent?**

A. I was able to access the exterior, if you will, of the machine. I was able to observe the reels, the center drive gearbox, overall shape of the machine. And I could get a glimpse, if I looked through some cracks on the machine, of some of the internals, which are the most critical components of a snowblower.

It's like looking at a car. I can see the shape of it, but I can't see the insides. And what's inside is really what's critical.

**Q. I don't recall if I asked you this, but about how long did you have to access the machine on that date?**

A. It was a couple of hours.

**Q. Who was with you at the time?**

A. Kameron Bolster. I believe it was David. I can't phone a friend, but it was another engineer that had been invited to participate, as well as Dan, the attorney. And Scott was there, as well as, I believe it was Randall, but I can't be for sure.

**Q. Because you never actually met him before, correct?**

A. Correct.

**Q. All right. To your knowledge, was anyone else present at that time?**

A. There may have been an employee or somebody passed through, but I don't think anybody was on site as part of this inspection.

**Q. And did you bring any measuring tools with you?**

A. Yes.

**Q. Which ones did you bring?**

A. Calipers and a tape measure.

**Q. Anything else?**

A. That's all I brought. I know David brought other equipment, but I only brought calipers and a tape measure because that is the only equipment that I needed in order to identify whether or not the parts on the equipment were comparable or matched those of Kodiak.

**Q. And so, let me ask you with regard to was there an digital scanner that was brought?**

A. I believe there was.

**Q. Okay. And so, let me talk to you about the devices you brought, the calipers and the tape measure. Can you identify which components you measured?**

A. The most visibly identifiable components were the things that I focused on, although may not have been the most significant component of the machine. The cutter bars were one of the aspects of the machine that were virtually identical to those of Kodiak --

**Q. So I'm just asking you to identify the components that you measured. That's the scope of my question right now.**

A. I believe I --

MR. BIDDULPH: Objection. I think he was answering it.

THE WITNESS: I believe I submitted a document with comparables on what was measured and how they compared with Kodiak's equipment. Because the shape of the machine is not dimensional, it's not square, it wasn't easy to obtain the measurements to reverse engineer, it I would say.

BY MR. BASTIAN:

THE WITNESS: We do that today. We use those files, even if they're imperfect, and we build equipment.

BY MR. BASTIAN:

**Q. So if they're imperfect, what else do you need to build a machine?**

A. When it comes to manufacturing, we want to build the best machine as quickly as possible for the least amount of money. So it wasn't known to me when I started that there were issues with the files that would impede efficient manufacturing. Kodiak, SRM, was able to build equipment despite those files being imperfect.

**Q. And how -- I mean, how do you build a machine when the files are imperfect?**

A. You have employees who have skills who can overcome those gaps.

**Q. They fill the gaps, right?**

A. To some degree, yes.

**Q. With tribal knowledge?**

A. Sometimes with tribal knowledge, but tribal knowledge only makes up a small percentage of a piece of equipment.

**Q. But it comes into play, at least, right?**

A. In the quality and draftsmanship, absolutely.

**Q. Okay.**

A. But in the overall design of the equipment, no, I think that is driven by the engineering team. And those files are transferred digitally from the engineers to those people with the equipment, the CNC equipment, in order to generate or build specific parts.

**Q. Later on here, Tyler, you state that "...many parts lack sufficient information to duplicate them exactly."**

**Correct?**

A. Where did I state that?

**Q. It's later on in paragraph 8, around the middle.**

A. Okay. So it's referring to one specific drawing, if I'm not mistaken. Do we have that drawing, K10968?

**Q. Let me just read this sentence to you.**

A. Okay.

**Q. "If parts were recreated using paper drawings, there would be differences in how the parts were digitized because many parts lack sufficient information to duplicate them exactly."**

**Did I read that correctly?**

A. Yes.

**Q. And so, my question is about your statement here that many parts lack sufficient information to duplicate them exactly. And so my question is: If those parts lack sufficient information, then they can't be relied upon solely to build a machine; is that right?**

MR. BIDDULPH: Object to form.

THE WITNESS: The engineering department maintains SOLIDWORKS files that shows the three-dimensional geometry of the file. That's what I work on.

BY MR. BASTIAN:

**Q. Right.**

A. There are programmers within Kodiak who have very specific programs that manufacture those parts. That's why Christensen Machine called Snake River Manufacturing. They didn't have the program to recreate that file. So there are files, yes, that are not transcribed in a two-dimensional form, but Kodiak has computer programs, CNC G-code files, that allow us to create those files.

And this is where other employees who have more expertise in the machining side of the place could

give you a lot more information about what we do and we don't have, because a physical paper is not the full picture of how these parts were made. And it has been over time, in which thousands of programs have been written in order for Kodiak to produce the thousands of unique parts that they have in their inventory or they have in their intellectual library.

**Q. All right. Next question's going to be on the following paragraph. Paragraph 9 states that on December 21st, 2022, you visited the Paul facility.**

**Prior to your visit on December 21st, 2022, had you ever visited the Paul facility?**

A. I had driven past it. I was curious what was inside.

**Q. I'm sure you were.**

A. But I never had permission or a reason to go. So before then, no.

**Q. All right. And then you state here that you took photographs of the state of the Paul facility. I want to circle back to what you said previously about I believe this visit.**

**And, correct me if I'm wrong, but I believe that your prior testimony was that you entered every room in this facility; is that accurate?**

A. I'm not familiar with the building. I walked

# Exhibit 5

**Kyle Bastian**

---

**From:** L Thompson <Lauri_Thompson@id.uscourts.gov>
**Sent:** Wednesday, May 21, 2025 4:15 PM
**To:** jcutler_parsonsbehle_com; Katelyn De La Cruz
**Cc:** Kyle Bastian; Daniel Biddulph; Gabe Davis; Leah Trahan; Davonna Wolff; Kenna Burgie
**Subject:** RE:

Counsel –

I am Judge Grasham's law clerk assigned to this case. As Katelyn stated in her email, Judge Grasham will be resolving the Motion to Compel (Dkt. 103) and the Motion to Seal (Dkt. 106).

Generally speaking, Judge Grasham's practice for addressing discovery disputes is for the parties to contact chambers before filing any discovery motion and the law clerk will have a telephonic conference with all counsel to attempt to informally resolve the dispute and/or narrow the issues. Because the Motion to Compel and Motion to Seal have already been filed and the parties have represented they have made previous efforts to confer, Judge Grasham will take up the motions once they are fully briefed. After reviewing the briefing, we will advise the parties as to whether any hearing on the motions will be held.

Please feel free to contact me regarding any discovery matters.

Thank you,
Lauri

Lauri Thompson
Staff Attorney for Hon. Debora K. Grasham
U.S. Courts, District of Idaho
lauri_thompson@id.uscourts.gov
(208) 334-9403

---

**From:** John E. Cutler <JCutler@parsonsbehle.com>
**Sent:** Wednesday, May 21, 2025 10:01 AM
**To:** Katelyn De La Cruz <Katelyn_DeLaCruz@id.uscourts.gov>
**Cc:** L Thompson <Lauri_Thompson@id.uscourts.gov>; Kyle Bastian <kbastian@wrightbrotherslaw.com>; Daniel Biddulph <DBiddulph@parsonsbehle.com>; Gabe Davis <GDavis@parsonsbehle.com>; Leah Trahan <LTrahan@parsonsbehle.com>; Davonna Wolff <DWolff@parsonsbehle.com>; Kenna Burgie <KBurgie@parsonsbehle.com>
**Subject:** Re:

**CAUTION - EXTERNAL:**

Katie,

I apologize on behalf of Plaintiff, for the misunderstanding surrounding the Court's comments at the end of the hearing with respect to law clerk mediation conferences and appointment of a magistrate judge over discovery. It wasn't until after sending the email and subsequently reviewing the transcript that I recalled that the discussion on referral to a magistrate was off the record and not part of the court's oral decision. That was my mistake, and I appreciate the clarification. Given that we have not received any response to our request to schedule the inspection on May 27th, despite talking with Scott Pilling's counsel on two occasions about other issues, we anticipate it likely will not happen in time for the reply. So we will proceed with a motion to suspend the time for reply.

Lastly, we are happy to follow any procedure or process that Judge Grasham's chambers has for discovery issues. And we look forward to direction on that moving forward.

Best,

John

Get Outlook for iOS

PARSONS BEHLE & LATIMER

A Professional Law Corporation

**John E. Cutler**
Attorney at Law
**Parsons Behle & Latimer**
350 Memorial Drive, Suite 300 • Idaho Falls, Idaho 83402
Main +1 208.522.6700 • Direct +1 208.528.5223

**parsonsbehle.com** • JCutler@parsonsbehle.com • vCard

**CONFIDENTIALITY NOTICE:** This electronic mail message and any attachment(s) are confidential and may also contain privileged attorney-client information or work product. The message is intended only for the use of the addressee. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you may not use, distribute, or copy this communication. If you have received the message in error, please immediately notify us by reply electronic mail or by telephone at +1 801.532.1234, and delete this original message.

---

**From:** Katelyn De La Cruz <Katelyn_DeLaCruz@id.uscourts.gov>
**Sent:** Wednesday, May 21, 2025 9:38:58 AM
**To:** John E. Cutler <JCutler@parsonsbehle.com>
**Cc:** L Thompson <Lauri_Thompson@id.uscourts.gov>; Kyle Bastian <kbastian@wrightbrotherslaw.com>; Daniel Biddulph <DBiddulph@parsonsbehle.com>; Gabe Davis <GDavis@parsonsbehle.com>; Leah Trahan <LTrahan@parsonsbehle.com>; Davonna Wolff <DWolff@parsonsbehle.com>; Kenna Burgie <KBurgie@parsonsbehle.com>; Kenna Burgie <KBurgie@parsonsbehle.com>
**Subject:**

Good morning John,

Lauri forwarded me your email from Monday afternoon related to the disputes arising in relation to Defendants Motion to Seal (Dkt. 106), and the pending inspection of the snow blower machine at the center of the contempt issue. We want to make sure we are all on the same page, especially here at the beginning where discovery disputes seem to be intertwined with the Motion for Contempt.

First, Judge Nye wanted to clarify that, now that this case has been referred to Judge Grasham for the resolution of discovery disputes, it is completely within her purview to decide what process should be used for the resolution of any issues. At the TRO hearing, Judge Nye informally indicated he would be referring the case to Judge Grasham for discovery resolution because continual informal conferences with his law clerks would likely not be the most efficient way to resolve any issues. He at no point orally ruled that informal law conference requirements of the Court's scheduling order should be dispensed of. Either way, he reiterates that Judge Grasham has complete discretion in resolving disputes moving forward in the way that she sees fit, including requiring informal conferences with her clerks, should she so choose.

Second, Judge Nye will be resolving the Motion to Amend/Correct (Dkt. 61) and the Contempt Motion (Dkt. 88). Judge Grasham will be resolving the Motion to Compel (Dkt. 103) and the Motion to Seal (Dkt. 106). The Motion to Seal is ultimately a discovery issue – whether certain documents are properly designated attorney eyes only under the existing protective order and discovery plan.

Now, turning to your two stated issues John. As the Court has previously indicated, the Contempt Motion and Motion to Compel will be decided in due time, and the Court has declined expediting briefing on either. Additionally, the Court has instructed the parties to conduct the inspection of the snow blower machine in accordance with Rule 34. The Court currently has no indication when you served Defendants with the request for inspection (Rule 34(2)(A)), but the Court's order was issued on May 12, and even if you issued the demand the same day, Defendants would have until June 9 to respond. You have not sought any order from the Court that would shorten said timeline. While you might seek an inspection prior to drafting your Reply, compliance with Rule 34 does not dictate such a timeline. If you do not feel that you can properly reply to the Contempt Motion before an inspection, or before a decision is made on the Motion to Seal, you are able to seek a Motion to Stay Reply on the Contempt Motion (which would be handled by Judge Nye).

Ultimately, the Court is just as interested in obtaining swift, fair, and efficient discovery and ultimate resolution of this case as you are. However, the Court is the ultimate determinate in what issues are time-sensitive or otherwise emergent. We are hitting a crossroads where ruling on some of the issues being presented are borderline requiring decisions on the merits of issues in this case, and such decisions are premature. In other words, and to be straightforward, all parties must start legitimately participating in discovery. Judge Grasham is available to help settle genuine disputes, but there seems to be roadblocks in exchanging even the most basic of information. You are all experienced litigators who know how to communicate. Please do so.

At least from Judge Nye's chambers, the Court intends to abide by Local Rule 7.1 moving forward, absent extremely rare circumstances. The parties need to plan accordingly when filing motions in relation to where things are at in discovery.

Best,

**Katie De La Cruz**
**Term Law Clerk**
**Chief Judge David C. Nye**
**U.S. Courts, District of Idaho**
**katelyn_delacruz@id.uscourts.gov**
**(208) 478-8394**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.